UMBERG ZIPSER LLP
Mark A. Finkelstein (SBN 173851)
mfinkelstein@umbergzipser.com
1920 Main Street, Ste. 750
Irvine, CA 92614
Telephone:  (949) 679-0052
Facsimile:  (949) 679-0461

DICKINSON WRIGHT PLLC
James K. Cleland (*Admitted Pro Hac Vice*)
JCleland@dickinson-wright.com
(734) 436-7356
Christopher J. Ryan (*Admitted Pro Hac Vice*)
CRyan@dickinson-wright.com
(734) 623-1907
Yafeez S. Fatabhoy (*Admitted Pro Hac Vice*)
YFatabhoy@dickinson-wright.com
(248) 205-3264
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
Facsimile: (844) 670-6009

*Attorneys for Plaintiff*
*Pensmore Reinforcement Technologies, LLC*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENSMORE REINFORCEMENT TECHNOLOGIES, LLC d/b/a HELIX STEEL,<br><br>Plaintiff,<br><br>v.<br><br>CORNERSTONE MANUFACTURING AND DISTRIBUTION, INC.,<br><br>Defendant. | CASE NO.: 5:21-cv-01556-JWH-SHKx<br><br>**FIRST AMENDED COMPLAINT FOR (1) DIRECT PATENT INFRINGEMENT OF '970 PATENT, (2) INDIRECT PATENT INFRINGEMENT OF '970 PATENT, (3) DIRECT PATENT INFRINGEMENT OF '881 PATENT, (4) INDIRECT INFRINGEMENT OF '881 PATENT, AND (5) COMMON LAW INTERFERENCE WITH CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

NOW    COMES    Plaintiff    PENSMORE    REINFORCEMENT

TECHNOLOGIES, LLC d/b/a HELIX STEEL ("Helix"), by and through its

attorneys, and for its First Amended Complaint against CORNERSTONE MANUFACTURING AND DISTRIBUTION, INC. ("Cornerstone"), states:

## **INTRODUCTION**

1.      This case arises out of Cornerstone's infringement of Helix's patents for Concrete Reinforcing Fibers, US Patent No. 10,266,970 ("'970 Patent") and a Micro-Rebar Concrete Reinforcement System, US Patent No. 9,440,881 ("'881 Patent") and Cornerstone's tortious interference with Helix's customers and/or prospective customers. The '970 and '881 Patents protect Helix's concrete reinforcing Micro Rebar™ products.  Micro Rebar™ is an improved alternative to traditional rebar that consists of thousands of small twisted metal fibers mixed into concrete prior to its application.



Helix's patented concrete reinforcing Micro Rebar™ results in stronger, more durable, and more flexible concrete than traditional rebar, with improved fatigue endurance, crack resistance, impact capacity, energy absorption, and shatter resistance.

2.      Cornerstone's principals, who are also former employees of Helix, used the knowledge they gained during their tenure with Helix to help Cornerstone manufacture, import, market, and sell products that infringe Helix's '970 and '881 Patents.

First Amended Complaint

3.      Cornerstone's infringing product is copied from and highly similar to Helix's MicroRebar reinforcement, and both are covered by the claims of the '970 and '881 Patents:



4.      The Court should enjoin Cornerstone, and compensate Helix for the damage caused to it.

## THE PARTIES

5.      Pensmore Reinforcement Technologies, LLC ("Pensmore") is a limited liability company headquartered in Ann Arbor, Michigan.  It operates under the assumed name Helix Steel ("Helix").  Pensmore was previously known as Polytorx, LLC.

6.      On information and belief, Cornerstone is a California corporation located at 955 Cornerstone Way in the City of Corona, County of Riverside, State of California.   Therefore, Cornerstone resides within the Central District of California.  On information and belief, Cornerstone also operates under the name Badger Forms.  (See Exhibit. A.)

## JURISDICTION AND VENUE

7.      This is a complaint for direct and contributory patent infringement arising under the Patent Act, 35 U.S.C. § 271 *et seq.*  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

8.     Venue is proper in this Court under 28 U.S.C. § 1400(b) because Cornerstone is a California corporation with a regular and established place of business in this District, and therefore resides in this District under 28 U.S.C. §§ 1391(b) and 1400(b), and because Cornerstone has committed acts of infringement in this District, directly and/or through a third party because it manufacturers, makes, imports, sells, offers to sell or uses concrete reinforcing fibers for a variety of concrete applications, including concrete reinforcing twisted steel products identified under names such as Badger 5:25, SteelX, and SteelX 5:25 within this judicial District.  Cornerstone has purposefully directed its activities to this State and this District and/or purposefully availed itself of this jurisdiction.

