Kevin Abbott, SBN 281312
   kabbott@lp-attorneys.com
Chandra Winter SBN 325353
   cwinter@lp-attorneys.com
LOBB & PLEWE, LLP
4160 Temescal Canyon Road, Suite 202
Corona, California 92883
(951) 788-9410   Fax: (951) 788-0766

Scott R. Brown, SBN 151635
   sbrown@hoveywilliams.com
HOVEY WILLIAMS LLP
84 Corporate Woods
10801 Mastin Boulevard, Suite 1000
Overland Park, Kansas 66210
(913) 647-9050   Fax: (913) 647-9057

Attorneys for Defendant / Counterclaimant

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENSMORE REINFORCEMENT TECHNOLOGIES, LLC d/b/a HELIX STEEL, <br><br> Plaintiff / Counterclaim Defendant, <br><br> v. <br><br> CORNERSTONE MANUFACTURING AND DISTRIBUTION, INC., <br><br> Defendant / Counterclaimant. | Case No. 5:21-cv-1556-JWH-SHK <br><br> **AMENDED ANSWER, SEPARATE DEFENSES, AND COUNTERCLAIMS TO FIRST AMENDED COMPLAINT** |

## ANSWER

Defendant, Cornerstone Manufacturing and Distribution, Inc. ("Cornerstone"), answers the numbered paragraphs of Plaintiff's First Amended Complaint as follows:

1

**INTRODUCTION**

2       1.      This case arises out of Cornerstone's infringement of Helix's patents

3   for Concrete Reinforcing Fibers, US Patent No. 10,266,970 ("'970 Patent") and a

4   Micro-Rebar Concrete Reinforcement System, US Patent No. 9,440,881 ("'881

5   Patent") and Cornerstone's tortious interference with Helix's customers and/or

6   prospective customers. The '970 and '881 Patents protect Helix's concrete

7   reinforcing Micro Rebar™ products. Micro Rebar™ is an improved alternative to

8   traditional rebar that consists of thousands of small twisted metal fibers mixed into

9   concrete prior to its application.



16  Helix's patented concrete reinforcing Micro Rebar™ results in stronger, more

17  durable, and more flexible concrete than traditional rebar, with improved fatigue

18  endurance, crack resistance, impact capacity, energy absorption, and shatter

19  resistance.

20      **ANSWER:**  Cornerstone states that Plaintiff has accurately stated the nature

21  of this action in the first sentence of this paragraph but denies that it infringes or has

22  infringed any of Plaintiff's patents or has tortiously interfered with Plaintiff's

23  customers or prospective customers. Cornerstone denies the allegations in the

24  second sentence of this paragraph. Cornerstone lacks sufficient knowledge or

25  information to form a belief as to the truth of the remaining allegations in this

26  paragraph and, on that basis, denies them.

27      2.      Cornerstone's principals, who are also former employees of Helix, used

28  the knowledge they gained during their tenure with Helix to help Cornerstone

manufacture, import, market, and sell products that infringe Helix's '970 and '881 Patents.

**ANSWER:** Denied.

3.      Cornerstone's infringing product is copied from and highly similar to Helix's MicroRebar reinforcement, and both are covered by the claims of the '970 and '881 Patents:



**ANSWER:** Denied.

4.      The Court should enjoin Cornerstone, and compensate Helix for the damage caused to it.

**ANSWER:** Denied.

### THE PARTIES

5.      Pensmore Reinforcement Technologies, LLC ("Pensmore") is a limited liability company headquartered in Ann Arbor, Michigan. It operates under the assumed name Helix Steel ("Helix"). Pensmore was previously known as Polytorx, LLC.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

6.      On information and belief, Cornerstone is a California corporation located at 955 Cornerstone Way in the City of Corona, County of Riverside, State of California. Therefore, Cornerstone resides within the Central District of California.

On information and belief, Cornerstone also operates under the name Badger Forms. (See Exhibit A.)

**ANSWER:**  To the extent this paragraph states legal conclusions, no response is required. To the extent a response is required, Cornerstone admits the allegations in this paragraph.

## JURISDICTION AND VENUE

7.      This is a complaint for direct and contributory patent infringement arising under the Patent Act, 35 U.S.C. § 271 *et seq*. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:**  To the extent this paragraph states legal conclusions, no response is required. Cornerstone states that Plaintiff has accurately stated the nature of this action but denies that it infringes or has infringed any of Plaintiff's patents. Cornerstone admits that this Court has subject-matter jurisdiction.

8.      Venue is proper in this Court under 28 U.S.C. § 1400(b) because Cornerstone is a California corporation with a regular and established place of business in this District, and therefore resides in this District under 28 U.S.C. §§ 1391(b) and 1400(b), and because Cornerstone has committed acts of infringement in this District, directly and/or through a third party because it manufacturers [*sic*], makes, imports, sells, offers to sell or uses concrete reinforcing fibers for a variety of concrete applications, including concrete reinforcing twisted steel products identified under names such as Badger 5:25, SteelX, and SteelX 5:25 within this judicial District. Cornerstone has purposefully directed its activities to this State and this District and/or purposefully availed itself of this jurisdiction.

**ANSWER:**  To the extent this paragraph states legal conclusions, no response is required. Cornerstone admits that it has a regular and established place of business in this District and that it imports, sells, offers to sell, and uses concrete-reinforcing fibers in this District. Cornerstone denies that it has committed acts of infringement in this District or elsewhere. Cornerstone admits that venue is proper in this District.

9.      This Court has jurisdiction over Helix's common law claims because the amount in controversy exceeds $75,000, and the parties are citizens of different states. 28 U.S.C. § 1332. Further, the Court has supplemental jurisdiction over Helix's common law claims because they are part of the same case or controversy as Helix's federal question claims. 28 U.S.C. § 1367.

**ANSWER:** To the extent this paragraph states legal conclusions, no response is required. Cornerstone admits that it is a citizen of a different state than Plaintiff. Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and, on that basis, denies them.

10.     This Court has personal jurisdiction over Cornerstone for the reasons identified above and according to the laws of the United States.

**ANSWER:** Cornerstone incorporates its answers to paragraphs 7 through 9 as though fully set forth herein. Cornerstone admits that it is subject to this Court's personal jurisdiction.

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

**A.      BACKGROUND**

11.     Helix is a leading provider of concrete reinforcement in the form of twisted steel fibers that are mixed with concrete to make the concrete stronger, more durable, and more flexible.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

12.     Helix was founded as part of a project that challenged University of Michigan Engineers to create an alternative to traditional rebar that could provide better flexural strength, resiliency, ductility, and elasticity to concrete structures.

1
2
3
4
5


Traditional Rebar

6      **ANSWER:** Cornerstone lacks sufficient knowledge or information to form a

7  belief as to the truth of the allegations in this paragraph and, on that basis, denies

8  them.

9      13.    Helix developed its Micro Rebar™ concrete reinforcement, also known

10  as Helix 5-25, Helix 5-25 Micro Rebar™ or Twisted Steel Micro Rebar™. It

11  consists of thousands of small twisted metal fibers that are mixed into concrete prior

12  to application:





25      **ANSWER:** Cornerstone lacks sufficient knowledge or information to form a

26  belief as to the truth of the allegations in this paragraph and, on that basis, denies

27  them.

28

14.     Helix invested significant time and resources to develop its concrete reinforcing Micro Rebar™ technology, and underwent stringent testing to ensure safety and efficacy.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

15.     Helix's Micro Rebar™ concrete reinforcement technology results in concrete that is stronger, more durable, and more flexible than concrete used with traditional rebar. Concrete treated with Helix's Micro Rebar™ technology requires less repairs and has a longer lifespan, thus saving time and money.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

16.     Helix's Micro Rebar™ concrete reinforcement technology meets building code requirements. Helix Micro Rebar™ is the first fiber for use in concrete with code approval for structural applications. Helix Micro Rebar™ also meets ACI, IBC and IRC codes, including those through its two evaluation service reports from ICC-ES AC 470 & ESR-3949, IAPMO EC-015 2016 and ER 279.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

17.     Helix manufactures its Micro Rebar™ product in Grand Rapids, Michigan. Helix sells genuine Helix concrete reinforcing products under its trademarks Helix™, Micro Rebar™, Twisted Steel Micro Rebar™, and TSMR™. Helix sells and distributes its proprietary Micro Rebar™ product worldwide.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

18.     Helix's proprietary concrete reinforcing Micro Rebar™ product and technology is protected by various patents, including the '970 and '881 Patents.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

19.     Helix's Micro Rebar™ concrete reinforcement is used in interior and exterior settings and in high load applications. For example, Helix has been used to replace traditional rebar in slabs designed for M1 Abrams Tank traffic by the U.S. Military.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

20.     Helix has enjoyed considerable success with its Micro Rebar™ reinforcement technology. Helix's Micro Rebar™ technology has been used in hundreds of millions of square feet of concrete, and tens of thousands of successful structures. Helix has enjoyed years of successful applications with a strong record of structural success.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

21.     Helix's Micro Rebar™ has been and remains the leading concrete reinforcing twisted steel fiber product of its kind. Helix's products are known throughout the world to represent genuine, high-quality goods.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

**B.      THE PATENTS-IN-SUIT**

22.      The '970 Patent is entitled "Concrete Reinforcing Fibers" and issued on April 23, 2019. A true and correct copy of '970 Patent, along with its Certificate of Correction, are attached as Exhibit B.

