1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

O

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

PENSMORE REINFORCEMENT
   TECHNOLOGIES, LLC d/b/a
HELIX STEEL,

         Plaintiff,

     v.

CORNERSTONE
   MANUFACTURING AND
   DISTRIBUTION, INC.,

        Defendant.

_____

CORNERSTONE
   MANUFACTURING AND
   DISTRIBUTION, INC.,

        Counterclaimant,

     v.

PENSMORE REINFORCEMENT
   TECHNOLOGIES, LLC d/b/a
HELIX STEEL,

        Counterdefendant.

Case No. 5:21-cv-01556-JWH-SHK

**MEMORANDUM OPINION AND
ORDER ON MOTION OF
PLAINTIFF AND
COUNTERDEFENDANT TO
DISMISS AMENDED
COUNTERCLAIMS III and VI and
AFFIRMATIVE DEFENSES 1, 4,
and 5 [ECF No. 44]**

Before the Court is the motion of Plaintiff and Counterdefendant Pensmore Reinforcement Technologies, LLC, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the counterclaims for inequitable conduct and the defenses of failure to state a claim, inequitable conduct, and patent misuse asserted by Defendant and Counterclaimant Cornerstone Manufacturing and Distribution, Inc.[1]  The Court finds this matter appropriate for resolution without a hearing.  *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support and in opposition,[2] the Court **GRANTS-IN-PART** and **DENIES-IN-PART** the Motion.

## I.  BACKGROUND

**A.    Procedural Background**

Pensmore does business under the name "Helix Steel," and it refers to itself as "Helix" throughout its pleadings.[3]  The Court will likewise do so here.

In December 2021, Helix filed its operative Amended Complaint.  In that pleading, Helix asserts claims for direct and indirect infringement of two patents:  U.S. Patent No. 10,266,970 (the "'970 Patent"), entitled "Concrete Reinforcing Fibers"; and U.S. Patent No. 9,440,881 (the "'881 Patent"), entitled "Micro-Rebar Concrete Reinforcement System" (jointly, the "Asserted Patents").[4]  In response, Cornerstone asserts counterclaims for non-infringement, invalidity, and unenforceability of the Asserted Patents.[5]  As

---

[1]      Pl.'s Mot. to Dismiss Amended Counterclaims III and VI and Affirmative Defenses 1, 4, and 5 (the "Motion") [ECF No. 44].

[2]      The Court considered the following papers and all attachments thereto: (1) First Am. Compl. (the "Amended Complaint") [ECF No. 29]; (2) Am. Answer and Am. Counterclaim (the "Amended Answer" and the "Amended Counterclaims," respectively) [ECF No. 37]; (3) the Motion; (4) Def.'s Opp'n to the Motion (the "Opposition") [ECF No. 47]; and (5) Pl.'s Reply in Supp. of the Motion (the "Reply") [ECF No. 49].

[3]      Amended Complaint ¶ 5.

[4]      *See generally id.*

[5]      *See* Amended Answer 36-49.

-2-

1  relevant to the Motion, Cornerstone also asserts separate defenses for failure to

2  state a claim, inequitable conduct, and patent misuse.[6]

3         In January 2022, Helix filed the instant Motion, seeking the dismissal of

4  Cornerstone's inequitable conduct counterclaims on the ground that they fail to

5  state a claim for relief.  Helix also seeks an order dismissing Cornerstone's

6  separate affirmative defenses for failure to state a claim, inequitable conduct,

7  and patent misuse.  Helix's Motion is fully briefed.

