UMBERG ZIPSER LLP
Mark A. Finkelstein (SBN 173851)
mfinkelstein@umbergzipser.com
1920 Main Street, Ste. 750
Irvine, CA 92614
Telephone:  (949) 679-0052
Facsimile:  (949) 679-0461

DICKINSON WRIGHT PLLC
James K. Cleland (*Admitted Pro Hac Vice*)
JCleland@dickinson-wright.com
(734) 436-7356
Christopher J. Ryan (*Admitted Pro Hac Vice*)
CRyan@dickinson-wright.com
(734) 623-1907
Yafeez S. Fatabhoy (*Admitted Pro Hac Vice*)
YFatabhoy@dickinson-wright.com
(248) 205-3264
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
Facsimile: (844) 670-6009

*Attorneys for Plaintiff*
*Pensmore Reinforcement Technologies, LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PENSMORE REINFORCEMENT TECHNOLOGIES, LLC d/b/a HELIX STEEL,<br><br>Plaintiff,<br><br>v.<br><br>CORNERSTONE MANUFACTURING AND DISTRIBUTION, INC.,<br><br>Defendant. | CASE NO.: 5:21-cv-01556-JWH-SHKx<br><br>**PLAINTIFF PENSMORE REINFORCEMENT TECHNOLOGIES, LLC d/b/a HELIX STEEL'S RESPONSE CLAIM CONSTRUCTION BRIEF** |

## Table of Contents

I.    INTRODUCTION ................................................................................................. 1

II.   DISPUTED CLAIM TERMS FOR CONSTRUCTION ..................................... 1

    A.    "Dominant crack" ....................................................................................... 1

    B.    "Elastic, perfectly plastic behavior" ........................................................... 2

    C.    Strain Capacity ............................................................................................ 3

    D.    Post crack tensile stability .......................................................................... 5

    E.    "A load carried at Sa (design crack width) of the test specimen divided by the maximum load after 0.01 in displacement" ........................................................... 6

    F.    "A micro reinforcement comprise of a twisted steel fiber having . . . wherein the twisted steel fiber meets the following criteria. . ." ............................................ 8

    G.    "Wherein the twisted steel fiber meets the following criteria . . . a strain capacity increase requirement . . ." ..................................................................................... 13

    H.    "Twisted steel fiber crack width, Sa" ....................................................... 13

    I.    "d=equivalent diameter of the twisted steel fiber, inches (mm)" ............. 14

IV.   CONCLUSION .................................................................................................. 15

## Cases

*Nature Simulation Sys., Inc. v. Autodesk, Inc.*, 2020-2257 (Fed. Cir. Jan. 27, 2022)................... 9

*Sonix Tech. Co., Ltd. v. Pub. Intl., Ltd.,* 844 F.3d 1370, 1376 (Fed. Cir. 2017) .......................... 9

*Chef America v. Lamb-Weston*, Inc., 358 F.3d 1371 (Fed. Cir. 2004)……………………..11

*Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991)…………………….….11

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006)………11

*Callaway Golf Co. v. Acushnet Co.,* 576 F.3d 1331, 1346 (Fed. Cir. 2009)……………………..15

I.  **INTRODUCTION**

Helix's proposed constructions of the 9 disputed claim terms are the ordinary meanings of those terms to a POSA based on the claim language in view of the '881 specification. Most of Defendant's proposed constructions are not constructions at all, but rather strained arguments to invalidate Claim 3. Defendant's "constructions" ignore the claim language, '881 specification, the ordinary meaning to a POSA, and the Federal Circuit's rule that claims are presumed valid and definite. Helix requests that the Court adopt its proposed constructions.