9.     This Court has jurisdiction over Helix's common law claims because the amount in controversy exceeds $75,000, and the parties are citizens of different states.  28 U.S.C. § 1332.  Further, the Court has supplemental jurisdiction over Helix's common law claims because they are part of the same case or controversy as Helix's federal question claims.  28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Cornerstone for the reasons identified above and according to the laws of the United States.

## **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

### A.     **BACKGROUND**

11.     Helix is a leading provider of concrete reinforcement in the form of twisted steel fibers that are mixed with concrete to make the concrete stronger, more durable, and more flexible.

12.     Helix was founded as part of a project that challenged University of Michigan Engineers to create an alternative to traditional rebar that could provide better flexural strength, resiliency, ductility, and elasticity to concrete structures.

First Amended Complaint



13.    Helix developed its Micro Rebar™ concrete reinforcement, also known as Helix 5-25, Helix 5-25 Micro Rebar™ or Twisted Steel Micro Rebar™. It consists of thousands of small twisted metal fibers that are mixed into concrete prior to application:



First Amended Complaint

14.     Helix invested significant time and resources to develop its concrete reinforcing Micro Rebar™ technology, and underwent stringent testing to ensure safety and efficacy.

15.     Helix's Micro Rebar™ concrete reinforcement technology results in concrete that is stronger, more durable, and more flexible than concrete used with traditional rebar.  Concrete treated with Helix's Micro Rebar™ technology requires less repairs and has a longer lifespan, thus saving time and money.

16.     Helix's Micro Rebar™ concrete reinforcement technology meets building code requirements.  Helix Micro Rebar™ is the first fiber for use in concrete with code approval for structural applications.  Helix Micro Rebar™ also meets ACI, IBC and IRC codes, including those through its two evaluation service reports from ICC-ES AC 470 & ESR-3949, IAPMO EC-015 2016 and ER 279.

17.     Helix manufactures its Micro Rebar™ product in Grand Rapids, Michigan. Helix sells genuine Helix concrete reinforcing products under its trademarks Helix™, Micro Rebar™, Twisted Steel Micro Rebar™, and TSMR™.  Helix sells and distributes its proprietary Micro Rebar™ product worldwide.

18.     Helix's proprietary concrete reinforcing Micro Rebar™ product and technology is protected by various patents, including the '970 and '881 Patents.

19.     Helix's Micro Rebar™ concrete reinforcement is used in interior and exterior settings and in high load applications.  For example, Helix has been used to replace traditional rebar in slabs designed for M1 Abrams Tank traffic by the U.S. Military.

20.     Helix has enjoyed considerable success with its Micro Rebar™ reinforcement technology.  Helix's Micro Rebar™ technology has been used in hundreds of millions of square feet of concrete, and tens of thousands of successful structures.  Helix has enjoyed years of successful applications with a strong record of structural success.

First Amended Complaint

21.     Helix's Micro Rebar™ has been and remains the leading concrete reinforcing twisted steel fiber product of its kind.  Helix's products are known throughout the world to represent genuine, high-quality goods.

**B.     THE PATENTS-IN-SUIT**

22.     The '970 Patent is entitled "Concrete Reinforcing Fibers" and issued on April 23, 2019.  A true and correct copy of '970 Patent, along with its Certificate of Correction, are attached as Exhibit B.

23.     Pensmore Reinforcement Technologies, LLC owns by assignment the entire right, title and interest in and to the '970 Patent.

24.     The '881 Patent is entitled "Micro-Rebar Concrete Reinforcement System" and was issued on September 13, 2016.  A true and correct copy of the '881 Patent is attached as Exhibit C.

25.     Pensmore Reinforcement Technologies, LLC owns by assignment the entire right, title and interest in and to the '881 Patent.

26.     The '970 and '881 Patents protect concrete reinforcing fibers, as well as a method for manufacturing concrete reinforcing fibers and the design class system for micro reinforced concrete.

**C.     CORNERSTONE'S INFRINGEMENT**

27.     Cornerstone is owned and headed by the former vice president of sales and management team member of Helix, Hans Hausfeld.  Cornerstone directly competes with Helix in the market for concrete reinforcing twisted steel fibers.