**ANSWER:**  Cornerstone states that the '970 Patent speaks for itself.

23.      Pensmore Reinforcement Technologies, LLC owns by assignment the entire right, title and interest in and to the '970 Patent.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

24.      The '881 Patent is entitled "Micro-Rebar Concrete Reinforcement System" and was issued on September 13, 2016. A true and correct copy of the '881 Patent is attached as Exhibit C.

**ANSWER:**  Cornerstone states that the '881 Patent speaks for itself.

25.      Pensmore Reinforcement Technologies, LLC owns by assignment the entire right, title and interest in and to the '881 Patent.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

26.      The '970 and '881 Patents protect concrete reinforcing fibers, as well as a method for manufacturing concrete reinforcing fibers and the design class system for micro reinforced concrete.

**ANSWER:**  Cornerstone states that that '970 and '881 Patents speak for themselves.

**C.      CORNERSTONE'S [ALLEGED] INFRINGEMENT**

27.      Cornerstone is owned and headed by the former vice president of sales and management team member of Helix, Hans Hausfeld. Cornerstone directly competes with Helix in the market for concrete reinforcing twisted steel fibers.

1    **ANSWER:** Admitted.

2    28.    Cornerstone, frequently operating under the d/b/a name Badger Forms,

3   intentionally targeted, solicited and employs multiple former Helix employees and

4   sales representatives, including at least Jay Middleton, Jeff Knight, and Wes Dees.

5   See, for instance, Exhibit D, showing Cornerstone's U.S. Trademark Reg. No.

6   5528776 for "Badger Forms."

7    **ANSWER:** Cornerstone admits that it does business under the name Badger

8   Forms and employs former Helix employee Jay Middleton. Cornerstone denies the

9   remaining allegations in this paragraph.

10    29.    Cornerstone was built on Helix's technology platform. In addition to

11   forming its business with former Helix personnel—each has retained confidential

12   and proprietary Helix information—Cornerstone on information and belief arranged

13   for Helix's former manufacturing facility in China to manufacture and import into

14   the United States infringing concrete reinforcing twisted steel fiber products for

15   distribution and sale by Cornerstone.

16    **ANSWER:** Denied.

17    30.    On information and belief, Cornerstone's infringing concrete

18   reinforcing twisted steel fiber products are made by Helix's proprietary process.

19    **ANSWER:** Denied.

20    31.    In an attempt to capitalize on Helix's industry recognition and goodwill

21   built up over many years as the leading supplier of concrete reinforcing twisted steel

22   fibers sold under the name Helix 5-25, Cornerstone markets and sells its infringing

23   product under substantially similar names that include, at minimum, Badger 5:25,

24   SteelX 5:25 or SteelX ("Accused Products"). See Exhibit E, Design Process

25   Brochure for SteelX 5:25.

26    **ANSWER:** Cornerstone admits that it uses the name Badger 5:25, SteelX

27   5:25, and SteelX for the Accused Products. Cornerstone denies the remaining

28   allegations in this paragraph.

32.     Also on information and belief, Cornerstone partnered with former Helix Australian distributor Reuben Ramsay to sell its infringing concrete reinforcing twisted steel fibers in the United States and Australia under the brand name "SteelX." See Exhibit F, Cornerstone's U.S. Trademark Reg. No. 6250129 for "SteelX." See also Exhibit G, specimen of product packaging for SteelX submitted by Cornerstone as evidence to support the U.S. SteelX trademark registration.



**ANSWER:** Cornerstone admits that is uses the brand name "SteelX" and distributes products in the United States and Australia. Cornerstone denies the remaining allegations in this paragraph.

33.     Cornerstone markets and sells the Accused Products through its network of former Helix sales representatives, employees, and associates by claiming that its Accused Products are equivalent to Helix's product, thus conceding that its product is nothing more than a re-branded duplicate of Helix's product.

**ANSWER:** Denied.

34.    Helix learned that Cornerstone was attempting to introduce a duplicate of Helix's patented Micro Rebar reinforcement into the United States. On February 21, 2020, Helix sent Cornerstone a letter notifying Cornerstone of the '970 and '881 patents, its potential infringement of those patents, and warning Cornerstone that any unauthorized marketing, sale, or offer to sell an infringing concrete reinforcement fiber product into the United States would result in damages and irreparable harm.

**ANSWER:**  Cornerstone states that Helix's February 21, 2020 letter speaks for itself. Cornerstone denies the remaining allegations in this paragraph.

35.    Despite possessing knowledge of Helix's '970 and '881 patents, Cornerstone continued with its plans to market, offer to sell and sell the Accused Products in United States, including representing that the Accused Products are the same as Helix's patented Micro Rebar reinforcement.

**ANSWER:**  Cornerstone denies that it represents or has represented that the Accused Products are the same as Helix's patented Micro Rebar reinforcement. Cornerstone admits the remaining allegations in this paragraph.

36.    Helix recently learned that Cornerstone (Badger Forms) is actively marketing and selling the Accused Products in the United States, including to Helix's customers.

**ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

37.    For instance, in an August 5, 2020 email from Cornerstone (Badger Forms) principal Jay Middleton to the City of Overland Park, Kansas (a Helix customer), Middleton represented to the City of Overland Park that he used to work for Helix, left Helix, but maintained his commitment to the idea that you can make better concrete with twisted steel fiber in the concrete so "we launched our own brand of that product." (Exhibit H.)

1    **ANSWER:**  Cornerstone states that the August 5, 2020 email attached as

2  Exhibit H speaks for itself. Cornerstone denies the remaining allegations in this

3  paragraph.

4       38.     Cornerstone (Badger Forms) followed up with another email on April

5  22, 2021 informing the City of Overland Park that "we finally have stock of our

6  twisted steel concrete reinforcement product, called SteelX, here in KC." (Exhibit I.)

7    **ANSWER:**  Cornerstone states that the April 22, 2021 email attached as

8  Exhibit I speaks for itself.

9       39.     In another example, an April 24, 2021 email from Cornerstone (Badger

10  Forms) principal Middleton to the City of Overland Park, Badger claims, asserts and

11  markets the Accused Products as "physically equivalent" to Helix's patented Micro

12  Rebar (TSMR product) described in IAPMO E-015 and ICC AC-470. See Exhibit J,

13  a portion of which is reproduced below.



22    **ANSWER:**  Cornerstone states that the April 24, 2021 email attached as

23  Exhibit J speaks for itself.

24       40.     Recently, on information and belief, Helix learned that Cornerstone

25  (Badger Forms) recently applied for permits for a foundation job in Grain Valley,

26  Missouri using the Accused Products.



**ANSWER:** Denied.

41.      On information and belief, Cornerstone (Badger Forms) placed the Accused SteelX Products into foundations in Grain Valley, Missouri. Also on information and belief, Cornerstone relied on its equivalence to Helix's patented TSMR product covered by the same IAPMO EC-015 standard in order to obtain approval for the permits and job.

**ANSWER:** Denied.

42.      Cornerstone markets, sells and/or offers to sell the Accused Products directly to Helix customers and others, including through former Helix personnel who now work for Cornerstone.

**ANSWER:** Admitted.

43.      Cornerstone's Accused Products infringe one or more claims of the '970 and '881 Patents.

**ANSWER:** Denied.

**D.      CORNERSTONE'S [ALLEGED] TORTIOUS INTERFERENCE**

44.      Cornerstone is also intentionally and tortiously interfering with Helix's customers and/or prospective customers.

**ANSWER:** Denied.

45. Cornerstone has intentionally caused and/or induced one or more of Helix's customers and/or distributors to breach Helix's distribution agreements with those customers and/or distributors, including to terminate or decrease their business relationship with Helix.

1   **ANSWER:** Denied.

2   46. For example, Helix (which was, at the time, known as Polytorx, LLC)

3   entered into a Distributorship Agreement with Liteform Technologies on June 7,

4   2013. See Exhibit N ("Liteform Agreement"). Hans Hausfeld signed the Liteform

5   Agreement as a duly authorized officer on behalf of Helix.

6   **ANSWER:** To the extent this paragraph states legal conclusions, no response

7   is required. Cornerstone states that the Liteform Agreement speaks for itself.

8   Cornerstone admits that the first signature on page 5 of the Liteform Agreement is

9   the signature of Hans Hausfeld.

10   47. The Liteform Agreement provided Liteform with the right to act as a non-

11   exclusive distributor of the Helix 5-25 product in certain regions, and with the right

12   to act as the exclusive distributor of the Helix 5-25 product in other regions.

13   **ANSWER:** Cornerstone states that the Liteform Agreement speaks for itself.

14   48. The Liteform Agreement was for an initial term of one year, which

15   automatically renewed. Liteform continued to act as a distributor under the Liteform

16   Agreement for Helix over the past 8 years. Neither Helix nor Liteform had

17   terminated the Liteform Agreement until recently, when Liteform sent Helix notice

18   that it no longer wished to renew the Liteform Agreement beyond its expiration date

19   in June of 2022.

20   **ANSWER:** Cornerstone states that the Liteform Agreement speaks for itself.

21   Cornerstone lacks sufficient knowledge or information to form a belief as to the

22   truth of the allegations in the second and third sentences of this paragraph and, on

23   that basis, denies them.