8  **B.**    **Factual Background**

9         **1.**    **Technological Background**

10         The '970 Patent "relates to concrete reinforcing fibers."[7]  Because

11  concrete has low tensile strength and low fracture toughness, it generally needs

12  to be reinforced.  The '970 Patent sought to improve on the standard process of

13  reinforcing concrete with rebar "by incorporating short, randomly distributed

14  fibers in concrete such that the reinforcing fibers are distributed throughout the

15  matrix and thus a new composite material . . . is obtained."[8]  This method is

16  desirable because "[f]iber reinforced concrete has significantly improved energy

17  absorption capability (often called toughness), impact resistance, and fatigue

18  endurance, with greater resistance to cracking."[9]  Although different types of

19  fibers had been used to reinforce concrete, the claimed invention sought to

20  improve upon such fibers by inventing "an efficient and low cost method to

21  manufacture the fibers used in these composites."[10]  Thus, the disclosed fibers

22  satisfied the need for "improved geometries," which "improve[d] the pull-out

23  load of the fiber, the stress-strain response," and the "energy absorbing capacity

24

25      6     *See id.* at 30-32.

26      7     *See* '970 Patent [ECF No. 29-2] 1:14.

27      8     *Id.* at 1:18-30.

    9     *Id.* at 1:30-34.

28      10    *Id.* at 1:35-48.

of the composite," and they did so "at a significantly lower cost than [was] currently available."[11]

To that end, Claim 1 discloses:

1.      A reinforcing fiber comprising:

a body defining a longitudinal axis and having a cross section in the shape of a bilateral truncated circle, wherein the bilateral truncated circle has an aspect ratio between 1.53 and 1.93, wherein the aspect ratio is a ratio of width (w) to thickness (t) of the body,

wherein the body is twisted along its longitudinal axis;

wherein the body has a width (w) of between 0.01375 inches and 0.0159 inches.[12]

Relatedly, the '881 Patent discloses a micro-rebar concrete reinforcement system, including "[a] method for designing and manufacturing micro reinforced concrete that produces a composite material that shares physical properties with both the reinforcing material and the concrete."[13]  The micro reinforced concrete comprises "a two-part system that [is] made of micro reinforcements, which are twisted steel fibers, and a concrete matrix."[14]  To overcome problems with prior fiber-reinforced concrete (*e.g.*, high cost and performance inefficiencies), which had prevented fiber-reinforced concrete from gaining ground vis-à-vis traditional rebar-reinforced concrete, the disclosed system offered "a way to characterize its tensile performance and develop

---

[11]     *Id.* at 1:46-61.
[12]     *See id.* at Claim 1, 13:26-35.
[13]     *See* '881 Patent [ECF No. 29-3] at Abstract.
[14]     *Id.*

designs that are reliable and more economical than typical steel fiber concrete."[15]

### 2. Infringement and Inequitable Conduct Allegations

In its Amended Complaint, Helix alleges that the '970 and '881 Patents "protect Helix's concrete reinforcing Micro Rebar™ products," which offer "an improved alternative to traditional rebar that consists of thousands of small[,] twisted metal fibers mixed into concrete prior to its application."[16]  The Amended Complaint further alleges that Cornerstone's principals previously worked at Helix and used the knowledge that they gained there to develop a competing infringing product.[17]  The Amended Complaint provides the following comparison:



As relevant to the Motion, Cornerstone asserts counterclaims seeking a declaration of unenforceability of the Asserted Patents based upon inequitable conduct.[18]  Cornerstone alleges that, before obtaining the Asserted Patents, Helix previously sold concrete-reinforcing fibers under an exclusive license for technology disclosed in several University of Michigan patents.[19]  Cornerstone

---

[15]    *Id.* at 2:7-14.

[16]    Amended Complaint ¶ 1.

[17]    *Id.* ¶ 2; *see also id.* at ¶¶ 27-33.

[18]    *See* Amended Answer 41 (Amended Third Counterclaim—Declaratory Judgment of Unenforceability of the '881 Patent) & 45 (Amended Sixth Counterclaim—Declaratory Judgment of Unenforceability of the '970 Patent).