II.  **DISPUTED CLAIM TERMS FOR CONSTRUCTION**
    A.  **"Dominant crack"**

Defendant's proposed construction includes three unsupported limitations that take "dominant crack" outside of its ordinary meaning. First, a "dominant crack" is just that – the largest crack that becomes the failure plan in the concrete matrix. (Declaration of Yafeez S. Fatabhoy ("Fatabhoy Resp. Decl."), Ex. 1, p. 3.) "Two closely spaced cracks" do not belong in the construction. Defendant's supporting extrinsic evidence is a 2019 article that was published well after filing of the '881 patent in 2012, and when it mentions two cracks, those cracks ultimately form a single dominant crack. (Fatabhoy Resp. Decl., Ex. 1, p.3-4; Dkt. No. 69, Ex. D, p. 8-9.) A POSA knows that concrete failure occurs along a dominant crack, and the other micro cracks become largely inactive. (*See also* Dkt. No. 70, Ex. 4, Li. at p. 370.) The specification informs a POSA that the dominant crack is a single failure point that helps define the maximum load allowable. ('881 Patent, 6:4-34, 6:42-7:-21, 7:32-52; *see also* Dkt. 70, Ex. 3, p. 22.)

Second, a "dominant crack" does not need to extend through the entirety of the concrete matrix. Rather, a dominant crack is characterized by being the failure

1

plane. (Fatabhoy Resp. Decl., Ex. 1, p. 4.) A POSA familiar with testing of reinforced concrete understands that the dominant crack often does not extend through the entirety of the concrete matrix. (*Id*.)

Third, adding the limitation "across which the tensile load is exclusively carried by the fibers" is unnecessary and unsupported. There is no support in the '881 claims or specification. It is also improper because (1) a "dominant crack" can exist in plain concrete with no fibers and (2) there may be other materials in the concrete matrix besides the twisted steel fibers (i.e. traditional rebar) that bear the tensile load across the dominant crack. (*Id*. at ¶__; *see also* '881 Patent, Fig. 3.)

B.   **"Elastic, perfectly plastic behavior"**

Defendant alleges that the term "elastic, perfectly plastic behavior" is indefinite, but both Plaintiff and Defendant's experts provided similar idealized graphs showing elastic, perfectly plastic behavior. (Fatabhoy Resp. Decl., Ex. 1, p. 8; Smith Decl. ¶52.) Both graphs have elastic and perfectly plastic portions that are similar to the elastic and perfectly plastic portions shown in Fig. 3 and described in the '881 Patent. "Elastic, perfectly plastic behavior" is a term of art well known by a POSA in the reinforced concrete arts – exactly why it was used in Claim 3.



As support, Defendant argues that "the specification of the '881 patent does not describe elastic, perfectly plastic behavior before dominant crack formation." (Op. Br., p. 14-15.) Not true:

> According to the present invention, the preferred micro reinforcements (10) have **elastic, perfectly plastic behavior up to the point of dominant crack formation in the micro reinforced concrete (14)** and have stable tensile resistance after dominant crack formation up to a characteristic length of the micro reinforcement (10), as determined by its length, material used for manufacture and the number of twists. ('881 Patent, 4:60-67.)

Defendant further argues that Fig. 3 does not show elastic, perfectly plastic behavior, but Fig. 3 shows the plateau region described in the '881 Patent as "perfectly plastic behavior." (Fatabhoy Resp. Decl., Ex. 1, p. 8-9.) Defendant's Figs. 2 arguments are non-starters as Fig. 2 is an idealized stress strain curve not magnified to show perfectly plastic behavior up to dominant crack formation. (*Id.*)

Defendant's also accuses Helix of reading "perfectly" out of the claim. This position has no merit because "perfectly plastic behavior" is a term well known to POSA in the reinforced concrete art to describe behavior where tensile stress remains substantially constant while the tensile strain increases and the concrete matrix cannot return to its original form. (Fatabhoy Resp. Decl., Ex. 1, p. 9). "Perfectly plastic behavior" in actual material is well-known to include some variation, as shown in Fig. 3 of the '881 Patent. (*Id.*) This is confirmed by other POSAs in the field, "[w]hile no actual material behaves exactly as shown in Fig. 2.60 [shown above], this stress-strain diagram will prove useful in discussing the plastic deformations of ductile materials such as mild steel." (Fatabhoy Resp. Decl., Ex. 1, p. 9; Mechanics of Materials, Second Edition, Beer, and Johnston, p. 95.)