28.     Cornerstone, frequently operating under the d/b/a name Badger Forms, intentionally targeted, solicited and employs multiple former Helix employees and sales representatives, including at least Jay Middleton, Jeff Knight, and Wes Dees. See, for instance, Exhibit D, showing Cornerstone's U.S. Trademark Reg. No. 5528776 for "Badger Forms."

29.     Cornerstone was built on Helix's technology platform.  In addition to forming its business with former Helix personnel—each has retained confidential and proprietary Helix information—Cornerstone on information and belief arranged for Helix's former manufacturing facility in China to manufacture and import into the United States infringing concrete reinforcing twisted steel fiber products for distribution and sale by Cornerstone.

30.     On information and belief, Cornerstone's infringing concrete reinforcing twisted steel fiber products are made by Helix's proprietary process.

31.     In an attempt to capitalize on Helix's industry recognition and goodwill built up over many years as the leading supplier of concrete reinforcing twisted steel fibers sold under the name Helix 5-25, Cornerstone markets and sells its infringing product under substantially similar names that include, at minimum, Badger 5:25, SteelX 5:25 or SteelX ("Accused Products").  See Exhibit E, Design Process Brochure for SteelX 5:25.

32.     Also on information and belief, Cornerstone partnered with former Helix Australian distributor Reuben Ramsay to sell its infringing concrete reinforcing twisted steel fibers in the United States and Australia under the brand name "SteelX."  See Exhibit F, Cornerstone's U.S. Trademark Reg. No. 6250129 for "SteelX."  See also Exhibit G, specimen of product packaging for SteelX submitted by Cornerstone as evidence to support the U.S. SteelX trademark registration.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22



23       33.    Cornerstone markets and sells the Accused Products through its
24   network of former Helix sales representatives, employees, and associates by
25   claiming that its Accused Products are equivalent to Helix's product, thus
26
27
28

            First Amended Complaint

conceding that its product is nothing more than a re-branded duplicate of Helix's product.

34.   Helix learned that Cornerstone was attempting to introduce a duplicate of Helix's patented Micro Rebar reinforcement into the United States. On February 21, 2020, Helix sent Cornerstone a letter notifying Cornerstone of the '970 and '881 patents, its potential infringement of those patents, and warning Cornerstone that any unauthorized marketing, sale, or offer to sell an infringing concrete reinforcement fiber product into the United States would result in damages and irreparable harm.

35.   Despite possessing knowledge of Helix's '970 and '881 patents, Cornerstone continued with its plans to market, offer to sell and sell the Accused Products in United States, including representing that the Accused Products are the same as Helix's patented Micro Rebar reinforcement.

36.   Helix recently learned that Cornerstone (Badger Forms) is actively marketing and selling the Accused Products in the United States, including to Helix's customers.

37.   For instance, in an August 5, 2020 email from Cornerstone (Badger Forms) principal Jay Middleton to the City of Overland Park, Kansas (a Helix customer), Middleton represented to the City of Overland Park that he used to work for Helix, left Helix, but maintained his commitment to the idea that you can make better concrete with twisted steel fiber in the concrete so "we launched our own brand of that product."  (Exhibit H.)

38.   Cornerstone (Badger Forms) followed up with another email on April 22, 2021 informing the City of Overland Park that "we finally have stock of our twisted steel concrete reinforcement product, called SteelX, here in KC." (Exhibit I.)

39.     In another example, an April 24, 2021 email from Cornerstone (Badger Forms) principal Middleton to the City of Overland Park, Badger claims, asserts and markets the Accused Products as "physically equivalent" to Helix's patented Micro Rebar (TSMR product) described in IAPMO E-015 and ICC AC-470.  See Exhibit J, a portion of which is reproduced below.

From: **Jay Middleton** <jay@badgerforms.com>
Date: Sat, Apr 24, 2021 at 8:10 AM
Subject: Re: acceptable criteria
To: Brown, Jim <jim.brown@opkansas.org>

Hi Jim,

Thank you for being open to discussion on another way to provide you what you need to be comfortable.  Please refer to the attached report from Twining laboratory, which is an approved laboratory for both ICC and IAPMO, this document shows that our Badger 5:25 product (now branded as SteelX) is physically equivalent to a TSMR product that you are familiar with and is also described in the Iapmo E-015 and ICC AC-470 acceptance criteria (let me know if you need copies of those criteria).  For the design procedure and calculations, we followed ACI-332 section 8.2.1.1 MOR calculation method with our product MOR values, the engineering firm was able to confirm the calculations are correct and certifies our SteelX 5:25 Gold with 9 lbs/yd3 meets or exceeds the IRC and ACI standard's required capacity when used and constructed with other details in the foundation drawing (dowels, dead men, etc.). We are hopeful that this clears the way for acceptance of our product on stamped engineering drawings.  Looking forward to your reply.