24   49. The Liteform Agreement contains a non-competition clause, which

25   provides that during the term of the agreement and for six months after termination

26   of the agreement, Liteform cannot directly or indirectly represent or sell any product

27   of a company that competes with Helix. (Ex. N, ¶11(b)). The Liteform Agreement is

28   governed by Michigan law. (Ex. N, ¶11(g)).

1    **ANSWER:**  Cornerstone states that the Liteform Agreement speaks for itself.

2    50. Cornerstone has knowledge of Helix's contractual relationship with

3    Liteform as evidenced by at least the fact that Cornerstone's principal, Hans

4    Hausfeld, signed the Liteform Agreement on behalf of and as an officer of Helix

5    during his employment with Helix.

6    **ANSWER:**  To the extent this paragraph states legal conclusions, no response

7    is required. Cornerstone states that the Liteform Agreement speaks for itself.

8    Cornerstone admits that the first signature on page 5 of the Liteform Agreement is

9    the signature of Hans Hausfeld. Cornerstone denies that it has knowledge of the

10   relationship between Plaintiff and Liteform since 2015.

11   51. Upon information and belief, Cornerstone recently supplied the competing

12   and infringing SteelX 5:25 product to Liteform, which then supplied SteelX 5:25 to

13   at least one customer.

14   **ANSWER:**  Cornerstone admits that it supplied the SteelX 5:25 product to

15   Liteform but denies that the SteelX 5:25 product infringes any valid claim of either

16   of the Patents-in-Suit. Cornerstone lacks sufficient knowledge or information to

17   form a belief as to the truth of the allegations in this paragraph regarding Liteform

18   supplying SteelX 5:25 to its customers and, on that basis, denies them.

19   52. Upon information and belief, Liteform received an order for Helix 5-25,

20   but instead of providing Helix 5-25 to the customer, Liteform provided SteelX 5:25

21   to the customer without notifying the customer of the switch. Liteform received the

22   SteelX 5:25 product from Cornerstone.

23   **ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a

24   belief as to the truth of the allegations in this paragraph and, on that basis, denies

25   them.

26   53. Cornerstone supplied its competing SteelX 5:25 product to Liteform

27   knowing that Liteform intended to sell the SteelX 5:25 to customers in violation of

28   the Liteform Agreement. Cornerstone knows that its sales of SteelX 5:25 to

1   Liteform constitute a direct violation of the Liteform Agreement, and constitute

2   intentional and tortious interference with the Liteform Agreement.

3       **ANSWER:** Denied.

4                    **FIRST CAUSE OF ACTION:**

5       **Violation of 35 U.S.C. § 271 – Direct Infringement of the '970 Patent**

6       54.     Helix incorporates the above paragraphs as though fully set forth

7   herein.

8       **ANSWER:** Cornerstone incorporates its answers to the above paragraphs as

9   though fully set forth herein.

10      55.     In violation of 35 U.S.C. § 271, Cornerstone has infringed and

11  continues to infringe, literally or under the doctrine of equivalents, at least claim 1

12  of the '970 Patent by making, using, selling, or offering for sale within the United

13  States, or importing into the United States, concrete reinforcing twisted steel fibers

14  that are covered by one or more claims of the '970 Patent, including but not limited

15  to the Accused Products.

16      **ANSWER:** Denied.

17      56.     An analysis of a sample of Cornerstone's Accused Products reveals that

18  Cornerstone's Accused Products comprise a reinforcing fiber. Below is a photo of

19  one of the Accused Products, and an image taken from Cornerstone's SteelX 5:25

20  design brochure, both showing the Accused Products. See Exhibit E.

21

22

23  

24

25

26      **ANSWER:** Cornerstone states that the images contained in Exhibit E speak

27  for themselves. Cornerstone denies the remaining allegations in this paragraph.

28

57.     Cornerstone's Accused Products comprise a body defining a longitudinal axis and having a cross section in the shape of a bilateral truncated circle.



**ANSWER:**  Denied.

58.     Measurements of a sample show that the bilateral truncated circle of Cornerstone's Accused Products have an aspect ratio calculated to be between 1.53 and 1.93, wherein the aspect ratio is a ratio of width (w) to thickness (t) of the body. In particular, a sample measured 0.62 mm (0.0244 inches) in width, and 0.40 mm (0.0157 inches) thick, with an aspect ratio of 1.55.

**ANSWER:**  Cornerstone specifically denies that it sells product with the alleged attributes. Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in this paragraph and, on that basis, denies them.

59.     Cornerstone's Accused Products have a body that is twisted along its longitudinal axis.



**ANSWER:** . Admitted.

60.    Cornerstone's Accused Products have a body with a thickness measured to be between 0.01375 inches and 0.0159 inches. In particular, a sample measured 0.40 mm (0.0157 inches) thick.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the second sentence of this paragraph and, on that basis, denies them. Cornerstone denies the remaining allegations in this paragraph.

61.    As a direct and proximate consequence of Cornerstone's infringement, Helix has been, is being, and, unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, including lost profits, but in no event less than a reasonable royalty.

**ANSWER:** Denied.

62.    Cornerstone's infringement is further causing and will continue to cause Helix irreparable harm, for which there is no adequate remedy at law. Unless

1  and until enjoined by this Court, Cornerstone will continue to infringe the '970

2  Patent. Under 35 U.S.C. § 283, Helix is entitled to an injunction against further

3  infringement.

4      **ANSWER:**  Denied.

5      63.    Additionally, on information and belief, Cornerstone knows and has

6  known that its Accused Products infringe at least claim 1 of the '970 patent.

7      **ANSWER:**  Denied.

8      64.    On information and belief, Cornerstone has made no attempt to design

9  around the '970 patent. Cornerstone's infringement was undertaken willfully and

10  without permission or license to use Helix's '970 Patent.

11      **ANSWER:**  Denied.

12      65.    On information and belief, Cornerstone's infringement of at least claim

13  1 of the '970 patent has been willful. Helix has been damaged as the result of

14  Cornerstone's willful infringement, and seeks increased damages, up to and

15  including treble damages.

16      **ANSWER:**  Denied.

17      66.    Helix is entitled to and claims all damages allowable by law including,

18  injunctive relief, adequate compensation for the infringement, costs, interest,

19  attorney fees, and for the sales of infringing product as well as the sales of any

20  accessory/ancillary products.

21      **ANSWER:**  Cornerstone denies that Plaintiff is entitled to such relief.

22      67.    Helix further seeks a declaration that it is entitled to three times the

23  amount of damages found or assessed pursuant to 35 U.S.C. § 284.

24      **ANSWER:**  Cornerstone denies that Plaintiff is entitled to such relief.

25                    **SECOND CAUSE OF ACTION:**

26      **Violation of 35 U.S.C. § 271 – Indirect Infringement of the '970 Patent**

27      68.    Helix incorporates the above paragraphs as though fully set forth

28  herein.

1    **ANSWER:** Cornerstone incorporates its answers to the above paragraphs as
2  though fully set forth herein.

3    69.    Cornerstone has indirectly infringed on at least claim 1 of the '970
4  Patent including by inducing others, including its independent sales representatives,
5  distributors, other re-sellers, customers, Helix customers and other end users of the
6  Accused Products to directly infringe at least claim 1 of the '970 Patent including by
7  making, using, selling, or offering to sell Cornerstone's Accused Products.

8    **ANSWER:** Denied.

9    70.    On information and belief, Cornerstone intentionally took actions that
10 induced others, including its independent sales representatives, distributors, other re-
11 sellers, customers, Helix customers and other end users of the Accused Products, to
12 directly infringe at least claim 1 of the '970 Patent.

13   **ANSWER:** Denied.

14   71.    Cornerstone has known of the '970 patent since at least February 21,
15 2020, and has induced infringement since at least that time.

16   **ANSWER:** Denied.

17   72.    Cornerstone's actions demonstrate an intent to cause the acts that form
18 the basis of the direct infringement, and that Cornerstone did so with the specific
19 intent to infringe the '970 patent.

20   **ANSWER:** Denied.

21   73.    Cornerstone has also contributed to the infringement of at least claim 1
22 of the '970 patent by others, including its independent sales representatives,
23 distributors, other re-sellers, customers, Helix customers and other end users of the
24 Accused Products, that directly infringe at least claim 1, by making, using, selling or
25 offering to sell the Accused Products recited in at least claim 1 of the '970 patent.
26 For example, Cornerstone's customers and/or the end users have incorporated
27 Accused Products into their reinforced concrete projects.

28   **ANSWER:** Denied.

74.    Cornerstone has contributorily infringed and is a contributory infringer because, with knowledge of the '970 Patent, it supplies the Accused Products, which comprise a material part of the claimed combination, where the Accused Products are not a staple article of commerce, and have no substantial non-infringing uses.

**ANSWER:** Denied.

75.    Cornerstone knew that the Accused Products were especially made or adapted for use in a manner that would infringe at least claim 1 of the '970 patent.

**ANSWER:** Denied.

76.    Helix has been damaged as a result of Cornerstone's indirect infringement, and is entitled to relief under 35 U.S.C. §§ 283 and 284 based on Cornerstone's induced and/or contributory infringement.