[19]    Amended Counterclaim (Statement of Facts) ¶¶ 12 & 15.

first became aware of that product when Cornerstone distributed Helix products in the late 2000s.[20]  Cornerstone describes Helix as Pensmore's "predecessor company."[21]

In the early 2010s when Helix was looking for investors, Cornerstone's CEO, Hans Hausfeld, provided funding.[22]  Before deciding to invest, Hausfeld asked Luke Pinkerton, then-CEO of Helix, about the long-term viability of competitively selling the concrete-reinforcing fibers, given the shelf-life of the University of Michigan patents.[23]  Pinkerton said not to worry "because he had a plan to extend patent protection for the Helix products beyond the life of the University of Michigan Patents."[24]  The Amended Counterclaims allege that the Asserted Patents "are the fruits of that plan."[25]

Although Helix ultimately applied for and acquired new patents—*i.e.*, the Asserted Patents—Cornerstone contends that, for at least two years before Hausfeld became an investor through 2015, no one at Helix "invented any new concrete reinforcing fibers, came into possession of any newly invented concrete reinforcing fibers, or was conducting any research and development relating to new concrete reinforcing fibers."[26]  Cornerstone asserts that Helix, through Pinkerton, applied for new patents anyway, "for the purpose of extending patent protection for [the] concrete-reinforcement products despite not having invented anything or otherwise being in possession of any invention."[27]  The Amended Counterclaims aver that that activity constitutes inequitable conduct

---

[20]     *Id.* at ¶ 17.
[21]     *Id.* at ¶ 11.
[22]     *Id.* at ¶¶ 18 & 19.
[23]     *Id.* at ¶¶ 20 & 21.
[24]     *Id.* at ¶ 22.
[25]     *Id.*
[26]     *Id.* at ¶ 23.
[27]     *Id.* at ¶ 24.

1   because, in the new patent applications, "Pinkerton and his coinventors

2   intentionally failed to disclose" Helix's "own invalidating prior art and other

3   prior art, which Mr. Pinkerton knew would prevent the Patents-in-Suit from

4   issuing and result in Plaintiff's Helix concrete-reinforcing products being

5   unprotected by any U.S. patent once the University of Michigan Patents expired

6   in 2016."[28]  Helix now moves to dismiss the inequitable conduct counterclaims

7   and separate defenses.

## II.  LEGAL STANDARDS

### A.    Rule 12(b)(6)—Motion to Dismiss

10          A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the

11   claims asserted in a complaint.  *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir.

12   2001).  In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are

13   taken as true and construed in the light most favorable to the nonmoving party."

14   *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir.

15   2002).  Although a complaint attacked through a Rule 12(b)(6) motion "does

16   not need detailed factual allegations," a plaintiff must provide "more than labels

17   and conclusions."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

18          To state a plausible claim for relief, the complaint "must contain

19   sufficient allegations of underlying facts" to support its legal conclusions.  *Starr*

20   *v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Factual allegations must be

21   enough to raise a right to relief above the speculative level on the assumption

22   that all the allegations in the complaint are true (even if doubtful in fact) . . . ."

23   *Twombly*, 550 U.S. at 555 (citations and footnote omitted).  Accordingly, to

24   survive a motion to dismiss, a complaint "must contain sufficient factual matter,

25   accepted as true, to state a claim to relief that is plausible on its face," which

26   means that a plaintiff must plead sufficient factual content to "allow[] the Court

27

28   [28]    *Id.* at ¶ 25.

to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  A complaint must contain "well-pleaded facts" from which the Court can "infer more than the mere possibility of misconduct." *Id*. at 679.

**B.    Rule 9(b)—Pleading Inequitable Conduct**

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011).  Rule 9(b) governs inequitable conduct claims.  *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009).  That rule "requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Id.* (internal quotation marks and bracket omitted).  To meet that standard, the Federal Circuit (like other circuits) requires the pleading party to identify "the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id.* at 1327.

Thus, a well-pleaded claim for inequitable conduct must allege facts supporting that "(1) an individual associated with the filing and prosecution of a patent application made an affirmative misrepresentation of a material fact, failed to disclose material information, or submitted false information; and (2) the individual did so with a specific intent to deceive the PTO." *Id.* at 1327 n.3.  "A pleading that simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)." *Id.* at 1326-27.

With respect to materiality, "[w]here a patent applicant fails to disclose prior art to the PTO, the prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense*, 649 F.3d at 1292.