In the end, Defendant's suggestion that a "POSITA would not be able to understand what is meant by elastic, perfectly plastic behavior to a reasonable degree of certainty" is contradicted by plain meaning of the term, the '881 specification and both experts.

### C. Strain Capacity

Defendant claims that "strain capacity" is indefinite and cannot be construed because there are numerous extrinsic sources definitions. (Op. Br., p. 17-18). Getting past some slight differences in wording, however, all of the definitions mean the same thing: "strain capacity" in the context of reinforced concrete is "the ability to stretch or deform under tensile stress until dominant crack formation." This has been the definition since the origins of the study of concrete, and remains the definition today. (Fatabhoy Resp. Decl., Ex. 1, p. 10.)

Defendant cites to the American Concrete Institute's "Concrete Terminology" (ACI CT-13) definition of strain capacity: "the maximum tensile strain that hardened cement paste, mortar, or concrete can sustain before cracking occurs." (Op. Br., p. 18.) That definition is entirely consistent with Helix's proposed construction as both refer to the ability to withstand tensile stress up to dominant crack formation. (Fatabhoy Resp. Decl., Ex. 1, p. 10-11.) Defendant also cites to a Journal Article by Qian & Li: "tensile/compressive strain corresponding to ultimate tensile/compressive strength (maximum stress in stress-strain curve)." (Op. Br., p. 18.) This definition is also consistent with Helix's proposed construction as it refers to the tensile strain corresponding to the maximum tensile stress, which occurs right before dominant crack formation. This is exactly what is shown in Fig. 3 and disclosed in the '881 patent. (Fatabhoy Resp. Decl., Ex. 1, p. 11.)

Defendant's other arguments fare no better. Defendant argues that the '881 Patent shows "initial cracking occurs at the same tension between plain concrete and micro-reinforced concrete which would mean that the micro-reinforcements would not increase the strain capacity of the concrete" (Op. Br., p. 18), but that is not what Fig. 3 shows. Fig. 3 shows that the twisted steel fiber reinforced strains more than plain concrete before formation of the dominant crack. (Fatabhoy Resp. Decl., Ex. 1, p. 11.) Defendant also suggests that "strain capacity" is undefined

{227739.1}                                    4

because it relies on the recipe of the concrete used, but a POSA knows better. Strain capacity may vary according to the concrete recipe, or the type and amount of reinforcement used in a concrete matrix, but the definition of strain capacity remains the same and can be measured using the same tensile tests no matter the recipe. (*Id.*) Defendant also argues that strain capacity should not be tied to dominant crack formation. (Op. Br., p. 18.) This goes against the very nature and definition of strain capacity, which is necessarily the capacity to withstand increasing stain up to a certain point. A POSA understands that the point is dominant crack formation. (Fatabhoy Resp. Decl., Ex. 1, p. 12.) This is confirmed by Claim 3, which distinguishes between the strain capacity increase requirement prior to dominant crack formation, and the post-crack tensile stability requirement after dominant crack formation. *See also* Figs. 2, 3, '881 Patent, 5:48-50, 6:22-33 ("Throughout this description, the described **strains are based on deformation of the concrete, both before and after formation of a dominant crack**.")

### D. Post crack tensile stability

Defendant's indefiniteness argument tries to complicate the simple. "Crack" is the dominant crack referred to earlier in Claim 3, and "post crack tensile stability" is simply the "tensile stability after formation of a dominant crack." (Fatabhoy Resp. Decl., Ex. 1, p. 12-13.) Contrary to Defendant's argument that Claim 3 "does not set forth a comprehensible test by which the post crack tensile stability, or Sa, can be determined" (Op. Br., p. 23), Claim 3 plainly defines the "post-crack tensile stability requirement" as the entirety of part (b) of Claim 3.