All the best,
Jay

40.     Recently, on information and belief, Helix learned that Cornerstone (Badger Forms) recently applied for permits for a foundation job in Grain Valley, Missouri using the Accused Products.



41.     On information and belief, Cornerstone (Badger Forms) placed the Accused SteelX Products into foundations in Grain Valley, Missouri.   Also on information and belief, Cornerstone relied on its equivalence to Helix's patented TSMR product covered by the same IAPMO EC-015 standard in order to obtain approval for the permits and job.

42.     Cornerstone markets, sells and/or offers to sell the Accused Products directly to Helix customers and others, including through former Helix personnel who now work for Cornerstone.

43.     Cornerstone's Accused Products infringe one or more claims of the '970 and '881 Patents.

### D.     CORNERSTONE'S TORTIOUS INTERFERENCE

44.     Cornerstone is also intentionally and tortiously interfering with Helix's customers and/or prospective customers.

45.     Cornerstone has intentionally caused and/or induced one or more of Helix's customers and/or distributors to breach Helix's distribution agreements with those customers and/or distributors, including to terminate or decrease their business relationship with Helix.

46.     For example, Helix (which was, at the time, known as Polytorx, LLC) entered into a Distributorship Agreement with Liteform Technologies on June 7, 2013. See Exhibit N ("Liteform Agreement").  Hans Hausfeld signed the Liteform Agreement as a duly authorized officer on behalf of Helix.

47.     The Liteform Agreement provided Liteform with the right to act as a non-exclusive distributor of the Helix 5-25 product in certain regions, and with the right to act as the exclusive distributor of the Helix 5-25 product in other regions.

48.     The Liteform Agreement was for an initial term of one year, which automatically renewed.   Liteform continued to act as a distributor under the

First Amended Complaint

Liteform Agreement for Helix over the past 8 years.  Neither Helix nor Liteform had terminated the Liteform Agreement until recently, when Liteform sent Helix notice that it no longer wished to renew the Liteform Agreement beyond its expiration date in June of 2022.

49.     The Liteform Agreement contains a non-competition clause, which provides that during the term of the agreement and for six months after termination of the agreement, Liteform cannot directly or indirectly represent or sell any product of a company that competes with Helix. (Ex. N, ¶11(b)).  The Liteform Agreement is governed by Michigan law.   (Ex. N, ¶11(g)).

50.     Cornerstone has knowledge of Helix's contractual relationship with Liteform as evidenced by at least the fact that Cornerstone's principal, Hans Hausfeld, signed the Liteform Agreement on behalf of and as an officer of Helix during his employment with Helix.

51.     Upon information and belief, Cornerstone recently supplied the competing and infringing SteelX 5:25 product to Liteform, which then supplied SteelX 5:25 to at least one customer.

52.     Upon information and belief, Liteform received an order for Helix 5-25, but instead of providing Helix 5-25 to the customer, Liteform provided SteelX 5:25 to the customer without notifying the customer of the switch.   Liteform received the SteelX 5:25 product from Cornerstone.

53.     Cornerstone supplied its competing SteelX 5:25 product to Liteform knowing that Liteform intended to sell the SteelX 5:25 to customers in violation of the Liteform Agreement.   Cornerstone knows that its sales of SteelX 5:25 to Liteform constitute a direct violation of the Liteform Agreement, and constitute intentional and tortious interference with the Liteform Agreement.

1
2

### FIRST CAUSE OF ACTION:
### VIOLATION OF 35 U.S.C. § 271 –
### DIRECT INFRINGEMENT OF THE '970 PATENT

3       54.    Helix incorporates the above paragraphs as though fully set forth
4   herein.

5       55.    In violation of 35 U.S.C. § 271, Cornerstone has infringed and
6   continues to infringe, literally or under the doctrine of equivalents, at least claim 1
7   of the '970 Patent by making, using, selling, or offering for sale within the United
8   States, or importing into the United States, concrete reinforcing twisted steel fibers
9   that are covered by one or more claims of the '970 Patent, including but not limited
10  to the Accused Products.