**ANSWER:** Denied.

**THIRD CAUSE OF ACTION:**

**Violation of 35 U.S.C. § 271 – Direct Infringement of the '881 Patent**

77.    Helix incorporates the above paragraphs as though fully set forth herein.

**ANSWER:** Cornerstone incorporates its answers to the above paragraphs as though fully set forth herein.

78.    In violation of 35 U.S.C. § 271, Cornerstone has infringed and continues to infringe, literally or under the doctrine of equivalents, at least claim 3 of the '881 Patent by making, using, selling, or offering for sale within the United States, or importing into the United States, concrete reinforcing twisted steel fibers that are covered by one or more claims of the '881 Patent, including but not limited to the Accused Products and the design class system in which they are sold.

**ANSWER:** Denied.

79.    Cornerstone claims that its product complies with IAPMO[1] EC 015 and that it is "physically equivalent" to Helix's 5-25 Micro Rebar TSMR, covered by the IAPMO EC 015 criteria. (See Exhibit J; see also Exhibit K, third party Twining Report certifying that Cornerstone's Accused Products meets the requirements per these acceptance criteria and sections to be classified as a 'Twisted Steel Micro Rebar' (TSMR) product per Iapmo's EC 015-2016 Section 3.1….").

**ANSWER:**  Denied.

80.    Claim 3 of Helix's '881 Patent includes similar elements as the IAPMO EC 015 standard. Because Cornerstone claims the Accused Products meets IAPMO's EC 015 criteria, Cornerstone's Accused Products infringes at least Claim 3 of the '881 Patent.

**ANSWER:**  Denied.

81.    More specifically, on information and belief, Cornerstone's Accused Products are a micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement. Cornerstone's Accused Products comprise twisted steel fibers that are physically equivalent to Helix's 5-25 Micro Rebar TSMR, both of which comprise twisted steel fiber having elastic, perfectly plastic behavior up to the point of a dominant crack formation. See Exhibit M; see also Exhibit J. Additionally, the twisted steel fiber further includes stable tensile resistance after dominant crack formation up to a characteristic length determined by length, material used to manufacture and the number of twists provided in the twisted steel fiber. See, for instance, Ex. L, IAPMO EC-015 Sections 3 and 8 requiring twisted steel fiber complying with the standard to have a stable tensile resistance after dominant crack formation up to a characteristic length determined

---

[11] International Association of Plumbing and Mechanical Officials.

1  by length, material used to manufacture and the number of twists in the twisted steel

2  fiber. See also Exhibit J.

3       **ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a

4  belief as to the truth of the allegations in this paragraph and, on that basis, denies

5  them.

6       82.   On information and belief, Cornerstone's Accused Products comprise a

7  twisted steel fiber with a strain capacity increase requirement determined by tensile

8  test results indicating a statistically significant increase (minimum of 95%

9  confidence, the maximum p-value in a two sample t-test, 0.05) in tensile strain

10  capacity versus structural plain concrete, wherein a minimum of six control (plain

11  concrete) specimens are considered in the analysis in addition to a minimum number

12  of twisted steel fiber samples. See, for instance, Ex. L, Section 8.1 of IAPMO EC

13  015 which requires conforming products to meet this requirement: "Tensile test

14  results shall indicate a statistically significant increase (minimum of 95% confident,

15  the maximum p-value in a two sample t-test, 0.05) in tensile strain capacity

16  compared to structural plain concrete. A minimum of six control (plain concrete)

17  specimens shall be considered in the analysis in addition to the minimum number of

18  TSMR samples required in Section 6.0."

19       **ANSWER:**  Cornerstone lacks sufficient knowledge or information to form a

20  belief as to the truth of the allegations in this paragraph and, on that basis, denies

21  them.

22       83.   On information and belief, Cornerstone's Accused Products comprise a

23  twisted steel fiber with a post-crack tensile stability requirement determined by

24  tensile test results indicating that the median of a load carried at Sa (design crack

25  width) of the test specimen divided by a maximum load after 0.01 in displacement is

26  equal to or greater than 0.85, wherein the twisted steel fiber crack width, Sa, is the

27  crack width resulting from tensile stresses typically measured for structural design

28  applications and represents the average upper limit of displacement in a direct

1  tension test where the stress remains stable, wherein Sa is set forth as: Sa= σ+X/3

2  where σ=material elongation as stated on raw material certification test reports, inch

3  (mm), X=elongation from twist, representing the materials approximate ability to

4  "stretch" and need not be exactly determined, inch (mm), x=1-cos(atan(n2πd/l)), and

5  where n=number of full twists in the twisted steel fiber, d= equivalent diameter of

6  the twisted steel fiber, inches (mm), L=length of the twisted steel fiber, inches

7  (mm), and X=percentage reduction in length from twisting of the twisted steel fiber,

8  and where the resulting values of Sa are used as a reference point for computing

9  tensile resistance and compute maximum allowable crack widths. See, for instance,

10  Section 3.1 of IAPMO EC 015 which specifies a design crack width resulting from

11  tensile stresses and requires tensile tests to indicate that the median of the load

12  carried at Sa divided by the maximum load after 0.01 inch (0.25 mm) displacement

13  is equal to or greater than 0.85, and utilizes the same formula referenced above to

14  calculate Sa:

15

16  $$S_a = \delta + X/3 \qquad\qquad (Eq.-1)$$

    Where:
17  $\delta$ = material elongation as stated on raw material certification test reports, inch (mm).
    $X$ = elongation from twist, representing the materials approximate ability to "stretch"
    and need not be exactly determined, inch (mm).

18  $$X = 1 - \cos\left(\operatorname{atan}\left(\frac{n2\pi d}{l}\right)\right) \qquad\qquad (Eq.-2)^i$$

19  Where:
    $n$ = number of full revolutions of the part

20  $d$ = equivalent diameter of the wire, inches (mm)
    $L$ = length of the part, inches (mm)
    $X$ = percentage reduction in length from twisting the part

21

22  (Exhibit L.) See also, for instance, Section 8.0 of IAPMO EC 015 which specifies

23  that tensile tests shall indicate that the median of the load carried at Sa divided by

24  the maximum load after 0.01 inch (0.25mm) displacement is equal to or greater than

25  0.85. (Exhibit L.)

26  **ANSWER:** Cornerstone lacks sufficient knowledge or information to form a

27  belief as to the truth of the allegations in this paragraph and, on that basis, denies

28  them.

1   84.   As a direct and proximate consequence of Cornerstone's infringement,

2   Helix has been, is being, and, unless such acts and practices are enjoined by the

3   Court, will continue to be injured in its business and property rights, and has

4   suffered, is suffering, and will continue to suffer injury and damages for which it is

5   entitled to relief under 35 U.S.C. § 284 adequate to compensate for such

6   infringement, including lost profits, but in no event less than a reasonable royalty.

7   **ANSWER:**  Denied.

8   85.   Cornerstone's infringement is further causing and will continue to

9   cause Helix irreparable harm, for which there is no adequate remedy at law. Unless

10  and until enjoined by this Court, Cornerstone will continue to infringe the '881

11  Patent. Under 35 U.S.C. § 283, Helix is entitled to an injunction against further

12  infringement.

13  **ANSWER:**  Denied.

14  86.   Additionally, on information and belief, Cornerstone knows and has

15  known that its Accused Products infringe at least claim 3 of the '881 patent.

16  **ANSWER:**  Denied.

17  87.   On information and belief, Cornerstone has made no attempt to design

18  around the '881 patent. Cornerstone's infringement was undertaken willfully and

19  without permission or license to use Helix's '881 Patent.

20  **ANSWER:**  Denied.

21  88.   On information and belief, Cornerstone's infringement of at least claim

22  3 of the '881 patent has been willful. Helix has been damaged as the result of

23  Cornerstone's willful infringement, and seeks increased damages, up to and

24  including treble damages.

25  **ANSWER:**  Denied.

26  89.   Helix is entitled to and claims all damages allowable by law including

27  injunctive relief, adequate compensation for the infringement, costs, interest,

28

1  attorney fees, and for the sales of infringing product as well as the sales of any
2  accessory/ancillary products.

3      **ANSWER:** Cornerstone denies that Plaintiff is entitled to such relief.

4      90.    Helix further seeks a declaration that it is entitled to three times the
5  amount of damages found or assessed pursuant to 35 U.S.C. § 284.

6      **ANSWER:** Cornerstone denies that Plaintiff is entitled to such relief.

7                      **FOURTH CAUSE OF ACTION:**

8  **Violation of 35 U.S.C. § 271 – Indirect Infringement of the '881 Patent**

9      91.    Helix incorporates the above paragraphs as though fully set forth
10 herein.

11     **ANSWER:** Cornerstone incorporates its answers to the above paragraphs as
12 though fully set forth herein.

13     92.    Cornerstone has indirectly infringed on at least claim 3 of the '881
14 Patent including by inducing others, including its independent sales representatives,
15 distributors, other re-sellers, customers, Helix customers and other end users of the
16 Accused Products to directly infringe at least claim 3 of the '881 Patent including by
17 making, using, selling, or offering to sell Cornerstone's Accused Products.

18     **ANSWER:** Denied.

19     93.    On information and belief, Cornerstone intentionally took actions that
20 induced others, including its independent sales representatives, distributors, other
21 re-sellers, customers, Helix customers and other end users of the Accused Products,
22 to directly infringe at least claim 3 of the '881 Patent.

23     **ANSWER:** Denied.