### III.  DISCUSSION

**A.    Summary of Arguments**

Helix moves to dismiss Cornerstone's inequitable conduct counterclaims for failure to plead materiality and specific intent to deceive.  First, Helix argues that Cornerstone did not plead the "why" and the "how" establishing that Helix's pre-2009 product would have been material to the examiner, or the "what" and the "where" by including to which claim limitation(s) it would have been relevant.[29]  Helix maintains that the allegations do not "identify a specific sale, or provide any measurements, qualities, characteristics or specifications of the pre-2009 Helix 5-25 product."[30]  Helix also states that Cornerstone's allegations that the pre-2009 Helix product "is identical to the subsequent product Helix patented starting in 2012 is pure speculation that lacks any support."[31]  Further, Helix rejects the allegations that Cornerstone makes upon information and belief, and it contends that those allegations are untrue because the Asserted Patents are based upon "research and development [conducted] in the 2009 to 2012 timeframe."[32]  Helix makes the same arguments with respect to the '881 Patent and adds that the additional prior art that Cornerstone cites does not cure the deficiencies, but, instead, it shows immateriality.[33]

Second, Helix asserts that Cornerstone did not provide facts that would support a reasonable inference of intent to deceive.[34]  Helix argues that "intent to deceive the Patent Office must be the single most reasonable inference," and,

---

[29]     Motion 7:1-3; *see also id.* at 7:20-22 & 8:12-18.

[30]     *Id.* at 7:23-25.

[31]     *Id.* at 7:25-8:1.

[32]     *Id.* at 8:1-9.

[33]     *See generally id.* at 11:20-28.

[34]     *Id.* at 10:9-15.

1    here, "it is not."[35]  Instead, Helix avers that "[t]he much more reasonable and
2    logical inference is [Helix's] asserted patents were based upon research and
3    development [conducted] in the 2009 to 2012 timeframe, and filed in 2012 to
4    protect new product and process developments."[36]  Helix makes the same
5    arguments with respect to the '881 Patent.[37]

6           Cornerstone responds that, as a threshold matter, the Court should
7    disregard Helix's assertions that Cornerstone's allegations in the Amended
8    Counterclaims are "false," "unsubstantiated," etc., because factual allegations
9    must be taken as true at the pleading stage.[38]  Additionally, the "single most
10   reasonable inference" standard from *Therasense* "'governs what needs to be
11   shown to prevail on an inequitable conduct claim, not what is needed to survive
12   a Rule 12 motion.'"[39]  Cornerstone observes that, "when essential information
13   is in the other party's control, Rule 9(b) permits pleading on information and
14   belief as long as 'the pleading sets forth the specific facts upon which the belief is
15   reasonably based.'"[40]

16          Cornerstone contends that "four years investing in and working for
17   [Helix] and [Hausfeld's] prior experience distributing [Helix's] products for
18   Cornerstone [] gave [Hausfeld] knowledge of [Helix's] business," and "[h]is
19   beliefs about [Helix's] pre-2011 activities are reasonably based on that
20   knowledge."[41]  Thus, Cornerstone concludes that it has sufficiently pleaded:

21

---

22   [35]     *Id.* at 11:3-4.
23   [36]     *Id.* at 11:10-13.
     [37]     *See generally id.* at 13:1-15.
24
     [38]     Opposition 7:7-20.
25   [39]     *Id.* at 11:4-6 (quoting *Seville Classics, Inc. v. Neatfreak Group, Inc.*, 2016
26   WL 6661176, at *4 (C.D. Cal. Apr. 1, 2016)).
     [40]     *Id.* at 7:27-8:4 (quoting *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d
27   1312, 133-31 (Fed. Cir. 2009) (pleading must provide "the 'information' on
     which it relies" as well as "the plausible reasons for its 'belief'").
28   [41]     *Id.* at 8:24-27.