This construction accords with the specification and a POSA's understanding. Because the steel fiber reinforcement imparts tensile stability to the concrete matrix after formation of the dominant crack, the '881 more generally and

Claim 3 specifically specify tensile stability of the steel fiber reinforced concrete *after* dominant crack formation. *See* '881 Patent, 4:60-67 ("in the micro reinforced concrete (14) and have **stable tensile resistance after dominant crack formation)**; 7:53-64 (**the stable post-cracking behavior of micro-reinforced concrete (Phase III in FIG. 2)** mimics the stable tensile response of traditional reinforcing bars in concrete); Fig. 2 (showing post-dominant crack tensile stability). Also contrary to Defendant's contention, this term does not depend on other terms – it stands alone.

### E. "A load carried at Sa (design crack width) of the test specimen divided by the maximum load after 0.01 in displacement"

For this term, Defendant first argues that Claim 3 defines Sa three separate times. Incorrect. Claim 3 *uses* Sa at least three separate times. Sa is the design crack width. Sa is quantified by Equation 1 in Claim 3: Sa= $\delta$ +X/3. The design crack width is the largest crack width permissible in a particular design to ensure safety. $\delta$ accounts for elongation of the steel based upon its material properties, while X accounts for elongation due to the untwisting or stretching of the twisted steel fibers. (Fatabhoy Resp. Decl., Ex. 1, p. 15.)

Defendant also argues that Sa is described using inconsistent units of measurement. Incorrect again. Sa is measured in units of length (inches or mm) because $\delta$ and X are measured in inches or mm. (*Id*.) Claim 3 is clear that $\delta$ is the "material elongation as stated on raw material certification test reports, **inch (mm)**." $\delta$'s value is reported in inches or mm. A POSA understands that if raw material certifications report elongation in inches/inch (or mm/mm), $\delta$ is computed using the length of the fibers (about 1 inch for the '881 fibers). (*Id*.)

The same goes for X in Equation 1, which is the "elongation from twist . . . **inch (mm)**." Equations 1 and 2 work together as Equation 2 quantifies the percentage reduction in length (X) of the twisted steel fibers that results from

twisting the fibers. The X in Equation 2 is calculated as a percentage. (*Id*.) A POSA understands that X from Equation 2 is simply multiplied by the length of the fibers for insertion into Equation 1. (*Id*.)

Defendants remaining three arguments also lack merit. First, Defendant argues that "the median of a load carried at Sa" lacks antecedent basis (Op. Br., p. 20), but this reflects a misunderstanding of Claim 3. Claim 3 requires the calculation of *the median value of* "a load carried at Sa (design crack width) of the test specimen divided by a maximum load after 0.01 in displacement." Claim 3 specifies a median (a simple statistical calculation) because the direct tensile test is performed on multiple test specimens. (*Id*.)

Second, Defendant claims that Equation 2 is wrong because it contains an extra "2" in the numerator. (Op. Br., p. 20-21.) Another misunderstanding. The inventors intentionally used the "2" in Equation 2's numerator to modify the equation derived by Defendant's expert (based upon a circular rod in tension) because of the preferred cross sectional shape of the '881 twisted steel fibers (closer to rectangular with a different aspect ratio). (Fatabhoy Resp. Decl., Ex. 2, ¶6-16.) Equation 2 was also confirmed with actual testing. (*Id*.)