11      56.    An analysis of a sample of Cornerstone's Accused Products reveals
12  that Cornerstone's Accused Products comprise a reinforcing fiber.  Below is a
13  photo of one of the Accused Products, and an image taken from Cornerstone's
14  SteelX 5:25 design brochure, both showing the Accused Products.  See Exhibit E.

15
16
17
18  
19
20
21
22      57.    Cornerstone's Accused Products comprise a body defining a
23  longitudinal axis and having a cross section in the shape of a bilateral truncated
24  circle.

25
26
27
28



58.    Measurements of a sample show that the bilateral truncated circle of Cornerstone's Accused Products have an aspect ratio calculated to be between 1.53 and 1.93, wherein the aspect ratio is a ratio of width (w) to thickness (t) of the body. In particular, a sample measured 0.62 mm (0.0244 inches) in width, and 0.40 mm (0.0157 inches) thick, with an aspect ratio of 1.55.

59.    Cornerstone's Accused Products have a body that is twisted along its longitudinal axis.





60. Cornerstone's Accused Products have a body with a thickness measured to be between 0.01375 inches and 0.0159 inches. In particular, a sample measured 0.40 mm (0.0157 inches) thick.

61. As a direct and proximate consequence of Cornerstone's infringement, Helix has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, including lost profits, but in no event less than a reasonable royalty.

62. Cornerstone's infringement is further causing and will continue to cause Helix irreparable harm, for which there is no adequate remedy at law. Unless and until enjoined by this Court, Cornerstone will continue to infringe the '970

Patent.  Under 35 U.S.C. § 283, Helix is entitled to an injunction against further infringement.

63.     Additionally, on information and belief, Cornerstone knows and has known that its Accused Products infringe at least claim 1 of the '970 patent.

64.     On information and belief, Cornerstone has made no attempt to design around the '970 patent.  Cornerstone's infringement was undertaken willfully and without permission or license to use Helix's '970 Patent.

65.     On information and belief, Cornerstone's infringement of at least claim 1 of the '970 patent has been willful.  Helix has been damaged as the result of Cornerstone's willful infringement, and seeks increased damages, up to and including treble damages.

66.     Helix is entitled to and claims all damages allowable by law including, injunctive relief, adequate compensation for the infringement, costs, interest, attorney fees, and for the sales of infringing product as well as the sales of any accessory/ancillary products.

67.     Helix further seeks a declaration that it is entitled to three times the amount of damages found or assessed pursuant to 35 U.S.C. § 284.

## SECOND CAUSE OF ACTION:
## VIOLATION OF 35 U.S.C. § 271 –
## INDIRECT INFRINGEMENT OF THE '970 PATENT

68.     Helix incorporates the above paragraphs as though fully set forth herein.

69.     Cornerstone has indirectly infringed on at least claim 1 of the '970 Patent including by inducing others, including its independent sales representatives, distributors, other re-sellers, customers, Helix customers and other end users of the Accused Products to directly infringe at least claim 1 of the '970

Patent including by making, using, selling, or offering to sell Cornerstone's Accused Products.

70.     On information and belief, Cornerstone intentionally took actions that induced others, including its independent sales representatives, distributors, other re-sellers, customers, Helix customers and other end users of the Accused Products, to directly infringe at least claim 1 of the '970 Patent.

71.     Cornerstone has known of the '970 patent since at least February 21, 2020, and has induced infringement since at least that time.

72.     Cornerstone's actions demonstrate an intent to cause the acts that form the basis of the direct infringement, and that Cornerstone did so with the specific intent to infringe the '970 patent.

73.     Cornerstone has also contributed to the infringement of at least claim 1 of the '970 patent by others, including its independent sales representatives, distributors, other re-sellers, customers, Helix customers and other end users of the Accused Products, that directly infringe at least claim 1, by making, using, selling or offering to sell the Accused Products recited in at least claim 1 of the '970 patent. For example, Cornerstone's customers and/or the end users have incorporated Accused Products into their reinforced concrete projects.

74.     Cornerstone has contributorily infringed and is a contributory infringer because, with knowledge of the '970 Patent, it supplies the Accused Products, which comprise a material part of the claimed combination, where the Accused Products are not a staple article of commerce, and have no substantial non-infringing uses.

75.     Cornerstone knew that the Accused Products were especially made or adapted for use in a manner that would infringe at least claim 1 of the '970 patent.

76.     Helix has been damaged as a result of Cornerstone's indirect infringement, and is entitled to relief under 35 U.S.C. §§ 283 and 284 based on Cornerstone's induced and/or contributory infringement.