24     94.    Cornerstone's actions demonstrate an intent to cause the acts that form
25 the basis of the direct infringement, and that Cornerstone did so with the specific
26 intent to infringe the '881 patent.

27     **ANSWER:** Denied.

28

95.    Cornerstone's actions demonstrate an intent to cause the acts that form the basis of the direct infringement, and that Cornerstone did so with the specific intent to infringe the '881 patent.

**ANSWER:** Denied.

96.    Cornerstone has also contributed to the infringement of at least claim 3 of the '881 patent by others, including its independent sales representatives, distributors, other re-sellers, customers, Helix customers and other end users of the Accused Products, that directly infringe at least claim 3, by making, using, selling or offering to sell the Accused Products recited in at least claim 3 of the '881 patent. For example, Cornerstone's customers and/or the end users have incorporated Accused Products into their reinforced concrete projects.

**ANSWER:** Denied.

97.    Cornerstone has contributorily infringed and is a contributory infringer because, with knowledge of the '881 Patent, it supplies the Accused Products, which comprise a material part of a claimed combination, where the Accused Products is not a staple article of commerce, and has no substantial non-infringing uses.

**ANSWER:** Denied.

98.    Helix has been damaged as a result of Cornerstone's indirect infringement, and is entitled to relief under 35 U.S.C. §§ 283 and 284 based on Cornerstone's induced and/or contributory infringement.

**ANSWER:** Denied.

99.    Helix has been damaged as a result of Cornerstone's indirect infringement, and is entitled to relief under 35 U.S.C. §§ 283 and 284 based on Cornerstone's induced and/or contributory infringement.

**ANSWER:** Denied.

**FIFTH CAUSE OF ACTION:**

**Common Law Interference with Contract**

100.   Helix incorporates the above paragraphs as though fully set forth herein.

**ANSWER:** Cornerstone incorporates its answers to the above paragraphs as though fully set forth herein.

101.   Helix has valid contracts with its third party distributors and/or customers, including but not limited to Liteform, that provided an economic benefit to Helix.

**ANSWER:** Cornerstone lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph and, on that basis, denies them.

102.   Cornerstone has knowledge of Helix's contractual relationship with its distributors and/or customers, including its contractual relationship with Liteform, as evidenced by the fact that Cornerstone's principal was an employee of Helix, and signed the Liteform Agreement on behalf of Helix.

**ANSWER:** Denied.

103.   Cornerstone sold SteelX 5:25 or similar product to Helix's distributors and/or customers, or otherwise entered into an agreement to sell SteelX 5:25 or similar product to Helix's distributors and/or customers, including Liteform, knowing that doing so resulted in a violation of Helix's contracts with its distributors and/or customers, and that doing so would induce Helix's distributors and/or customers, including Liteform, to breach Helix's contracts with its distributors and/or customers, including the Liteform Agreement.

**ANSWER:** Denied.

104.   Helix's customers and distributors breached their agreements with Helix, including but not limited to Liteform, as a direct result of Cornerstone's tortious conduct. For example, Liteform breached the Liteform Agreement with

Helix by providing SteelX 5:25 to its customers, including providing SteelX 5:25 instead of providing Helix 5-25.

**ANSWER:** Denied.

105. Liteform also terminated its longstanding relationship with Helix on November 21, 2021 as a direct result of Cornerstone's tortious conduct.

**ANSWER:** Denied.

106. Cornerstone engaged in intentional, willful and wrongful conduct by causing and/or inducing Liteform to breach the Liteform Agreement. Cornerstone's intentional, willful and wrongful conduct caused harm to Helix, including lost sales and lost profits.

**ANSWER:** Denied.

107. Helix has sustained damages as a result of Cornerstone's tortious interference with its customers and distributors, including but not limited to Liteform, in the form of at least lost sales, lost profits and lost market share.

**ANSWER:** Denied.

## GENERAL DENIAL

Cornerstone denies all allegations in Plaintiff's First Amended Complaint not expressly and specifically admitted above.

## AMENDED SEPARATE DEFENSES

Cornerstone sets forth the following amended separate defenses to Plaintiff's First Amended Complaint and does not intend to limit thereby its ability to seek to allege any and all defenses not presently known that are revealed during the course of discovery or at trial in this case. Cornerstone asserts these defenses, affirmative or otherwise, without assuming any burden of proof that it would not otherwise have.

1. Plaintiff's First Amended Complaint fails to state a claim upon which any relief may be granted because Plaintiff's allegations in paragraphs 27–43 and 77–83 of the First Amended Complaint, even if accepted as true, do not establish that any claim of the '881 Patent is infringed.

1    2.      Cornerstone has not infringed and does not infringe literally or under

2 the doctrine of equivalents any valid claim of the '970 Patent or '881 Patent, either

3 directly or indirectly, for at least the reasons set forth in the Amended First

4 Counterclaim and Amended Fourth Counterclaim, both of which are incorporated

5 herein by reference.

6    3.      The claims of the '970 Patent and '881 Patent are invalid for at least the

7 reasons set forth in the Amended Second Counterclaim and Amended Fifth

8 Counterclaim, both of which are incorporated herein by reference. In addition, at

9 least claim 1 of the '970 Patent is invalid under 35 U.S.C. § 112 for at least the

10 reason that it fails for lack of written description and under 35 U.S.C. § 132 for

11 improper inclusion of new matter. Claim 1 includes a recitation of specific

12 dimensions that are not supported by the original application, and furthermore new

13 matter was added improperly by amendment dated January 3, 2019, to attempt to

14 provide the missing support for the claim. In addition, at least claim 3 of the '881

15 Patent is invalid under 35 U.S.C. § 112 for at least the reason that it is indefinite.

16 The preamble of claim 3 recites "[a] micro reinforcement comprised of a twisted

17 steel fiber …, wherein the twisted steel fiber meets the following criteria:" but

18 criteria a and b in the body of the claim are directed toward the "strain capacity

19 increase requirement" and "post-crack tensile stability requirement", respectively, of

20 a concrete matrix, not of a twisted steel fiber. Because the criteria of claim 3 are a

21 measure of a concrete matrix and not a steel fiber, at least claim 3 and its dependents

22 fail to inform, with reasonable certainty, those skilled in the art about the scope of

23 the purported invention.

24    4.      Plaintiff's claim for relief is barred in whole or in part by the doctrine

25 of inequitable conduct, as set forth in detail in the Statement of Facts section of the

26 Amended Counterclaims, the Amended Third Counterclaim, and the Amended Sixth

27 Counterclaim, all of which are incorporated herein by reference.

28

5.     Plaintiff's claim for relief is barred in whole or in part by the doctrine of patent misuse, for at least the reasons set forth in detail in the Statement of Facts section of the Amended Counterclaims, which are incorporated herein by reference. Even to the extent the Court finds that the conduct of Plaintiff and its founder, president, and chief technology officer, Luke Pinkerton, does not rise to the level of inequitable conduct, Plaintiff and Mr. Pinkerton improperly sought to artificially extend patent protection for products they had already invented and had already been selling for well over a year before the applications that would eventually issue as the Patents-in-Suit  were filed, despite not having invented anything new or engaging in any research and development directed toward new products.

6.     Plaintiff's recovery for alleged infringement of the '970 Patent and '881 Patent, if any, is limited by Title 35 of the United States Code, including without limitation 35 U.S.C. §§ 286 and 287. Plaintiff does not mark and has not marked its products purportedly covered by the '970 and '881 Patent, thereby limiting its recoverable damages for alleged infringement to those purportedly incurred on and after the date it provided actual notice of alleged infringement to Cornerstone.

Cornerstone reserves the right to rely on all defenses under Federal Rule of Civil Procedure 8, Title 35 of the United States Code, and any other defense, at law or at equity, that now exists, or that may in the future be available through information obtained through discovery or at trial.

WHEREFORE, Cornerstone respectfully requests that the Court enter judgment against Plaintiff on all counts of its First Amended Complaint, deny all relief requested by Plaintiff, and award such other relief to Cornerstone as the Court deems just and proper under the circumstances.

## AMENDED COUNTERCLAIMS

Defendant, Cornerstone Manufacturing and Distribution, Inc. ("Cornerstone"), pleads the following amended counterclaims ("Counterclaims") to the First Amended Complaint of Plaintiff, Pensmore Reinforcement Technologies, LLC d/b/a Helix Steel.

### PARTIES

1.      Cornerstone is a California corporation located at 955 Cornerstone Way, Corona, California.

2.      Upon information and belief, Plaintiff is a limited-liability company headquartered in Ann Arbor, Michigan that was previously known as Polytorx, LLC.

3.      This is an action for declaratory judgment in which there is an actual case or controversy between Plaintiff and Cornerstone relating to whether Cornerstone infringes U.S. Patent No. 10,266,970 (the " '970 Patent") and U.S. Patent No. 9,440,881 (the " '881 Patent") and whether one or more claims of the '970 Patent and '881 Patent (collectively, the "Patents-in-Suit") are invalid or unenforceable. This action arises under federal patent law, 35 U.S.C. §§ 101 *et seq.*

### JURISDICTION AND VENUE

4.      This Court has subject-matter jurisdiction over this action based on 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

5.      Plaintiff is subject to personal jurisdiction in this Court because it has sued Cornerstone for patent infringement, thereby consenting to jurisdiction in this District, where Cornerstone resides and has a regular and established place of business under 28 U.S.C. § 1400(b).