- the "who" and "when" (during prosecution of the Asserted Patents, Pinkerton withheld prior art identical products sold);[42]

- the "what" and the "where" (the Helix 5-25 product—"a microfiber, about one inch in length with a wire-thin diameter"— anticipates claim 3 of the '881 Patent and claim 1 of the '970 Patent);[43] and

- the "how" and the "why" (disclosure of "a covered product that was on sale or in public use at least a year before the critical date" would cause "the examiner [to] reject the claims as anticipated under the on-sale or public-use bar").[44]

Turning to knowledge and intent, Cornerstone argues that Pinkerton's knowledge of the invalidating prior art may reasonably be inferred from the allegations that:

- Pinkerton founded Helix ;
- Helix had an exclusive license to sell its product covered by the University of Michigan patents;
- Hausfeld raised those patents to Pinkerton when discussing potential investment in Helix ; and
- Pinkerton said that he had a plan, and then Pinkerton obtained new patents.[45]

Cornerstone argues that specific deceptive intent may be inferred from the allegations that Pinkerton told Hausfeld that Pinkerton had a plan to extend Helix 's patent protection, even though—according to Hausfeld—nothing new had been invented over the prior patents.[46]

---

[42]   *Id.* at 12:4-18.
[43]   *Id.* at 12:26-13:1 & 13:13-14.
[44]   *Id.* at 17:6-9
[45]   *Id.* at 19:3-17.
[46]   *Id.* at 19:18-27.

Helix replies that the Court should not accept allegations based upon information and belief because the claims do not set forth sufficient facts on which that belief is founded.[47]  Even if Hausfeld was unaware of research and development into new products from 2009-2015, Helix argues that Hausfeld's lack of knowledge does not establish that no such activities took place.[48]  Helix also contends that Cornerstone's response does not cure the Rule 9(b) deficiencies concerning materiality and intent.[49]

## B.   Inequitable Conduct Counterclaim

To state a claim for inequitable conduct, a plaintiff must allege with specificity the following:  (1) knowledge of the uncited reference; (2) knowledge of the reference's materiality; and (3) the specific intent to deceive the PTO by withholding that reference.  *See Therasense*, 649 F.3d at 1289-90.  "[A]lthough 'knowledge' and 'intent' may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO."  *Exergen Corp.*, 575 F.3d at 1328–29.  "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith."  *Id.* at 1329 n.5.  Further, although "[p]leading on 'information and belief' is permitted under Rule 9(b) when essential information lies uniquely within another party's control," it is permissible "only if the pleading sets forth the specific facts upon which the belief is reasonably based."  *Id.* at 1330.

---

[47]    Reply 6:28-7:2.

[48]    *Id.* at 8:4-7.

[49]    *Id.* at 9:1-17, 10:3-15, 11:21-25, & 12:11-15.

The Court concludes that Cornerstone has sufficiently pleaded its inequitable conduct allegations under Rule 9(b).  Helix challenges the sufficiency of the "materiality" and "intent to deceive" allegations, but those allegations meet the Rule 9(b) standard.

### 1.   Materiality

Cornerstone's Amended Counterclaims set forth sufficient factual allegations regarding materiality.  Cornerstone alleges that "the Helix concrete-reinforcing fibers that [Helix] began selling when the company was founded were developed at the University of Michigan."[50]  "From Mr. Pinkerton's founding of the company, [Helix] operated under an exclusive license from the University of Michigan . . . until the relevant patents expired on September 5, 2016."[51]  "[Helix] relied on its exclusive license to develop its market dominance by informing others that it was the only legitimate source for twisted steel fibers because of the University of Michigan Patents."[52]

The Amended Counterclaims further allege that, before Hausfeld became an investor in Helix, he asked Pinkerton "about the long-term profitability of Plaintiff's Helix concrete reinforcing fibers, given that the University of Michigan Patents would expire in 2016."[53]  Pinkerton responded that "there was nothing to worry about, because he had a plan to extend patent protection for the Helix products beyond the life of the University of Michigan Patents."[54]  Then, in 2012 and 2013, Pinkerton filed the patent applications that would issue as the '970 and '881 Patents," allegedly without "invent[ing] any new concrete reinforcing fibers, [coming] into possession of any newly invented concrete