Third, Defendant argues that the '881 Patent does not disclose a maximum load at 0.01 inches of displacement. (Op. Br., p. 21-22.) This is another failure to understand the '881 Patent's disclosure, which provides:

- "a post-crack tensile stability requirement determined by tensile test results indicating that the median of a load carried at Sa (design crack width) of the test specimen divided by a **maximum load after 0.01 in displacement** is equal to or greater than 0.85. . ." (*Id.* at 3:13-17.)
- "Tensile tests shall indicate that the median of the load carried at Sa divided by **the maximum load after 0.01 in displacement** is equal to or greater than 0.85" (*Id.* at 5:13-16).

Defendant challenges Fig. 2, but Fig. 2 is idealized and illustrates generally how the maximum load (1) at 0.01 inches of displacement and (2) at Sa frame the beginning

{227739.1}  7

and end of Phase III. Defendant's challenge to Fig. 3 makes no sense as Fig. 3 does not show Phase III, and a POSA knows that for twisted steel fiber reinforced concrete, the downward sloping curve in Fig. 3 does not approach 0, but rather levels off as the twisted steel fibers stabilize the concrete like shown in Fig. 2. (Fatabhoy Resp. Decl., Ex. 1, p.16-17.) The '881 Patent does include a typo (Col. 6) as the last portion of the sentence should read "engineering strain of 1% (10000 microstrain)", not "engineering strain of 1% (1000 microstrain)." (Fatabhoy Resp. Decl., Ex. 2, ¶17-23.) But this typo does not impact Claim 3 or the '881 Patent's disclosure. Claim 3 does not recite microstrain, and does not rely on the Column 6 microstrain disclosure to compute either (1) the strain capacity increase requirement (part (a) of Claim 3), or (2) the post-crack tensile stability requirement (part (b) of Claim 3). (*Id.*; Fatabhoy Resp. Decl., Ex. 1, p. 17.) Claim 3 provides a precise displacement value (0.01 inches) at which the load must be measured. (*Id.*)

        F.    **"A micro reinforcement comprise of a twisted steel fiber having . . . wherein the twisted steel fiber meets the following criteria. . ."**

Defendant's argument that Claim 3 is directed to a twisted steel fiber alone, not a concrete matrix reinforced with twisted steel fibers, is inconsistent with the plain language of Claim 3, the '881 specification and the purpose of the '881 patent. A POSA would readily understand that Claim 3 preamble's use of the phrase "wherein the twisted steel fiber meets the following criteria" means twisted steel fiber in a concrete matrix. (*Id.*) Patent claims must be read and understood in light of the specification and other relevant evidence bearing on how a skilled artisan would understand the scope of the invention. *Nature Simulation Sys., Inc. v. Autodesk, Inc.*, 2020-2257 (Fed. Cir. Jan. 27, 2022); *see also Sonix Tech. Co., Ltd. v. Pub. Intl., Ltd.,* 844 F.3d 1370, 1376 (Fed. Cir. 2017)("Claim language, standing

alone" is not the correct standard of law . . . Patent claims are viewed and understood in light of the specification".)

Defendant's argument boils down to reading Claim 3 preamble's "twisted steel fibers" language in isolation and divorcing that term from the rest of the claim language and specification. Defendant ignores the Federal Circuit's time-tested rule that "claims should be so construed, if possible, as to sustain their validity." *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed.Cir.1999).

Starting with the preamble claim language, Claim 3 immediately makes it clear that the invention is "a micro reinforcement comprised of **a twisted steel fiber** having elastic, perfectly plastic behavior up to the point of dominant crack formation **in a concrete matrix reinforced by the micro reinforcement**". Defendant cannot on one hand contend that the preamble is limiting, then on the other hand ignore the preamble's plain language specifying that the twisted steel fiber is in a concrete matrix. The remainder of the claim language supports a POSA's understanding that Claim 3 is directed to a twisted steel fiber reinforced **concrete matrix**:

- The preamble of Claim 3 references "dominant crack formation" in a concrete matrix.;
- Claim 3's strain capacity and post-crack tensile stability are measurements and characterizations of fiber reinforced concrete, not of a steel fiber;
- Claim 3's dominant crack is a term of art and occurs in a concrete matrix, not in a steel fiber;
- Claim 3, part (a) references "plain concrete" as a comparison point for twisted steel fiber reinforced concrete when addressing strain capacity prior to formation of a dominant crack. A POSA would not compare the strain capacity of plain concrete to that of a steel fiber;
- Claim 3 refers to both "control specimens" and "test specimens", both of which refer to concrete matrix test specimens. The control specimens contain no twisted steel fibers, and thus must be a concrete matrix; and

{227739.1}                                     9

- Claim 3 includes variables X and $\delta$, both of which are directed to properties of the raw material wire and twisted steel fibers that *go into* the concrete matrix, in contrast to the strain capacity and post-crack tensile stability which a POSA would readily recognize are measurements made on a concrete matrix. (Dkt. No. 70, Ex. 3, p. 49-50.)[1]

The entire '881 patent specification is directed to a direct tensile test for evaluating and characterizing a fiber reinforced **concrete matrix**:

- "method for designing and manufacturing micro reinforced concrete" ('881 Patent, Abstract);
- "the present disclosure provides a micro reinforcement concrete system that uses steel fibers. . ." (*Id*. at 2:6-10);
- "design method for micro fiber reinforced concrete structures." (*Id*. at 2:15-20);
- "Phase I-the micro reinforced concrete carries the tensile load until the first micro crack forms" (*Id*. at 6:4-9);
- "Comparing plain concrete and micro-reinforced concrete" (*Id*. at 6:17:20);
- "a micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior up to the point of dominant crack formation in a concrete matrix" (*Id*. at 10:20-25); and
- Figures 2 and 3, which show performance of a concrete matrix, not a twisted steel fiber alone.

(Dkt No. 70, Ex. 3, p. 51.) The evidence supporting Plaintiff is substantial.

Defendant's lead case, *Chef America v. Lamb-Weston*, Inc., 358 F.3d 1371 (Fed. Cir. 2004) misses the mark. In *Chef America,* the Court refused to rewrite the disputed claim to overcome a claimed temperature range that led to the burning of dough. *Id*. at 1374. That is not the case here. Helix is not asking the Court to rewrite Claim 3, but rather to interpret Claim 3 as a POSA would in view of the

---

[1] Defendant correctly cites to the Equation 2 variables n, d, L and X as each directed to "twisted steel fibers" in their descriptions, but omits mention that neither "strain capacity increase requirement" or "post-crack tensile stability" includes similar language. They are not directed to twisted steel fibers, they are directed to concrete. (Fatabhoy Resp. Decl., Ex. 1, p. 20-21.)

{227739.1} 10

claim language, specification and knowledge of a POSA. *Chef America* does not support ignoring plain claim language requiring twisted steel fibers in a concrete matrix, or ignoring the entire '881 specification.

Defendant's present other arguments with glaring omissions. Defendant alleges that Claim 3 is not directed to a twisted steel concrete matrix because Claim 3 does not begin with the phrase "a micro reinforcement concrete system" or use the term "micro reinforced concrete", claiming that neither phrase appears in Claim 3. (Op. Br., p. 11.) Defendant, however, fails to mention that Claim 3 requires "the twisted steel fibers . . . **in a concrete matrix** reinforced by the micro reinforcement." Defendant also argues that the twisted steel micro reinforcements "must have elastic, perfectly plastic behavior up to the point of dominant crack formation" (*id.*), but Defendant omits the very next words "in a concrete matrix."