### THIRD CAUSE OF ACTION:
### VIOLATION OF 35 U.S.C. § 271 –
### DIRECT INFRINGEMENT OF THE '881 PATENT

77.     Helix incorporates the above paragraphs as though fully set forth herein.

78.     In violation of 35 U.S.C. § 271, Cornerstone has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claim 3 of the '881 Patent by making, using, selling, or offering for sale within the United States, or importing into the United States, concrete reinforcing twisted steel fibers that are covered by one or more claims of the '881 Patent, including but not limited to the Accused Products and the design class system in which they are sold.

79.     Cornerstone claims that its product complies with IAPMO[1] EC 015 and that it is "physically equivalent" to Helix's 5-25 Micro Rebar TSMR, covered by the IAPMO EC 015 criteria.  (See Exhibit J; see also Exhibit K, third party Twining Report certifying that Cornerstone's Accused Products meets the requirements per these acceptance criteria and sections to be classified as a 'Twisted Steel Micro Rebar' (TSMR) product per Iapmo's EC 015-2016 Section 3.1….").

80.     Claim 3 of Helix's '881 Patent includes similar elements as the IAPMO EC 015 standard.  Because Cornerstone claims the Accused Products meets IAPMO's EC 015 criteria, Cornerstone's Accused Products infringes at least Claim 3 of the '881 Patent.

---

[1] International Association of Plumbing and Mechanical Officials.

81.     More specifically, on information and belief, Cornerstone's Accused Products are a micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement.  Cornerstone's Accused Products comprise twisted steel fibers that are physically equivalent to Helix's 5-25 Micro Rebar TSMR, both of which comprise twisted steel fiber having elastic, perfectly plastic behavior up to the point of a dominant crack formation.  See Exhibit M; see also Exhibit J.  Additionally, the twisted steel fiber further includes stable tensile resistance after dominant crack formation up to a characteristic length determined by length, material used to manufacture and the number of twists provided in the twisted steel fiber.  See, for instance, Ex. L, IAPMO EC-015 Sections 3 and 8 requiring twisted steel fiber complying with the standard to have a stable tensile resistance after dominant crack formation up to a characteristic length determined by length, material used to manufacture and the number of twists in the twisted steel fiber.  See also Exhibit J.

82.     On information and belief, Cornerstone's Accused Products comprise a twisted steel fiber with a strain capacity increase requirement determined by tensile test results indicating a statistically significant increase (minimum of 95% confidence, the maximum p-value in a two sample t-test, 0.05) in tensile strain capacity versus structural plain concrete, wherein a minimum of six control (plain concrete) specimens are considered in the analysis in addition to a minimum number of twisted steel fiber samples.  See, for instance, Ex. L, Section 8.1 of IAPMO EC 015 which requires conforming products to meet this requirement: "Tensile test results shall indicate a statistically significant increase (minimum of 95% confident, the maximum p-value in a two sample t-test, 0.05) in tensile strain capacity compared to structural plain concrete.  A minimum of six control (plain

concrete) specimens shall be considered in the analysis in addition to the minimum number of TSMR samples required in Section 6.0."

83.    On information and belief, Cornerstone's Accused Products comprise a twisted steel fiber with a post-crack tensile stability requirement determined by tensile test results indicating that the median of a load carried at Sa (design crack width) of the test specimen divided by a maximum load after 0.01 in displacement is equal to or greater than 0.85, wherein the twisted steel fiber crack width, Sa, is the crack width resulting from tensile stresses typically measured for structural design applications and represents the average upper limit of displacement in a direct tension test where the stress remains stable, wherein Sa is set forth as: Sa= σ+X/3 where σ=material elongation as stated on raw material certification test reports, inch (mm), X=elongation from twist, representing the materials approximate ability to "stretch" and need not be exactly determined, inch (mm), x=1-cos($a$tan($n2\pi d/l$)), and where n=number of full twists in the twisted steel fiber, d= equivalent diameter of the twisted steel fiber, inches (mm), L=length of the twisted steel fiber, inches (mm), and X=percentage reduction in length from twisting of the twisted steel fiber, and where the resulting values of Sa are used as a reference point for computing tensile resistance and compute maximum allowable crack widths.  See, for instance, Section 3.1 of IAPMO EC 015 which specifies a design crack width resulting from tensile stresses and requires tensile tests to indicate that the median of the load carried at Sa divided by the maximum load after 0.01 inch (0.25 mm) displacement is equal to or greater than 0.85, and utilizes the same formula referenced above to calculate Sa:

First Amended Complaint

$$S_a = \delta + X/3 \qquad\qquad\qquad (Eq.\text{-}1)$$

Where:
$\delta$ = material elongation as stated on raw material certification test reports, inch (mm).
$X$ = elongation from twist, representing the materials approximate ability to "stretch" and need not be exactly determined, inch (mm).

$$X = 1 - \cos\left(\operatorname{atan}\left(\frac{n2\pi d}{l}\right)\right) \qquad\qquad (Eq.\text{-}2)^i$$

Where:
$n$ = number of full revolutions of the part
$d$ = equivalent diameter of the wire, inches (mm)
$L$ = length of the part, inches (mm)
$X$ = percentage reduction in length from twisting the part

(Exhibit L.)  See also, for instance, Section 8.0 of IAPMO EC 015 which specifies that tensile tests shall indicate that the median of the load carried at Sa divided by the maximum load after 0.01 inch (0.25mm) displacement is equal to or greater than 0.85.  (Exhibit L.)

84.   As a direct and proximate consequence of Cornerstone's infringement, Helix has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, including lost profits, but in no event less than a reasonable royalty.

85.   Cornerstone's infringement is further causing and will continue to cause Helix irreparable harm, for which there is no adequate remedy at law.  Unless and until enjoined by this Court, Cornerstone will continue to infringe the '881 Patent.  Under 35 U.S.C. § 283, Helix is entitled to an injunction against further infringement.

86.   Additionally, on information and belief, Cornerstone knows and has known that its Accused Products infringe at least claim 3 of the '881 patent.

87.     On information and belief, Cornerstone has made no attempt to design around the '881 patent.  Cornerstone's infringement was undertaken willfully and without permission or license to use Helix's '881 Patent.

88.     On information and belief, Cornerstone's infringement of at least claim 3 of the '881 patent has been willful.  Helix has been damaged as the result of Cornerstone's willful infringement, and seeks increased damages, up to and including treble damages.

89.     Helix is entitled to and claims all damages allowable by law including injunctive relief, adequate compensation for the infringement, costs, interest, attorney fees, and for the sales of infringing product as well as the sales of any accessory/ancillary products.

90.     Helix further seeks a declaration that it is entitled to three times the amount of damages found or assessed pursuant to 35 U.S.C. § 284.

### FOURTH CAUSE OF ACTION:
### VIOLATION OF 35 U.S.C. § 271 –
### INDIRECT INFRINGEMENT OF THE '881 PATENT

91.     Helix incorporates the above paragraphs as though fully set forth herein.

92.     Cornerstone has indirectly infringed on at least claim 3 of the '881 Patent including by inducing others, including its independent sales representatives, distributors, other re-sellers, customers, Helix customers and other end users of the Accused Products to directly infringe at least claim 3 of the '881 Patent including by making, using, selling, or offering to sell Cornerstone's Accused Products.

93.     On information and belief, Cornerstone intentionally took actions that induced others, including its independent sales representatives, distributors, other

re-sellers, customers, Helix customers and other end users of the Accused Products, to directly infringe at least claim 3 of the '881 Patent.

94.     Cornerstone has known of the '881 patent since at least February 21, 2020, and has induced infringement since at least that time.

95.     Cornerstone's actions demonstrate an intent to cause the acts that form the basis of the direct infringement, and that Cornerstone did so with the specific intent to infringe the '881 patent.

96.     Cornerstone has also contributed to the infringement of at least claim 3 of the '881 patent by others, including its independent sales representatives, distributors, other re-sellers, customers, Helix customers and other end users of the Accused Products, that directly infringe at least claim 3, by making, using, selling or offering to sell the Accused Products recited in at least claim 3 of the ' 881 patent.   For example, Cornerstone's customers and/or the end users have incorporated Accused Products into their reinforced concrete projects.

97.     Cornerstone has contributorily infringed and is a contributory infringer because, with knowledge of the '881 Patent, it supplies the Accused Products, which comprise a material part of a claimed combination, where the Accused Products is not a staple article of commerce, and has no substantial non-infringing uses.

98.     Cornerstone knew that the Accused Products was especially made or adapted for use in a manner that would infringe at least claim 3 of the '881 patent.

99.     Helix has been damaged as a result of Cornerstone's indirect infringement, and is entitled to relief under 35 U.S.C. §§ 283 and 284 based on Cornerstone's induced and/or contributory infringement.