6.      Venue in this judicial district is proper under 28 U.S.C. §§ 1391 and 1400(b).

1

**STATEMENT OF FACTS**

2  7.  Plaintiff alleges that Cornerstone infringes at least one claim of each of

3  the Patents-in-Suit.

4  8.  Cornerstone denies that it infringes any claim of either of the Patents-

5  in-Suit.

6  9.  Cornerstone further alleges that one or more claims of each of the

7  Patents-in-Suit are invalid under 35 U.S.C. §§ 101 *et seq.*, including without

8  limitation 35 U.S.C. §§ 101, 102, 103, and/or 112.

9  10.  Cornerstone further alleges that the Patents-in-Suit are unenforceable

10  due to the inequitable conduct of Luke Pinkerton

11  11.  Upon information and belief, Mr. Pinkerton founded Plaintiff's

12  predecessor company in or about January 2002, currently serves as Plaintiff's

13  president and chief technology officer, and has served in those roles since the

14  company's founding.

15  12.  Upon information and belief, the Helix concrete-reinforcing fibers that

16  Plaintiff began selling when the company was founded were developed at the

17  University of Michigan and were licensed to Plaintiff under U.S. Patent

18  No. 5,989,713 (the " '713 Patent") and U.S. Patent No. 6,060,163 (the " '163

19  Patent").

20  13.  The '713 Patent was issued November 23, 1999 from an application

21  filed September 5, 1996.

22  14.  The '163 Patent was issued May 9, 2000 from an application filed

23  August 25, 1999. It is a division of the application that issued as the '713 Patent.

24  15.  From Mr. Pinkerton's founding of the company, Plaintiff operated

25  under an exclusive license from the University of Michigan, licensing the '713

26  Patent and '163 Patent (collectively, the "University of Michigan Patents") until

27  their expiration on September 5, 2016.

28

16.     Plaintiff relied on its exclusive license to develop its market dominance by informing others that it was the only legitimate source for twisted steel fibers because of the University of Michigan Patents.

17.     Cornerstone's current president and CEO, Hans Hausfeld, first became aware of Plaintiff's Helix concrete-reinforcing fibers as an employee of Cornerstone in the late 2000s, when Cornerstone distributed Helix products.

18.     In the early 2010s, Plaintiff was looking for investors in its company.

19.     In 2011, Mr. Hausfeld and Steve Huff became investors in Plaintiff, and Mr. Hausfeld assumed the roles of Plaintiff's vice president and a member of its sales management team.

20.     When Mr. Hausfeld and Mr. Huff were deciding whether to invest in Plaintiff, they raised the issue of the University of Michigan Patents with Mr. Pinkerton.

21.     Specifically, Mr. Hausfeld and Mr. Huff questioned Mr. Pinkerton about the long-term profitability of Plaintiff's Helix concrete reinforcing fibers, given that the University of Michigan Patents would expire in 2016.

22.     In response to Mr. Hausfeld's and Mr. Huff's concerns, Mr. Pinkerton assured them there was nothing to worry about, because he had a plan to extend patent protection for the Helix products beyond the life of the University of Michigan Patents. The Patents-in-Suit are the fruits of that plan.

23.     On information and belief, from at least about two years before the time Mr. Hausfeld became an investor and officer of Plaintiff in 2011 until he left the company in  December 2015, neither Mr. Pinkerton nor anyone else at Plaintiff invented any new concrete reinforcing fibers, came into possession of any newly invented concrete reinforcing fibers, or was conducting any research and development relating to new concrete reinforcing fibers.

24.     Nevertheless, Mr. Pinkerton and his co-inventors filed the applications that would ultimately issue as the '970 Patent and '881 Patent in 2012 and 2013,

respectively, for the purpose of extending patent protection for Plaintiff's Helix concrete-reinforcement products despite not having invented anything or otherwise being in possession of any invention.

25.     In their patent applications, which would eventually issue as the Patents-in-Suit, Mr. Pinkerton and his coinventors intentionally failed to disclose to the United States Patent and Trademark Office ("USPTO") Plaintiff's own invalidating prior art and other prior art, which Mr. Pinkerton knew would prevent the Patents-in-Suit from issuing and result in Plaintiff's Helix concrete-reinforcing products being unprotected by any U.S. patent once the University of Michigan Patents expired in 2016.

### AMENDED FIRST COUNTERCLAIM

### Declaratory Judgment of Noninfringement of the '881 Patent

26.     Cornerstone repeats and realleges all prior paragraphs of its Counterclaims as though fully set forth herein.

27.     Because Plaintiff asserts that Cornerstone infringes "at least claim 3 of the '881 Patent," there is an actual and justiciable controversy between Cornerstone and Plaintiff whether Cornerstone has directly or indirectly infringed the '881 Patent.

28.     Cornerstone has not in the past directly or indirectly infringed, and is not now directly or indirectly infringing, claim 3 of the '881 Patent—*i.e.*, the only asserted claim of the '881 Patent in Plaintiff's complaint—or any claim depending from claim 3.

29.     Claim 3 recites:

> 3. A micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement, the twisted steel fiber further having stable tensile resistance after dominant crack formation up to a

characteristic length determined by length, material used to manufacture and the number of twists provided in the twisted steel fiber, wherein the twisted steel fiber meets the following criteria:

a. a strain capacity increase requirement determined by tensile test results indicating a statically significant increase (minimum of 95% confidence, the maximum p-value in a two sample t-test, 0.05) in tensile strain capacity versus structural plain concrete, wherein a minimum of six control (plain concrete) specimens are considered in the analysis in addition to a minimum number of twisted steel fiber samples; and

b. a post-crack tensile stability requirement determined by tensile test results indicating that the median of a load carried at Sa (design crack width) of the test specimen divided by a maximum load after 0.01 in displacement is equal to or greater than 0.85, wherein the twisted steel fiber crack width, Sa, is the crack width resulting from tensile stresses typically measured for structural design applications and represents the average upper limit of displacement in a direct tension test where the stress remains stable, wherein Sa is set forth as:

$$Sa=\delta+X/3 \hspace{3cm} \text{(Eq. 1)}$$

where:

$\delta$=material elongation as stated on raw material certification test reports, inch (mm)

X=elongation from twist, representing the materials

approximate ability to "stretch" and need not be exactly

determined, inch (mm)

$$X = 1 - \cos\left(a\tan\left(\frac{n2\pi d}{l}\right)\right)$$

(Eq. 2)

and where:

n=number of full twists in the twisted steel fiber

d=equivalent diameter of the twisted steel fiber, inches (mm)

L=length of the twisted steel fiber, inches (mm)

X=percentage reduction in length from twisting of the

twisted steel fiber

and where:

the resulting values of Sa are used as a reference point for

computing tensile resistance and compute maximum

allowable crack width.

30.     Plaintiff's infringement allegation is premised on Cornerstone's claim "that [Cornerstone's] product complies with IAPMO [International Association of Plumbing and Mechanical Officials] EC 015 and that it is 'physically equivalent' to Helix's 5-25 Micro Rebar TSMR, covered by the IAPMO  EC 015 criteria." Plaintiff argues that because claim 3 of the '881 Patent "includes similar elements as the IAPMO EC 015 standard" and Cornerstone claims its Accused Products meet IAPMO's EC 015 criteria, the Accused Products therefore must infringe at least Claim 3 of the '881 Patent.

31.     But although IAPMO EC 015 contains some similar elements to claim 3 of the '881 Patent, it is not identical and does not recite each and every element of claim 3. Thus, compliance with IAPMO EC 015 does not equate to infringement of claim 3 of the '881 Patent, as alleged by Plaintiff.

32.    Furthermore, the accused products do not infringe on claim 3 for at least the reasons that Cornerstone does not incorporate the accused fibers into cement, the accused products by themselves are not a micro reinforcement within the meaning of the claim, Cornerstone never calculates a value for Sa as required by the claim and therefore no "resulting values of Sa are used as a reference point for computing tensile resistance and compute maximum allowable crack width," and on information and belief none of Cornerstone's customers ever calculate a value for Sa or perform the claimed characterization of cement incorporating the accused products.

33.    Cornerstone seeks a declaration from this Court that Cornerstone has not directly or indirectly infringed and does not directly or indirectly infringe claim 3 of the '881 Patent or any of its dependents, or any other claim of the '881 Patent that Plaintiff may assert to be or have been infringed in its future infringement contentions in this case.

## AMENDED SECOND COUNTERCLAIM

### Declaratory Judgment of Invalidity of the '881 Patent

34.    Cornerstone repeats and realleges all prior paragraphs of its Counterclaims as though fully set forth herein.

35.    There is an actual and justiciable controversy between Cornerstone and Plaintiff regarding the invalidity of at least claim 3 of the '881 Patent—*i.e.*, the only claim of the '881 Patent that Plaintiff specifically asserts to be infringed in its First Amended Complaint.

36.    At least claim 3 of the '881 Patent is invalid under at least 35 U.S.C. §§ 102, 103, and/or 112.

37.    For example, and without limitation, as apparently interpreted by Plaintiff, the '881 Patent is invalid as anticipated or rendered obvious by a number of prior-art references, including without limitation:

- U.S. Patent No. 6,060,163

1       •   U.S. Patent No. 5,989,713

2       •   PCT Application No. PCT/US2012/055567

3       •   Prior sales and public uses by Plaintiff in the United States, at least as

4            early as 2009, of the Helix 5-25  product, which had all the features of

5            at least claim 3 of the '881 Patent as apparently construed by Plaintiff

6            in this lawsuit.