---

[50]   Amended Counterclaims (Statement of Facts) ¶ 12.
[51]   *Id.* at ¶ 15.
[52]   *Id.* at ¶ 16.
[53]   *Id.* at ¶¶ 21 & 22.
[54]   *Id.*

reinforcing fibers, or [] conducting any research and development relating to new concrete reinforcing fibers."[55]  The Amended Counterclaims allege that, in those applications, Pinkerton failed to disclose "[Helix's] own invalidating prior art and other prior art, which Mr. Pinkerton knew would prevent the Patents-in-Suit from issuing and result in Plaintiff's Helix concrete-reinforcing products being unprotected by any U.S. patent once the University of Michigan Patents expired in 2016."[56]

Relatedly, the Amended Counterclaims aver that the Asserted Patents are invalid under 35 U.S.C. § 102 because they are rendered obvious by, *inter alia*, "[p]rior sales and public uses by [Helix] in the United States, at least as early as 2009, of the Helix 5-25 product, which had all the features of at least claim 3 of the '881 Patent as apparently construed by [Helix] in this lawsuit."[57]  The cited prior art "disclose[s] all elements of claim 3."[58]  Because "[Helix] was selling products in the United States having [] identical characteristics under the trade name Helix 5-25 at least as early as 2009, more than two years prior to the filing date of the '881 Patent," then "claim 3 is anticipated or rendered obvious by [Helix's] own prior sales."[59]  Thus, "the existence of the Helix 5-25 product and [Helix's] prior U.S. sales of the Helix 5-25 product well over one year  before Mr. Pinkerton and his coinventors applied for patent protection would have been material to the USPTO's evaluation of the application that would eventually issue as the '881 Patent."[60]

---

[55]     *Id.* at ¶¶ 23 & 24.
[56]     *Id.* at ¶ 25.
[57]     *Id.* at ¶ 37; *see also id.* at ¶¶ 46 & 47.
[58]     *Id.* at ¶ 38.
[59]     *Id.* ¶ 39.
[60]     *Id.* at ¶ 48; *see also id.* at ¶ 50.

The Amended Counterclaims make similar allegations regarding the '970 Patent.  Specifically, Cornerstone alleges that "Plaintiff's Helix 5-25 product was on sale more than a year before the earliest priority date of the '970 Patent.  The Helix 5-25 products embodied each and every limitation of claim 1 of the '970 Patent, and therefore constitute barring sales that anticipate or by themselves render obvious at least claim 1 of the '970 Patent."[61]  Thus, "the existence of the Helix 5-25 product and [Helix's] prior U.S. sales of the Helix 5-25 product well over one year before Mr. Pinkerton and his coinventor applied for patent protection would have been material to the USPTO's evaluation of the application that would eventually issue as the '970 Patent."[62]

The Court finds those allegations sufficient to support materiality.  In sum, Cornerstone contends that Pinkerton, on behalf of Helix, sold the Helix 5-25 product for years before applying for the Asserted Patents.  Further, Cornerstone states that the Helix 5-25 product embodies what is claimed in asserted claim 3 of the '881 Patent and claim 1 of the '970 Patent.  Thus, Cornerstone urges the conclusion that the prior sales are invalidating.  A patent applicant's prior sales that implicate the on-sale bar indisputably would have been material to the PTO examiner.  *See, e.g.*, *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1584 (Fed. Cir. 1996) ("[the plaintiff's] sales activities were also material, because they were potential statutory bars under 35 U.S.C. § 102(b)").

Helix may argue that the prior sales are not invalidating because, for example, the Helix 5-25 product does not embody the Asserted Patents, but that is a factual dispute relating to Cornerstone's burden of proof that cannot be resolved at the pleading stage.

---

[61]     *Id.* at ¶¶ 62-64 & 71.

[62]     *Id.* at ¶ 73.