Defendant also argues claim differentiation, in particular that Claims 1 and 2 limit Claim 3 to twisted steel fibers. (Op. Br., p. 10-11.) This is not a careful read of Claims 1, 2 or 3 as Claims 1 and 2 include nearly the same "twisted steel fibers . . . in a concrete matrix" language found in Claim 3.[2] Defendant's claim differentiation argument relative to dependent claims 4, 5 and 6 fares no better. Not only does Claim 3 include the "twisted steel fibers . . . in a concrete matrix" language similar to the "micro reinforcement combined in a concrete matrix" language in Claims 4, 5 and 6, but it is not the concrete matrix that distinguishes Claims 4, 5 and 6 from Claim 3; it is the other key distinguishing limitations that define the scope of those claims:

---

[2] While unnecessary to prevail here, it is important to remember that "[c]laim differentiation is a guide, not a rigid rule." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir.1991); *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006)

{227739.1}                                      11

- Claim 4: the micro concrete must be used in a tensile application that "experiences a maximum tensile strain that is less than a predetermined tensile strain limit for the micro reinforced concrete"

- Claim 5: the micro reinforced concrete must be "used for a tensile resistance of principle tensile stresses"

- Claim 6: the micro reinforced concrete must be used in a structure with "rebar or welded wire fabric to provide additional tensile resistance".

Finally, Defendant argues that Plaintiff's infringement contentions limit Claim 3 to a twisted steel fiber, not a concrete matrix reinforced with twisted steel fiber. (Op. Br., p. 12-13.) Defendant, however, fails to inform the Court that Plaintiff defined the "Accused Products" in its infringement contentions as including the concrete matrix:

> Defendant, Defendant's customer and/or other purchasers or end users combine Defendant's concrete reinforcing fibers with concrete to create a reinforced concrete composite structure. The **"Accused Products" are all past and present versions Defendant's concrete reinforcing fibers and the concrete composite structures in which they are used.** (Fatabhoy Response Declaration, Ex. 3.)

Defendant also suggests that Plaintiff limited its infringement allegations to direct infringement (Op. Br., p. 13), but the record shows that Plaintiff accused Defendant of both direct and indirect infringement, including inducing and contributing to infringement of the '881 Patent. (Fatabhoy Resp. Decl., Ex. 3, p. 8-10; *see also* Dkt. No. 29, Am. Compl., Count IV directed to indirect infringement.)  Finally, Defendant's list of infringement contentions using the language "The Accused Products comprise twisted steel fiber" supports Helix's position. (Op. Br., p. 13.) "Comprise" means "includes", not "is limited to." The Accused Products include twisted steel fibers. Defendant's infringement contention theory is a non-starter.

{227739.1}                                      12

### G. "Wherein the twisted steel fiber meets the following criteria . . . a strain capacity increase requirement . . ."

Defendant's indefiniteness argument for the term "strain capacity increase requirement" is a rehash of Defendant's prior indefiniteness argument for the preamble. Both start from the incorrect premise that Claim 3 is directed solely to a twisted steel fiber, not twisted steel fibers in a concrete matrix. A POSA would readily understand that the preamble refers to twisted steel fiber in a concrete matrix. For this limitation, a POSA would never attribute Claim 3's "strain capacity increase requirement" to a twisted steel fiber. (Fatabhoy Resp. Decl., Ex. 1, p. 23.) A POSA understands that the "strain capacity increase requirement" of Claim 3 is that of a concrete matrix, and is defined by part (a) of Claim 3. (*Id*. at p. 23.)

The claims and specification make Defendant's reading unworkable. Claim 3 itself specifies "plain concrete" as a comparison point for twisted steel fiber reinforced concrete for characterizing strain capacity prior to formation of a dominant crack. A POSA would not test or evaluate the strain capacity of plain concrete versus a mere steel fiber. (*Id*.) Claim 3 also refers to both "control specimens" and "test specimens", both of which refer to concrete matrix test specimens, *including plain concrete control specimens with no twisted steel fibers*. (*Id*.) The '881 specification aligns. The test fixture shown in Figs. 4A and 4B of the '881 patent for measuring strain capacity increase shows testing of concrete matrix specimens, not tensile testing on thin twisted steel fibers.