First Amended Complaint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### FIFTH CAUSE OF ACTION:
### COMMON LAW INTERFERENCE WITH CONTRACT

100.   Helix incorporates the above paragraphs as though fully set forth herein.

101.   Helix has valid contracts with its third party distributors and/or customers, including but not limited to Liteform, that provided an economic benefit to Helix.

102.   Cornerstone has knowledge of Helix's contractual relationship with its distributors and/or customers, including its contractual relationship with Liteform, as evidenced by the fact that Cornerstone's principal was an employee of Helix, and signed the Liteform Agreement on behalf of Helix.

103.   Cornerstone sold SteelX 5:25 or similar product to Helix's distributors and/or customers, or otherwise entered into an agreement to sell SteelX 5:25 or similar product to Helix's distributors and/or customers, including Liteform, knowing that doing so resulted in a violation of Helix's contracts with its distributors and/or customers, and that doing so would induce Helix's distributors and/or customers, including Liteform, to breach Helix's contracts with its distributors and/or customers, including the Liteform Agreement.

104.   Helix's customers and distributors breached their agreements with Helix, including but not limited to Liteform, as a direct result of Cornerstone's tortious conduct.  For example, Liteform breached the Liteform Agreement with Helix by providing SteelX 5:25 to its customers, including providing SteelX 5:25 instead of providing Helix 5-25.

105.   Liteform also terminated its longstanding relationship with Helix on November 21, 2021 as a direct result of Cornerstone's tortious conduct.

106.   Cornerstone engaged in intentional, willful and wrongful conduct by causing and/or inducing Liteform to breach the Liteform Agreement.

First Amended Complaint

Cornerstone's intentional, willful and wrongful conduct caused harm to Helix, including lost sales and lost profits.

107.   Helix has sustained damages as a result of Cornerstone's tortious interference with its customers and distributors, including but not limited to Liteform, in the form of at least lost sales, lost profits and lost market share.

## **PRAYER FOR RELIEF**

WHEREFORE, Helix respectfully requests that this Honorable Court:

a) Issue a judgment that Cornerstone is liable for direct and/or indirect infringement of one of more claims of both the '970 and '881 Patents;

b) Issue an injunction prohibiting Cornerstone and each of their agents, servants, employees, attorneys, and any other persons who are in active concert or participation with any of them from engaging in further actions to infringe the '970 Patent and/or '881 Patent, including but not limited to making, using, selling, manufacturing, advertising, marketing, attempting to sell, or importing the Badger 5:25 product, SteelX 5:25 product or similar infringing products;

c) Award Helix all damages adequate to compensate Helix for the infringement that has occurred, pursuant to 35 U.S.C. § 284, including lost profits, but in no event less than a reasonable royalty, plus prejudgment and post-judgment interest;

d) Award Helix an amount equal to adequate compensation for Cornerstone's willful patent infringement, multiplied by three pursuant to 35 U.S.C. § 284;

e) Declare this an exceptional case within the meaning of 35 U.S.C. § 285 and that Helix be awarded attorney's fees, costs, and expenses incurred in connection with this action;

First Amended Complaint

f) Award Helix damages sustained as a result of Cornerstone's interference with contracts, including lost sales, lost profits, lost market share, any profit obtained by Cornerstone resulting from the interference, appropriate punitive damages, and attorney's fees, costs and expenses resulting from the interference;

g) Award Helix the costs associated with bringing this action; and

h) Award Helix any further relief that this Court deems just and proper.

Dated: December 8, 2021                    UMBERG ZIPSER LLP

                              By:   /s/ *Mark A. Finkelstein*
                                    Mark A. Finkelstein

                                    DICKINSON WRIGHT PLLC
                                    James K. Cleland
                                    Christopher J. Ryan
                                    Yafeez S. Fatabhoy

                                    *Attorneys for Plaintiff Pensmore Reinforcement Technologies, LLC d/b/a Helix Steel*

First Amended Complaint

## <u>DEMAND FOR JURY TRIAL</u>

Helix demands a jury trial as to all claims and issues that are triable by jury in this action.

Dated: December 8, 2021          UMBERG ZIPSER LLP

                                            By:     /s/ *Mark A. Finkelstein*
                                                    Mark A. Finkelstein

                                            DICKINSON WRIGHT PLLC
                                            James K. Cleland
                                            Christopher J. Ryan
                                            Yafeez S. Fatabhoy

                                            *Attorneys for Plaintiff Pensmore Reinforcement Technologies, LLC d/b/a Helix Steel*

First Amended Complaint