7      38.    Separately or in combination, the prior-art references enumerated in

8 paragraph 37, as apparently interpreted by Plaintiff, disclose all elements of claim 3.

9      39.    Specifically, Plaintiff's allegation that the Accused Products infringe

10 claim 3 of the '881 Patent is based upon an alleged equivalence between the

11 Accused Products and Plaintiff's own products. But Plaintiff was selling products in

12 the United States having those identical characteristics under the trade name Helix

13 5-25 at least as early as 2009, more than two years prior to the filing date of the '881

14 Patent. Therefore, if the characteristics of the Accused Products alleged to be the

15 basis for infringement are covered by claim 3, claim 3 is anticipated or rendered

16 obvious by Plaintiff's own prior sales.

17      40.    In addition, at least claim 3 of the '881 Patent is invalid under 35

18 U.S.C. § 112 for at least the reason that it is indefinite. The preamble of claim 3

19 recites "[a] micro reinforcement comprised of a twisted steel fiber …, wherein the

20 twisted steel fiber meets the following criteria:" but criteria a and b in the body of

21 the claim are directed toward the "strain capacity increase requirement" and "post-

22 crack tensile stability requirement", respectively, of a concrete matrix, not of a

23 twisted steel fiber. Because the criteria of claim 3 are a measure of a concrete matrix

24 and not a steel fiber, at least claim 3 and its dependents fail to inform, with

25 reasonable certainty, those skilled in the art about the scope of the purported

26 invention.

27

28

1    41.    Cornerstone seeks a declaration from this Court that the claim 3 of the

2  '881 Patent and any other claim of the '881 Patent that Plaintiff may assert to be or

3  have been infringed in its future infringement contentions in this case are invalid.

4                          **AMENDED THIRD COUNTERCLAIM**

5          **Declaratory Judgment of Unenforceability of the '881 Patent**

6    42.    Cornerstone repeats and realleges all prior paragraphs of its

7  Counterclaims as though fully set forth herein.

8    43.    There is an actual and justiciable controversy between Cornerstone and

9  Plaintiff whether the '881 Patent is unenforceable due to Mr. Pinkerton's inequitable

10 conduct before the USPTO.

11   44.    Mr. Pinkerton is the first named inventor on the '881 Patent. Joseph L.

12 Stecher and Jeffrey Novak are named coinventors on the '881 Patent.

13   45.    Mr. Pinkerton, Mr. Stecher, and Mr. Novak filed the application that

14 would ultimately issue as the '881 Patent on December 18, 2013.

15   46.    On information and belief, at least as early as 2009, Plaintiff made sales

16 in the United States of the Helix 5-25 product, which had all the features of at least

17 claim 3 of the '881 Patent as apparently construed by Plaintiff in this lawsuit.

18   47.    Furthermore, on information and belief, at the time of the sales,

19 Plaintiff had publicly used the on-sale Helix 5-25 product in exactly the same

20 manner that Plaintiff now alleges Cornerstone's use of its Accused Products

21 constitutes infringement of at least claim 3 of the '881 Patent.

22   48.    Accordingly, the existence of the Helix 5-25 product and Plaintiff's

23 prior U.S. sales of the Helix 5-25 product well over one year before Mr. Pinkerton

24 and his coinventors applied for patent protection would have been material to the

25 USPTO's evaluation of the application that would eventually issue as the '881

26 Patent.

27   49.    As the founder, president, and chief technology officer of Plaintiff, Mr.

28 Pinkerton was aware of Plaintiff's prior invalidating sales and  public uses of the

Helix 5-25 product at the time the application that became the '881 Patent was filed. Yet, upon information and belief, Mr. Pinkerton did not disclose and directed his coinventors not to disclose Plaintiff's invalidating prior sales and public uses of the Helix 5-25 product to the USPTO because he knew that both University of Michigan Patents would expire in 2016, leaving the Helix 5-25 product and other Helix concrete-reinforcement products without patent protection and adversely affecting Plaintiff's market dominance and profits unless the USPTO could be deceived into issuing at least one new patent covering the same products.

50.     But for Mr. Pinkerton's decision to withhold and direct others to withhold material information and documentation from the USPTO concerning Plaintiff's invalidating prior sales and public uses of the Helix 5-25 product, the '881 Patent would not have issued.

51.     Because neither Mr. Pinkerton nor anyone else at Plaintiff had invented any new concrete reinforcing fibers, had come into possession of any newly invented concrete reinforcing fibers, or was conducting any research and development relating to new concrete reinforcing fibers at the time the application that would ultimately issue at the '881 Patent was filed, the only reasonable inference to draw from Mr. Pinkerton's failure to disclose to the USPTO the material information described above is that he sought to and did intentionally deceive the USPTO in order to obtain allowance of the '881 Patent, thereby artificially and fraudulently extending patent protection for Plaintiff's Helix concrete reinforcing products and artificially inflating Plaintiff's profits following expiration of the University of Michigan Patents.

52.     Mr. Pinkerton's failure to disclose invalidating prior sales and public uses of the Helix 5-25 product, combined with his intent to deceive the USPTO, renders the '881 Patent unenforceable due to inequitable conduct.

1

## AMENDED FOURTH COUNTERCLAIM

2

### Declaratory Judgment of Noninfringement of the '970 Patent

3      53.    Cornerstone repeats and realleges all prior paragraphs of its

4    Counterclaims as though fully set forth herein.

5      54.    Because Plaintiff asserts that Cornerstone infringes "at least claim 1 of

6    the '970 Patent," there is an actual and justiciable controversy between Cornerstone

7    and Plaintiff whether Cornerstone has directly or indirectly infringed the '970

8    Patent.

9      55.    Cornerstone has not in the past directly or indirectly infringed, and is

10   not now directly or indirectly infringing, claim 1 of the '970 Patent or any claim

11   depending from claim 1.

12     56.    Claim 1 recites:

13        1. A reinforcing fiber comprising:

14           a body defining a longitudinal axis and having a cross section in

15              the shape of a bilateral truncated circle, wherein the bilateral

16              truncated circle has an aspect ratio between 1.53 and 1.93,

17              wherein the aspect ratio is a ratio of width (w) to thickness

18              (t) of the body,

19        wherein the body is twisted along its longitudinal axis;

20        wherein the body has a width (w) of between 0.01375 inches

21              and 0.0159 inches.

22     57.    Cornerstone's accused products do not infringe claim 1 of the '970

23   Patent for at least the reason that they are not manufactured to create and do not

24   have a cross-section in the shape of a bilateral truncated circle.

25     58.    Cornerstone seeks a declaration from this Court that Cornerstone has

26   not directly or indirectly infringed and does not directly or indirectly infringe claim

27   1 of the '970 Patent and its dependents, or any other claim of the '970 Patent that

28

1  Plaintiff may assert to be or have been infringed in its future infringement

2  contentions in this case.

3  ### AMENDED FIFTH COUNTERCLAIM

4  **Declaratory Judgment of Invalidity of the '970 Patent**

5  59.   Cornerstone repeats and realleges all prior paragraphs of its

6  Counterclaims as though fully set forth herein.

7  60.   There is an actual and justiciable controversy between Cornerstone and

8  Plaintiff regarding the invalidity of at least claim 1 of the '970 Patent—*i.e.*, the only

9  claim of the '970 Patent that Plaintiff specifically asserts to be infringed in its First

10  Amended Complaint.

11  61.   At least claim 1 of the '970 Patent is invalid under at least 35 U.S.C. §§

12  102, 103, 112, and/or 132.

13  62.   For example, and without limitation, as apparently interpreted by

14  Plaintiff, the '970 Patent is invalid as anticipated or rendered obvious by a number

15  of prior-art references, including without limitation:

16  • U.S. Patent No. 6,060,163

17  • U.S. Patent No. 5,989,713

18  • Prior sales and public uses by Plaintiff in the United States, at least as

19     early as 2009, of the Helix 5-25 product, which had all the features of

20     at least claim 1 of the '970 Patent as apparently construed by Plaintiff

21     in this lawsuit.

22  63.   Separately or in combination, the prior-art references enumerated in

23  paragraph 62, as apparently interpreted by Plaintiff, disclose all elements of at least

24  claim 1 of the '970 Patent.

25  64.   For example, Plaintiff's Helix 5-25 product was on sale more than a

26  year before the earliest priority date of the '970 Patent. The Helix 5-25 products

27  embodied each and every limitation of claim 1 of the '970 Patent, and therefore

28

1 constitute barring sales that anticipate or by themselves render obvious at least claim

2 1 of the '970 Patent.

3      65.    In addition, at least claim 1 of the '970 Patent is invalid under

4 35 U.S.C. § 112 for at least the reason that it fails for lack of written description and

5 under 35 U.S.C. § 132 for improper inclusion of new matter. Claim 1 includes a

6 recitation of specific dimensions that are not supported by the original application,

7 and furthermore new matter was improperly added by amendment dated January 3,

8 2019, to attempt to provide the missing support for the claim.

9      66.    Cornerstone seeks a declaration from this Court that claim 1 of the

10 '970 Patent and any other claim of the '970 Patent that Plaintiff may assert to be or

11 have been infringed in its future infringement contentions in this case are invalid.