### 2.     Intent to Deceive

Turning to intent to deceive, the Court first declines Helix's invitation to apply the single-most-reasonable-inference test.  At the pleading stage, Cornerstone is not required to allege facts supporting the conclusion that specific intent to deceive is the single most reasonable inference to be drawn from the factual allegations.  *See, e.g.*, *Hangzhou Chic Intelligent Tech. Co. v. Razor USA LLC*, 2016 WL 10518582, at *2 (C.D. Cal. Dec. 19, 2016) (inequitable conduct need not be "the single most reasonable inference" drawn from the alleged facts at the pleading stage); *Human Genome Sciences, Inc. v. Genentech, Inc.*, 2011 WL 7461786, at *3 (C.D. Cal. Dec. 9, 2011) ("[i]n deciding a motion to dismiss an inequitable conduct claim, the level of scrutiny applied to the pleadings does not appear to be so exacting" as to require clear and convincing evidence or meeting the single-most-reasonable-inference burden; "a mere reasonable inference is quite enough to survive") (citing *Exergen*, 575 F.3d at 1326-27).

Instead, Cornerstone must merely plead facts sufficient to raise a reasonable inference of specific intent to deceive.  Taking the allegations in the light most favorable to Cornerstone and acknowledging the Federal Circuit's guidance that direct evidence of intent is rare, the Court concludes that Cornerstone has pleaded sufficient facts from which a reasonable inference of intent to deceive may be drawn.  The Amended Counterclaims allege that, when Hausfeld asked Pinkerton about the long-term viability of the Helix 5-25 product given the impending expiration of the underlying University of Michigan Patents, Pinkerton responded that he had a plan on how to *extend* protection for that products—not get protection for new products.[63]  Based upon Hausfeld's knowledge of Helix's business operations and the Helix 5-25 product, including

---

[63]     *See* Amended Counterclaims (Statement of Facts) ¶ 22.

Hausfeld's belief that no new products had been developed during the relevant timeframe, the Amended Counterclaims raise a reasonable inference that Pinkerton withheld disclosing the Helix 5-25 product as material prior art because it would have interfered with the alleged plan to extend patent protection covering that product.

Helix challenges the allegations that Cornerstone makes "on information and belief," but those allegations are sufficient under Rule 9(b) where the claims contain sufficient facts from which such a belief can reasonably be formed. That is, the information that allowed Cornerstone to form those beliefs can be found in the factual allegations concerning Hausfeld's involvement with Helix—both as a distributor and an investor—and the allegations concerning the market dominance of the Helix 5-25 product. Helix may contend that those allegations are false and that other inferences are more reasonable (*e.g.*, Helix was conducting research and development of which Hausfeld was unaware), but that is not the test at the pleading stage. Taken in totality, the Amended Counterclaims' allegations circumstantially support an inference concerning intent to deceive.

Although Cornerstone must ultimately bear the burden to prove inequitable conduct by clear and convincing evidence, at the pleading stage its factual allegations are sufficient to raise a reasonable inference. *See, e.g.*, *Human Genome Sciences*, 2011 WL 7461786, at *3. Accordingly, Helix's request to dismiss Cornerstone's inequitable conduct counterclaims is **DENIED**.

C.      **Other Defenses**

Helix moves to dismiss three affirmative defenses that Cornerstone raises in its Amended Counterclaims: failure to state a claim; inequitable conduct; and

-17-

patent misuse.[64]  For the reasons explained below, the Court **GRANTS** that

aspect of the Motion **in part**.

### 1.    Failure to State a Claim

First, the Court **GRANTS** Helix's request to dismiss Cornerstone's

"failure to state a claim defense."  The entirety of that "defense" is that the

Amended Complaint "fails to state a claim upon which any relief may be granted

because Plaintiff's allegations in paragraphs 27–43 and 77–83 of the First

Amended Complaint, even if accepted as true, do not establish that any claim of

the '881 Patent is infringed."[65]  That defense raises a pleading deficiency

argument that, if Cornerstone wishes to press it, must have been raised before

the responsive pleading was filed.  *See* Fed. R. Civ. P. 12(b) ("A motion

asserting any of these defenses [including failure to state a claim under

Rule 12(b)(6)] must be made before pleading if a responsive pleading is

allowed.").[66]  Because Cornerstone has already filed its responsive pleading—

indeed it has already filed an Answer and an Amended Answer—the time to

raise that defense has passed.  Accordingly, the Court concludes that, as

pleaded, it fails to state a valid defense.  Because Cornerstone has not suggested

any amendments that could cure this deficiency, the defense is **DISMISSED**.