There is no mention, support or disclosure in the '881 patent for testing twisted steel wires alone outside of a concrete matrix. None. Defendant's position cannot be squared with the '881 Patent. Helix's construction adopts the plain language of Claim 3 when read in light of '881 Patent.

### H. "Twisted steel fiber crack width, Sa"

{227739.1}  13

Defendant argues that Claim 3 provides three different meaning for Sa (Op. Br., p. 23), but Sa only has one meaning. Claim 3 defines Sa qualitatively as "design crack width" (a "load carried at Sa (design crack width) of the test specimen"). Claim 3 then specifies how to quantity the design crack width Sa in Equation 1 of Claim 3 (Sa=δ + X/3). The specification fully confirms and supports this interpretation of the design crack width Sa.

While Defendant suggests that Sa refers to a crack width of the twisted steel fibers, a POSA knows that twisted steel fibers are not characterized by a "crack width" or a "design crack width". (*Id.*) Defendant even concedes that the twisted steel fibers do not crack, they stretch and untwist. (Op. Br., p. 23.) Suggesting that Sa refers to anything other than the design crack width of the concrete matrix reinforced with twisted steel fibers finds no support and makes no sense. A POSA understands that the reference to "twisted steel fiber crack width Sa" is a reference to the design crack width of the twisted steel fiber reinforced concrete matrix. (Fatabhoy Resp. Decl., Ex. 1, p. 24-25.)

### I. "d=equivalent diameter of the twisted steel fiber, inches (mm)"

Defendant's argument involves a lot of unnecessary math, but boils down to an allegation that Helix is attempting to read "equivalent" out of the claim. (Op. Br., p. 25.) Quite the opposite, as "equivalent diameter" is a term commonly used and well known in the reinforced concrete arts. A POSA understands that the use of "equivalent" in this claim term is because the steel fibers are twisted, no longer round raw material wire. (Fatabhoy Resp. Decl., Ex. 1, p. 25-26.)

A POSA also readily understands that when designing concrete structures reinforced with steel fibers, ASTM A820 entitled "Standard Specification for Steel Fibers for Fiber-Reinforced Concrete" governs. It specifies that for drawn wire

{227739.1}   14

fibers (Type I) like the twisted steel fibers in Claim 3, the equivalent diameter is the actual diameter of the raw material wire. (Fatabhoy Resp. Decl., Ex. 1, p. 25-26; Fatabhoy Resp. Decl., Ex. 4, ASTM A820 §1,4, 7.)[3]

## IV. CONCLUSION

For the reasons above, Helix respectfully requests that the Court adopt its proposed constructions for the nine claim terms at issue in the '881 Patent, and deny Defendant's attempts to invalidate the '881 Patent.

Dated: July 20, 2022

By: /s/*James K. Cleland*

DICKINSON WRIGHT PLLC
James K. Cleland
Christopher J. Ryan
Yafeez S. Fatabhoy

UMBERG ZIPSER LLP
Mark A. Finkelstein

*Attorneys for Plaintiff Pensmore Reinforcement Technologies, LLC d/b/a Helix Steel*

---

[3] Defendant argues that "the '881 patent's specification discloses two different methods of calculating equivalent diameter." (Op. Br., p. 24.) It does not. Defendant's argument is based upon the incorrect premise that the '881 patent incorporated a method of calculating equivalent diameter from two prior art patents. There is no specific incorporation by reference of a method of calculating equivalent diameter from the Naaman patents. *See Callaway Golf Co. v. Acushnet Co.,* 576 F.3d 1331, 1346 (Fed. Cir. 2009) ("a mere reference to another application or patent, or publication without particular identification of specific material, however is not an incorporation of anything therein. . . .")

{227739.1}	15

# CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2022, a true and correct copy of the foregoing document has been served upon the following counsel via the ECF notification system.

                 /s/*Yafeez S. Fatabhoy*
                Yafeez S. Fatabhoy