12                    **AMENDED SIXTH COUNTERCLAIM**

13       **Declaratory Judgment of Unenforceability of the '970 Patent**

14      67.    Cornerstone repeats and realleges all prior paragraphs of its

15 Counterclaims as though fully set forth herein.

16      68.    There is an actual and justiciable controversy between Cornerstone and

17 Plaintiff whether the '970 Patent is unenforceable due to Mr. Pinkerton's inequitable

18 conduct before the USPTO.

19      69.    Mr. Pinkerton is the first named inventor on the '970 Patent. Mr.

20 Stecher is a named coinventor on the '970 Patent.

21      70.    Mr. Pinkerton and Mr. Stecher filed the application that would

22 ultimately issue as the '970 Patent on September 14, 2012.

23      71.    On information and belief, at least as early as 2009, Plaintiff made sales

24 in the United States of the Helix 5-25 product, which had all the features of at least

25 claim 1 of the '970 Patent as apparently construed by Plaintiff in this lawsuit.

26      72.    Furthermore, on information and belief at the time of the sales, Plaintiff

27 had publicly used the on-sale Helix 5-25 product in exactly the same manner that

28

1  Plaintiff now alleges Cornerstone's use of its Accused Products constitutes
2  infringement of at least claim 1 of the '970 Patent.

3       73.    Accordingly, the existence of the Helix 5-25 product and Plaintiff's
4  prior U.S. sales of the Helix 5-25 product well over one year before Mr. Pinkerton
5  and his coinventor applied for patent protection would have been material to the
6  USPTO's evaluation of the application that would eventually issue as the '970
7  Patent.

8       74.    As the founder, president, and chief technology officer of Plaintiff, Mr.
9  Pinkerton was aware of Plaintiff's invalidating prior sales and public uses of the
10  Helix 5-25 product at the time the application that became the '970 Patent was filed.
11  Yet, upon information and belief, Mr. Pinkerton did not disclose and directed his
12  coinventor not to disclose Plaintiff's invalidating prior sales and public uses of the
13  Helix 5-25 product to the USPTO because he knew that Plaintiff's Helix concrete-
14  reinforcement products would soon lack patent protection, adversely affecting
15  Plaintiff's market dominance and profits unless the USPTO could be deceived into
16  issuing at least one new patent covering the same products.

17       75.    But for Mr. Pinkerton's decision to withhold and direct others to
18  withhold material information and documentation from the USPTO concerning
19  Plaintiff's invalidating prior sales and public uses of the Helix 5-25 product, the '970
20  Patent would not have issued.

21       76.    Upon information and belief, the only difference between the
22  University of Michigan Patents and the '970 Patent is the particular cross-sectional
23  shape of the fiber and the particular dimensions claimed. Any such differences
24  would have been obvious by themselves to one of ordinary skill in the art in
25  possession of the University of Michigan Patents.

26       77.    Indeed, the University of Michigan Patents disclose fibers having a
27  polygonal shape but also disclose that other shapes are possible and would be within

28

the scope of the invention. As the '713 Patent states: "The individual fibers may be circular or of optimized shape according to this patent."

78.    As described above in paragraphs 59–64, the University of Michigan Patents are prior-art references that anticipate or, in combination with other prior-art references, render obvious one or more claims of the '970 Patent.

79.    Accordingly, the existence of the University of Michigan Patents and Plaintiff's license thereunder would have been material to the USPTO's evaluation of the application that would eventually issue as the '970 Patent.

80.    As the founder, president, and chief technology officer of Plaintiff, Mr. Pinkerton was aware of the University of Michigan Patents and Plaintiff's license thereunder at the time the application that became the '970 Patent was filed. Yet, upon information and belief, Mr. Pinkerton did not disclose and directed his coinventor not to disclose the existence of the University of Michigan Patents and Plaintiff's license thereunder to the USPTO because he knew that both University of Michigan Patents would expire in 2016, leaving the Helix 5-25 product and other Helix concrete-reinforcement products without patent protection and adversely affecting Plaintiff's market dominance and profits unless the USPTO could be deceived into issuing at least one new patent covering the same products.

81.    But for Mr. Pinkerton's decision to withhold and direct others to withhold material information and documentation from the USPTO concerning the University of Michigan Patents and Plaintiff's license thereunder, the '970 Patent would not have issued.

82.    Additionally, claim 10 of the '970 Patent purports to cover a method of making the fibers, the steps for which were fully performed for years prior to the critical date by the machines that Plaintiff owned and operated.

83.    Plaintiff admitted in a lawsuit it filed against the University of Michigan that the machines that were used in its earliest work to perform the same,

1  or very similar, method, had been disclosed prior to the application that became the

2  '970 Patent.

3      84.    In that lawsuit, Plaintiff accused the University of Michigan of

4  breaching confidentiality obligations owed to Plaintiff, and further that the breach

5  had resulted in its machine and method of manufacture being disclosed in South

6  Korean patent number 1011373090000.

7      85.    The application that became the South Korean patent that Plaintiff

8  accused of disclosing its alleged proprietary information was published in May of

9  2011.

10     86.    Accordingly, the existence of South Korean patent number

11 1011373090000 and Plaintiff's allegations about the method disclosed therein and

12 its longtime prior use in the United States would have been material to the USPTO's

13 evaluation of the application that would eventually issue as the '970 Patent.

14     87.    As the founder, president, and chief technology officer of Plaintiff, Mr.

15 Pinkerton was aware of the May 2011 South Korean patent application and

16 Plaintiff's allegations about the method disclosed therein and its longtime prior use

17 in the United States at the time the application that became the '970 Patent was

18 filed. Yet Mr. Pinkerton did not disclose to the USPTO the existence of the May

19 2011 South Korean patent application or the allegations Plaintiff had made in its

20 lawsuit against the University of Michigan about the method disclosed therein and

21 its longtime prior use in the United States, because he knew that Plaintiff's Helix

22 concrete-reinforcement products would soon lack patent protection, adversely

23 affecting Plaintiff's market dominance and profits unless the USPTO could be

24 deceived into issuing at least one new patent covering the same products.

25     88.    But for Mr. Pinkerton's decision to withhold from the USPTO material

26 information and documentation concerning the May 2011 South Korean patent

27 application, the method disclosed therein, and its longtime prior use in the United

28 States, the '970 Patent would not have issued.

89.     Because neither Mr. Pinkerton nor anyone else at Plaintiff had invented any new concrete reinforcing fibers, had come into possession of any newly invented concrete reinforcing fibers, or was conducting any research and development relating to new concrete reinforcing fibers at the time the application that would ultimately issue at the '970 Patent was filed, the only reasonable inference to draw from Mr. Pinkerton's failure to disclose to the USPTO the material information described above, is that he sought to and did intentionally deceive the USPTO in order to obtain allowance of the '970 Patent, thereby artificially and fraudulently extending patent protection for Plaintiff's Helix concrete reinforcing products and artificially inflating Plaintiff's profits following expiration of the University of Michigan Patents.

90.     Mr. Pinkerton's failure to disclose to the USPTO invalidating prior sales and public uses of the Helix 5-25 product and the multiple known, invalidating prior-art references described above, combined with his intent to deceive the USPTO, renders the '970 Patent unenforceable due to inequitable conduct.

## PRAYER FOR RELIEF

Based on the foregoing allegations, Cornerstone respectfully requests the following relief:

A.     That Plaintiff's claim against Cornerstone be dismissed with prejudice and that all relief requested by Plaintiff be denied;

B.     That the Court enter a declaratory judgment in favor of Cornerstone that Cornerstone does not infringe any asserted claim of the '970 Patent;

C.     That the Court enter a declaratory judgment in favor of Cornerstone that at least the asserted claims of the '970 Patent are invalid;

D.     That the Court enter a declaratory judgment in favor of Cornerstone that the '970 Patent is unenforceable due to Plaintiff's inequitable conduct;

E.   That the Court enter a declaratory judgment in favor of Cornerstone that Cornerstone does not infringe any asserted claim of the '881 Patent;

F.   That the Court enter a declaratory judgment in favor of Cornerstone that at least the asserted claims of the '881 Patent are invalid;

G.   That the Court enter a declaratory judgment in favor of Cornerstone that the '881 Patent is unenforceable due to Plaintiff's inequitable conduct;

H.   That the Court award Cornerstone its costs;

I.   That this case be deemed exceptional, and that Cornerstone be awarded its reasonable attorney fees in this action under 35 U.S.C. § 285; and

J.   That Cornerstone be granted such other and further relief as the Court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Cornerstone demands a trial by jury on all issues so triable.


HOVEY WILLIAMS LLP


DATED: January 4, 2022              By:  /s/ *Scott R. Brown*
                                         Scott R. Brown
                                         Attorneys for Defendant/Counterclaimant

1

<u>**CERTIFICATE OF SERVICE**</u>

2

     On January 4, 2022, the foregoing Amended Answer, Separate Defenses, and

3

Counterclaims to Plaintiff's First Amended Complaint was electronically filed with

4

the Clerk of the Court via the CM/ECF System, which will deliver electronic

5

notification to all registered counsel of record.

6

                    /s/ ***Scott R. Brown***

7

                    Scott R. Brown
                    Attorney for Defendant/Counterclaimant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28