### 2.    Inequitable Conduct

Second, the Court **DENIES** Helix's request to dismiss Cornerstone's

"inequitable conduct" defense.  That defense relies upon and incorporates the

same factual allegations that were sufficient to sustain Cornerstone's

counterclaims.[67]  For the same reasons that the Court concluded that

---

[64]    *See generally* Motion 13-16.

[65]    Amended Answer 30 (Amended Separate Defenses ¶ 1).

[66]    Of course, Cornerstone may still be able to file a Rule 12(c) motion for judgment on the pleadings.

[67]    *See* Amended Answer 31 (Amended Separate Defenses ¶ 4).

Cornerstone's inequitable conduct counterclaims are sufficiently pleaded, the Court concludes that the same factual allegations support this defense.

### 3. Patent Misuse

Third, the Court **GRANTS** Helix's request to dismiss Cornerstone's "patent misuse" defense. Cornerstone's patent misuse allegations demonstrate that this defense is premised on the same factual allegations as Cornerstone's inequitable conduct counterclaims and defense:

> Even to the extent the Court finds that the conduct of [Helix] and its founder, president, and chief technology officer, Luke Pinkerton, does not rise to the level of inequitable conduct, [Helix] and Mr. Pinkerton improperly sought to artificially extend patent protection for products they had already invented and had already been selling for well over a year before the applications that would eventually issue as the Patents-in-Suit were filed, despite not having invented anything new or engaging in any research and development directed toward new products.[68]

The Court is unaware of any authority supporting the proposition that inequitable conduct, without some sort of antitrust-type behavior such as tying or licensing conditions, can constitute patent misuse. "When a patentee seeks to expand its monopoly by misuse or fraud, the patentee exceeds the patent exception to antitrust laws." *Beal Corp. Liquidating Tr. v. Valleylab, Inc.*, 927 F. Supp. 1350, 1361 (D. Colo. 1996) (citing *United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647 (9th Cir. 1981)). For example, such "improper practices in connection with patents" could "include use of invalid patents in price fixing, cross-licensing of patents, attempts to extend the scope of patent monopoly, illegal price fixing activities in connection with patents, tieing patents

---

[68]    *See id.* 32 (Amended Separate Defenses ¶ 5).

1  to unpatented devices or processes, and seeking to extend the effect of an

2  expired patent." *Id.* (citing *Brownell v. Ketcham Wire & Mfg. Co.*, 211 F.2d 121,

3  129 (9th Cir. 1954)).  Cornerstone does not plead any such practices.  Rather,

4  this defense appears to be nothing more than a repackaging of Cornerstone's

5  inequitable conduct defense.  Because Cornerstone has not suggested any

6  amendments that could cure this deficiency, the defense is **DISMISSED**.

7  ## IV.  CONCLUSION

8  For the foregoing reasons, the Court hereby **ORDERS** as follows:

9  1. Helix's Motion is **DENIED** with respect to Cornerstone's

10  inequitable conduct counterclaims and defense.

11  2. Helix's Motion is **GRANTED** with respect to Cornerstone's

12  failure to state a claim and patent misuse defenses.

13  3. Helix is **DIRECTED** to file its Answer to Cornerstone's Amended

14  Counterclaims no later than July 22, 2022.

15  **IT IS SO ORDERED.**

16

17  Dated:_____          July 5, 2022

18  _____
   John W. Holcomb
   UNITED STATES DISTRICT JUDGE

19

20

21

22

23

24

25

26

27

28