Tim R. Plewe, SBN 222911
 tplewe@lp-attorneys.com
Michael J. DeSantis, SBN 318679
 mdesantis@lp-attorneys.com
LOBB & PLEWE, LLP
4160 Temescal Canyon Road, Suite 202
Corona, California 92883
(951) 788-9410   Fax: (951) 788-0766

Scott R. Brown, SBN 151635
 sbrown@hoveywilliams.com
Matthew B. Walters, *pro hac vice*
 mwalters@hoveywilliams.com
Todd A. Gangel, *pro hac vice*
 tgangel@hoveywilliams.com
HOVEY WILLIAMS LLP
84 Corporate Woods
10801 Mastin Boulevard, Suite 1000
Overland Park, Kansas 66210
(913) 647-9050   Fax: (913) 647-9057

*Attorneys for Defendant / Counterclaimant*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PENSMORE REINFORCEMENT TECHNOLOGIES, LLC d/b/a HELIX STEEL, <br><br> Plaintiff / Counterdefendant, <br><br> v. <br><br> CORNERSTONE MANUFACTURING AND DISTRIBUTION, INC., <br><br> Defendant / Counterclaimant. | Case No. 5:21-cv-1556-JWH-SHK <br><br> **NOTICE OF HEARING ON MOTION; CORNERSTONE MANUFACTURING AND DISTRIBUTION, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY** <br><br> Date: December 9, 2022 <br> Time: 9:00 a.m. <br> Before Judge John W. Holcomb |

///

PLEASE TAKE NOTICE that on Friday, December 9, 2022, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 9D of the above-entitled Court, located at 411 West Fourth Street, Santa Ana, California 92701-4516, Defendant/Counterclaimant, Cornerstone Manufacturing and Distribution, Inc. ("Cornerstone") will and hereby does move the Court, pursuant to Federal Rule of Civil Procedure 56(a) for partial summary judgment in Cornerstone's favor, and against Plaintiff/Counterclaim Defendant Pensmore Reinforcement Technologies, LLC d/b/a Helix Steel ("Plaintiff" or "Helix"), as follows:

- on Count I and Count II of Plaintiff's First Amended Complaint (Doc. 29), on Cornerstone's third Amended Separate Defense (Doc. 37 at 31:6–23), and on Cornerstone's Amended Fourth Counterclaim and Amended Fifth Counterclaim (*id.* at 43:1–45:11), on the ground that there is no genuine dispute as to any material fact and Cornerstone is entitled to judgment as a matter of law that all asserted claims of U.S. Patent No. 10,266,970 are invalid under 35 U.S.C. § 102 (pre-AIA) and/or 35 U.S.C. § 103 (pre-AIA) and, thus, not infringed; and

- on Cornerstone's Amended Sixth Counterclaim, that the Helix 5-25 concrete-reinforcing microfiber on sale in 2009 and U.S. Patent No. 5,989,713 were material to the patentability of U.S. Patent No. 10,266,970.

This motion will be based upon U.S. Patent No. 10,266,970; the attached Memorandum of Points and Authorities; the concurrently filed Statement of Uncontroverted Facts and Conclusions of Law; the concurrently filed declarations of undersigned counsel, Reuben Ramsay, and Fred Smith and exhibits to the declarations; the pleadings and papers filed in this action; and such other evidence and argument as may be properly received by the Court.

Pursuant to Local Rule 7-3, counsel met and conferred on September 26, 2022 regarding the substance of this motion. Plaintiff's counsel advised that Plaintiff intends to oppose the motion.

1

2

3    October 13, 2022

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HOVEY WILLIAMS LLP

By: /s/ **_Scott R. Brown_**
         Scott R. Brown

_Attorneys for Defendant/Counterclaimant_

# **Table of Contents**

Table of Authorities ..................................................................................... v

Memorandum of Points and Authorities ..................................................... 1

I.    Introduction .......................................................................................... 1

II.    Statement of Facts ................................................................................ 2

        A.    The original Helix 5-25 product ................................................ 2

        B.    The change to a generally rectangular Helix 5-25 fiber .............. 3

        C.    The manufacture and sale of generally rectangular Helix 5-25 fibers ........ 4

        D.    Helix's sales of generally rectangular Helix 5-25 product to Helix Fiber Australasia ................................................................. 8

        E.    The box of generally rectangular Helix 5-25 fibers sold by Helix Fiber Australasia in 2009 ....................................................... 8

        F.    The patents-in-suit and Helix's infringement allegations .......... 10

III.    Argument ............................................................................................ 11

        A.    Legal standards for summary judgment of invalidity ................ 11

        B.    The '970 Patent is invalid as obvious or anticipated in view of the generally rectangular Helix 5-25 fibers on sale before the critical date. .... 12

                1.    The claims of the '970 patent are obvious in view of the generally rectangular Helix 5-25 fibers on sale long before the critical date. ... 13

                2.    The claims of the '970 patent are anticipated by generally rectangular Helix 5-25 fibers sold in 2009. ......................................... 21

        C.    The generally rectangular Helix 5-25 fibers and the '713 patent were material to the patentability of the '970 patent. ......................... 24

IV.    Conclusion ......................................................................................... 25

Certificate of Service .................................................................................. 26

## <u>Table of Authorities</u>

**Cases**

*Allen Engineering Corp. v. Bartell Industries, Inc.*
   299 F.3d 1336 (Fed. Cir. 2002) .......................................................................13

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242 (1986)...........................................................................................11

*Barmag Barmer Maschinenfabrik AG v. Murata Machine, Ltd.*
   731 F.2d 831 (Fed. Cir. 1984) ..........................................................................11

*Blue Calypso, LLC v. Groupon, Inc.*
   815 F.3d 1331 (Fed. Cir. 2016) ........................................................................12

*Boston Scientific Scimed, Inc. v. Cordis Corp.*
   554 F.3d 982 (Fed. Cir. 2009) ..........................................................................14

*Caterpillar Inc. v. International Trade Commission*
   837 F. App'x 775 (Fed. Cir. 2020) ...................................................................23

*Celeritas Technologies, Ltd. v. Rockwell International Corp.*
   150 F.3d 1354 (Fed. Cir. 1998) ........................................................................21

*Celotex Corp. v. Catrett*
   477 U.S. 317 (1986)...........................................................................................11

*Classic Concepts, Inc. v. Linen Source, Inc.*
   Nos. CV 04-8088, CV 04-8457 GPS (MANx),
   2006 WL 4756377 (C.D. Cal. Apr. 27, 2006)..................................................22

*Dana Corp. v. American Axle & Manufacturing, Inc.*
   279 F.3d 1372 (Fed. Cir. 2002) ........................................................................13

*E.I. DuPont de Nemours & Co. v. Synvina C.V.*
   904 F.3d 996 (Fed. Cir. 2018) ....................................................................18, 19

*Graham v. John Deere Co.*
   383 U.S. 1 (1966)...............................................................................................14

*Hamilton Beach Brands, Inc. v. Sunbeam Products*
   726 F.3d 1370 (Fed. Cir. 2013) ........................................................................13

*Helsinn Healthcare S.A. v. Teva Pharmaceuticals USA, Inc.*
  855 F.3d 1356 (Fed. Cir. 2017), *aff'd*, 139 S.Ct. 628 (2019).............................13

*Hoffer v. Microsoft Corp.*
  405 F.3d 1326 (Fed. Cir. 2005) ...........................................................................12

*Illinois Tool Works, Inc. v. MOC Products Co.*
  856 F. Supp. 2d 1156 (S.D. Cal. 2012) ..............................................................14

*In re Aller*
  220 F.2d 454 (C.C.P.A. 1955) .............................................................................19

*In re Antonie*
  559 F.2d 618 (C.C.P.A. 1977) .............................................................................19

*In re Applied Materials, Inc.*
  692 F.3d 1289 (Fed. Cir. 2012) ...........................................................................19

*In re Peterson*
  315 F.3d 1325 (Fed. Cir. 2003) ...........................................................................18

*Intel Corp. v. International Trade Commission*
  946 F.2d 821 (Fed. Cir. 1991) .............................................................................13

*Intercontinental Great Brands LLC v. Kellogg North America Co.*
  869 F.3d 1336 (Fed. Cir. 2017) ...........................................................................12

*Junker v. Medical Components, Inc.*
  25 F.4th 1027 (Fed. Cir. 2022) ............................................................................12

*Kroy IP Holdings, LLC v. Safeway, Inc.*
  107 F. Supp. 3d 656 (E.D. Tex. 2015) .................................................................14

*KSR International Co. v. Teleflex Inc.*
  550 U.S. 398 (2007)......................................................................................14, 18

*Lamb-Weston, Inc., v. McCain Foods, Ltd.*
  78 F.3d 540 (Fed. Cir. 1996) ...............................................................................14

*Medicines Co. v. Hospira, Inc.*
  827 F.3d 1363 (Fed. Cir. 2016) (*en banc*)..........................................................13

*Merck & Cie v. Watson Laboratories, Inc.*
  822 F.3d 1347 (Fed. Cir. 2016) ...........................................................................13

*Merck Sharp & Dohme Corp. v. Hospira, Inc.*
  874 F.3d 724 (Fed. Cir. 2017) ........................................................21

*Microsoft Corp. v. i4i Limited Partnership*
  564 U.S. 91 (2011)............................................................................12

*Ormco Corp. v. Align Technology, Inc.*
  463 F.3d 1299 (Fed. Cir. 2006) ......................................................21

*Pfaff v. Wells Electronics, Inc.*
  525 U.S. 55 (1998)............................................................................13

*Pfizer, Inc. v. Apotex, Inc.*
  480 F.3d 1348 (Fed. Cir. 2007) ......................................................20

*Robbins Co. v. Lawrence Manufacturing Co.*
  482 F.2d 426 (9th Cir. 1973) ..........................................................23

*Rotec Industries, Inc. v. Mitsubishi Corp.*
  215 F.3d 1246 (Fed. Cir. 2000) ......................................................22

*Therasense, Inc. v. Becton, Dickinson & Co.*
  649 F.3d 1276 (Fed. Cir. 2011) ......................................................24

Tokai Corp. v. Easton Enterprises, Inc.
  632 F.3d 1358 (Fed. Cir. 2011) ......................................................21

*Zacharin v. United States*
  213 F.3d 1366 (Fed. Cir. 2000) ................................................22, 23


**Statutes**

35 U.S.C. § 100.........................................................................................12

35 U.S.C. § 102...........................................................................12, 23, 25

35 U.S.C. § 103...................................................................................14, 25

35 U.S.C. § 282.........................................................................................11

Uniform Commercial Code § 2-106 ......................................................22

Uniform Commercial Code § 2-401 ......................................................22

**Rules**

Fed. R. Civ. P. 56.........................................................................................................11

## Memorandum of Points and Authorities

### I.    Introduction

Cornerstone Manufacturing and Distribution, Inc. and Pensmore Reinforcement Technologies, LLC both sell twisted steel fibers that are used to reinforce concrete. Pensmore accuses Cornerstone's SteelX twisted steel fibers of infringing Pensmore's U.S. Patent No. 10,266,970.

The claims of the '970 patent are directed to fibers of particular dimensions, compositions, and shapes. Specifically, all the '970 patent's claims recite a fiber with a cross-sectional shape known as a "bilateral truncated circle"—essentially a rectangle with rounded ends instead of flat ones. This generally rectangular cross-sectional shape and the specific dimensions and aspect ratios of width (w) to thickness (t) were the only "inventions" even potentially disclosed in the '970 patent. Beginning several years before the critical date, Pensmore had been making and selling a twisted steel fiber with a triangular cross-sectional shape that was covered by an older patent it had licensed from the University of Michigan. Those triangular fibers were made from wire of the same original diameter, twisted at the same rate, cut to the same length, and even manufactured using the same machines and process as the generally rectangular fibers Pensmore purported to make and sell under its '970 patent.

But the triangular twisted steel fibers were not the only fibers Pensmore had been making and selling long before it sought a new patent. Nearly three years before the '970 patent's critical date, Pensmore had *already* switched from twisted steel fibers with a triangular cross-section to twisted steel fibers with a generally rectangular, bilateral truncated circle cross-section. Pensmore has admitted as much in written discovery responses. And Pensmore's former CEO has testified that the generally rectangular fibers he helped design and manufacture were actually shaped like a rectangle with rounded ends—*i.e.*, fibers having the same bilateral truncated circle

1  cross-section that Pensmore would seek to patent nearly three years after it started

2  selling them.

3      As shown below, Pensmore's manufacture and sale of fibers with a bilateral

4  truncated circle cross-sectional shape render the '970 patent invalid for obviousness

5  under the on-sale bar. Although the target dimensions and aspect ratios of the generally

6  rectangular fibers differ slightly from the dimensions and aspect ratios disclosed in the

7  '970 patent, it would have been obvious to one of skill in the art to make the minuscule

8  modifications necessary to arrive at the '970 patent's dimensions and aspect ratios.

9  Indeed, those very modifications are disclosed or suggested in the University of

10  Michigan patent under which Pensmore had licensed its earlier, triangular fiber design.

11  But Pensmore did not disclose the University of Michigan patent or its own pre-

12  existing, generally rectangular fibers to the Patent Office during prosecution of the

13  '970 patent.

14      In addition to obviousness, the '970 patent is also invalid as anticipated under

15  the on-sale bar. Although Pensmore's manufacturing target specifications may not

16  have facially aligned with the dimensions and aspect ratios disclosed in the '970

17  patent, a box of twisted steel fibers sold by Pensmore in 2009 nonetheless contains

18  fibers that meet all limitations of all claims of the '970 patent.

19      As shown below, the Court should enter summary judgment in favor of

20  Cornerstone that Pensmore's U.S. Patent No. 10,266,970 is invalid as obvious and/or

21  anticipated. The Court should also enter summary judgment in Cornerstone's favor

22  that (1) the generally rectangular twisted steel fibers sold by Pensmore before the

23  critical date and (2) U.S. Patent No. 5,989,713—*i.e.*, the University of Michigan patent

24  that Pensmore was licensed under but did not disclose to the Patent Office—were

25  material to the '970 patent's patentability.

26  **II.   Statement of Facts**

27      **A.   The original Helix 5-25 product**

28      Since the mid–2000s, Pensmore Reinforcement Technologies LLC d/b/a Helix

1  Steel and its predecessor, Polytorx LLC d/b/a Helix Steel (collectively, "Helix"), have
2  sold concrete micro reinforcement fibers known as Helix 5-25. Statement of
3  Undisputed Facts ("SUF") ¶ 4. Helix 5-25 are twisted steel fibers, each about one inch
4  (25 mm) long and half a millimeter in diameter, that are mixed into concrete in lieu of
5  traditional concrete-reinforcing materials like rebar or mesh. *Id.* ¶¶ 5–6. Helix
6  manufactured and sold Helix 5-25 fibers under an exclusive license to two now-
7  expired patents owned by the University of Michigan, U.S. Patent No. 5,989,713
8  (the " '713 patent") and U.S. Patent No. 6,060,163 (the " '163 patent"). *Id.* ¶ 20.

9       The original Helix 5-25 product had a roughly triangular cross-sectional shape,
10  formed by a machine that passed round, galvanized-coated steel wire through three
11  carbide rollers before twisting and cutting the fibers. *Id.* ¶¶ 7–9. After the wire was
12  rolled into a triangular shape, the machine twisted the wire at a rate of approximately
13  3.1 360-degree twists per inch. *Id.* ¶ 10–11. When the wire had been rolled and
14  twisted, the machine fed the wire into a box that spun at high speeds and lopped the
15  wire off in one-inch pieces as it came out of the box. *Id.* ¶ 12.

16       Helix's then-CEO, William Orabone, was heavily involved from the start in
17  designing the machines used to make Helix 5-25 fibers and had intimate knowledge of
18  their parts and operation. *Id.* ¶¶ 1–3, 13–15, 18–19. To create the original triangle
19  shape, two of the three rollers in the machine had chamfered edges that fit together at
20  angles to each other and to the third, flat roller. *Id.* ¶ 8. During the manufacturing
21  process, zinc dust from the wire would build up between the pair of angled, chamfered
22  rollers and push them apart, distorting the triangular shape of the fibers and requiring
23  the machine to be shut down frequently for cleaning. *Id.* ¶ 30.

24     **B.   The change to a generally rectangular Helix 5-25 fiber**

25       In early 2007, Mr. Orabone and Helix's founder and CFO, Luke Pinkerton,
26  discussed changing the cross-sectional shape of Helix 5-25 fibers to generally
27  rectangular—*i.e.*, two long, flat opposing sides with two short, rounded ends. *Id.* ¶¶ 16,
28  22. This shape would simplify the manufacturing process because only two flat,

1  parallel rollers were needed to form the rectangle's opposing flat sides. *Id.* ¶¶ 28–29.
2  Jettisoning the pair of angled, chamfered rollers would eliminate the zinc-dust-buildup
3  issue and its associated frequent shutdowns for cleaning. *Id.* ¶ 31.

4      Originally, Mr. Orabone and Mr. Pinkerton considered switching to a generally
5  rectangular fiber with a width-to-thickness aspect ratio somewhere between 2:1 and
6  3:4. *Id.* ¶ 34. By August 2007, they sought an outside engineering study to determine
7  how to create a generally rectangular fiber that would perform "as close to equal as
8  possible" to a triangular fiber. *Id.* ¶ 35. At that time, Mr. Pinkerton wrote that his "data
9  suggests a rectangle with aspect ratio 2:1 has the same untwisting resistance as a
10 triangle." *Id.* ¶ 36. Mr. Pinkerton proposed testing the generally rectangular fibers with
11 a 2:1 aspect ratio against fibers with a triangular cross section, because he believed
12 Helix would "probably be stuck with the 0.5 mm fibers for low dosage applications"—
13 *i.e.*, the generally rectangular fibers would need to be made from the same half-
14 millimeter-diameter wire that was used to make the roughly triangular fibers. *Id.* ¶ 37.
15 Mr. Pinkerton hoped to finalize the design of experiment by September 1, 2007. *Id.*
16 ¶ 38.

17     The proposed change from a roughly triangular cross-section to a generally
18 rectangular cross-section was ***not*** intended to improve Helix 5-25's performance, and
19 Mr. Pinkerton and Mr. Orabone did not expect rectangular fibers to perform any better
20 in concrete than triangular ones. *Id.* ¶¶ 32–33. But after testing determined that
21 generally rectangular fibers were an adequate substitute that performed about equally
22 well as roughly triangular fibers, Helix moved forward with the change. *Id.* ¶ 27.

23     **C.   The manufacture and sale of generally rectangular Helix 5-25 fibers**

24     The process of manufacturing generally rectangular Helix 5-25 fibers was
25 exactly the same as the process of manufacturing roughly triangular Helix 5-25 fibers,
26 except that only two flat, parallel rollers were used on the machine instead of the
27 original configuration of three rollers. *Id.* ¶¶ 49, 55. The newly configured machines
28 could use the same carbide rollers that were used to create the original configuration.

1  *Id.* ¶ 51. Thus, changing the roller configuration in the machines to produce generally

2  rectangular fibers was a simple process that was "literally done overnight," according

3  to Mr. Orabone. *Id.* ¶ 50. In the newly configured machines, the thickness of the

4  fiber—and, consequently, the aspect ratio—could be varied by adjusting a screw

5  setting to increase or decrease the gap between the two flat rollers. *Id.* ¶ 52.

6      As of May 2008, the manufacturing specifications for the generally rectangular

7  Helix 5-25 fibers required three 360-degree twists per inch—*i.e.*, three full twists per

8  individual fiber piece. *Id.* ¶¶ 39–40. The specifications further required a generally

9  rectangular cross-sectional shape with a thickness of 0.3013 mm (0.0123") and a width

10  of 0.627 mm (0.0246"). *Id.* In other words, the specifications required a rectangle with

11  a width-to-thickness aspect ratio of 2:1. *Id.*

12      According to Mr. Orabone, Helix was selling Helix 5-25 fibers with a generally

13  rectangular cross-section in the United States by the week of May 14, 2008. *Id.* ¶ 24.

14  Helix further admits in written discovery responses that it had changed the cross-

15  sectional shape of the Helix 5-25 product to generally rectangular in about May 2008,

16  and that it has offered for sale and sold a product under the name Helix 5-25 to

17  customers in the United States from before January 1, 2009 through the present day.

18  *Id.* ¶¶ 23, 25. Helix further characterizes the Helix 5-25 product that it sold between

19  January 2009 and the critical date as "compris[ing] twisted steel fibers formed of metal

20  used to reinforce concrete." *Id.* ¶ 26.

21      After Helix changed the cross-

22  sectional shape of the Helix 5-25 fiber

23  from roughly triangular to generally

24  rectangular, the cross-sections of Helix

25  5-25 fiber looked generally like the

26  images on the right. *Id.* ¶ 48. In other



27  words, the generally rectangular Helix 5-25 product had a cross-section that is a less-

28  flat version of the "bilateral truncated circle" depicted in Figure 1B of the '970 patent.

1   *Id.* ¶¶ 69–71. A "bilateral truncated circle" is "a shape somewhat like a rectangle only

2   with two opposing flat sides and rounded sides[;] it may

3   be thought of as a rectangle with two rounded opposite

4   ends." *Id.* ¶ 61. Mr. Orabone agrees that it would be

5   accurate to characterize the cross-sectional shape of the

6   Helix 5-25 when it became generally rectangular as

7   "somewhat like a rectangle, only with two opposing flat

8   sides and rounded sides." *Id.* ¶ 47, 61–62.



FIG. 1B

9       After Helix changed the cross-section of the Helix 5-25 product from roughly

10   triangular to generally rectangular, the generally rectangular Helix 5-25 fiber was the

11   only product Helix made and sold until at least 2011, when Mr. Orabone left the

12   company. *Id.* ¶¶ 3, 44. From 2008 to 2011, Helix sold thousands of dollars of Helix 5-

13   25 product with a generally rectangular cross-sectional shape. *Id.* ¶ 79.

14      Once the change to a generally rectangular fiber had been made, there was no

15   further research and development or attempt to change the design of the Helix 5-25

16   product for the rest of Mr. Orabone's tenure; there was not even discussion or

17   consideration of additional changes. *Id.* ¶¶ 45–46. According to Mr. Orabone, Helix

18   did not consider the Helix 5-25 product with a generally rectangular cross-section to be

19   a new product. *Id.* ¶ 77. Mr. Orabone assumed that the fibers with a generally

20   rectangular cross-section were covered by the same University of Michigan patents

21   that covered the triangular cross-section design—*i.e.*, the '713 patent and the '163

22   patent. *Id.* ¶ 76. According to Mr. Orabone, he did not have discussions with anyone at

23   Helix about trying to patent the Helix 5-25 fibers with a generally rectangular cross-

24   section, because Helix did not feel it was making a substantive change to the fibers. *Id.*

25   ¶ 78. Thus, according to Mr. Orabone, when Helix sold a generally rectangular Helix

26   5-25 product during his time as CEO, Helix considered that product to be covered by

27   the '713 patent and the '163 patent. *Id.* ¶ 21.

28

1   The generally rectangular Helix 5-25 product did not exhibit an increase in

2   performance compared to the triangular Helix 5-25 product. *Id.* ¶ 72. The change in

3   cross-sectional shape was made for the benefit of manufacturing efficiency. *Id.* ¶ 73.

4   And the change to a generally rectangular cross-section did, in fact, make the Helix

5   5-25 product less expensive to manufacture and allow Helix to increase output of the

6   Helix 5-25 product. *Id.* ¶¶ 74–75.

7   The machine diagram depicted in Figure 2 of the '970 patent generally describes

8   the machines that Mr. Orabone helped develop to manufacture the generally

9   rectangular Helix 5-25 fibers. *Id.* ¶ 53. In

10   those machines, a coil of wire is first fed

11   through a roller to a flattener. *Id.* ¶¶ 54–55.

12   After the wire has been flattened, it goes to a

13   twister. *Id.* ¶ 56. After the wire has been

14   flattened and twisted, it goes to a cutter.

15   *Id.* ¶ 57. After the wire has been flattened,

16   twisted, and cut, the individual fibers fall out of the cutter into a container. *Id.* ¶ 58.

17   The flow diagram depicted in Figure 6 of the '970 patent also generally

18   describes the operation of the machines that Mr. Orabone helped develop to

19   manufacture the generally rectangular Helix 5-25

20   fibers. First, the machine receives a round wire.

21   *Id.* ¶ 60. Next, the machine forms the wire into a fiber

22   having a cross sectional shape of a bilateral truncated

23   circle. *Id.* ¶¶ 61–63, 69–71. The machine then

24   simultaneously pulls and twists the fiber a threshold

25   number of twists per inch. *Id.* ¶ 64. Finally, the

26   machine cuts the fiber to a specified length. *Id.* ¶ 65.

27   This cutting step is performed with a spinning carbide

28   blade, which cuts the fiber without holding an end of the wire. *Id.* ¶ 66.



FIG. 2

FIG. 6

1     After Helix changed the cross-sectional shape of the Helix 5-25 fibers from

2  triangular to generally rectangular, Helix made no changes to the basic functionality of

3  the machine used to make the Helix 5-25 fibers. *Id.* ¶ 59, 67. Any changes Helix made

4  to the machine after changing the Helix 5-25 fibers' cross-section shape were minor

5  improvements designed to drive down the cost of the machine. *Id.* ¶ 59, 68.

### D.   Helix's sales of generally rectangular Helix 5-25 product to Helix Fiber Australasia

8     In 2009, Helix had no foreign sales force but worked directly with a partner in

9  Australia called Helix Fiber Australasia Pty Ltd ("Helix Fiber Australasia"). *Id.* ¶¶ 81–

10  82. Under the partnership with Helix Fiber Australasia, Helix sold Helix 5-25 product

11  to Helix Fiber Australasia, which Helix Fiber Australasia then resold to its customers

12  in its territories. *Id.* ¶ 83. Kevin Fuller of Helix Fiber Australasia emailed orders for

13  Helix 5-25 product directly to Mr. Orabone, and Mr. Orabone took the orders and

14  arranged the logistics of shipping and delivery. *Id.* ¶ 84–85.

15     All Helix 5-25 fibers with a generally rectangular cross-sectional shape were

16  manufactured in Grand Rapids, Michigan. *Id.* ¶ 80. When Helix 5-25 product was

17  shipped from Helix to Helix Fiber Australasia, Helix Fiber Australasia took title to the

18  product once the order left the Helix plant in Michigan and was thereafter responsible

19  for loss or damage to the product. *Id.* ¶ 86. Helix Fiber Australasia paid for the product

20  by wiring money from Australia to a U.S. account owned by Helix. *Id.* ¶ 87.

21     Any Helix 5-25 product manufactured by Helix in 2009 would have been the

22  same product whether it was sold in the United States or in Australia. *Id.* ¶ 88. Because

23  Helix was making product as fast as it could sell it and rarely held inventory of Helix

24  5-25 for more than 30 to 40 days before it was sold, any Helix 5-25 fibers made in

25  February 2009 would have been expected to sell in 2009. *Id.* ¶¶ 89–91.

### E.   The box of generally rectangular Helix 5-25 fibers sold by Helix Fiber Australasia in 2009

28     Reuben Ramsay ("Mr. Ramsay") is a former sales agent for Helix Fiber

1   Australasia who sold Helix 5-25 fibers during his association with the company. *Id.*

2   ¶¶ 92–93. On or about September 25, 2009, Mr. Ramsay sold 40 boxes of Helix 5-25

3   fibers, each weighing 45 pounds, to Ross Armstrong of Coolibah Plains, Comet,

4   Queensland, Australia. *Id.* ¶ 94. At Mr. Armstrong's property, Mr. Ramsay personally

5   observed the pouring of concrete containing the Helix 5-25 fibers Mr. Ramsay had

6   sold to him. *Id.* ¶ 95.

7       The September 2009 sale to Ross Armstrong was the second sale of Helix 5-25

8   fibers that Mr. Ramsay had made. *Id.* ¶ 96. Mr. Ramsay did not make another sale of

9   Helix 5-25 fibers to Ross Armstrong or any other member of his family after the

10  September 2009 sale. *Id.* ¶ 97. Within a year or two after 2009, the size of each box of

11  Helix 5-25 fibers sold in Australia changed from 45 pounds to 22 pounds. *Id.* ¶ 116.

12  When Mr. Ramsey learned in early 2020 that Cornerstone was interested in finding

13  Helix 5-25 fibers sold during the timeframe that he made the sale to Ross Armstrong,

14  he contacted Ross Armstrong's son, Jono Armstrong. *Id.* ¶¶ 98–99. Jono Armstrong

15  informed Mr. Ramsay that the Armstrongs still had residual Helix 5-25 product from

16  the September 2009 purchase. *Id.* ¶ 99. Mr. Ramsay asked the Armstrongs to return

17  some of this product to him, which they agreed to do. *Id.* ¶ 100.

18      Mr. Ramsay received back from the Armstrongs six 45-pound boxes of Helix 5-

19  25 product. *Id.* ¶ 101. One of the boxes (the "Opened Box"), had been opened and was

20  about half empty. *Id.* ¶ 102. The remaining five boxes (the "Unopened Boxes")

21  appeared to be full of Helix 5-25 product. *Id.* ¶ 103. The paper tape originally used to

22  close the Unopened Boxes was partially deteriorated on some of the Unopened Boxes,

23  apparently due to the passage of time. *Id.* ¶ 104.

24      One of the Unopened Boxes (the "Sample Box") had an extra piece of plastic

25  tape placed over the paper tape along the top when Mr. Ramsay received the Sample

26  Box from the Armstrongs. *Id.* ¶ 105. Underneath that plastic tape is paper tape with a

27  printed legend featuring the handwritten date 02-25-09, lot number 128, machine

28  number M2, and a set of initials. *Id.* ¶¶ 106–08, 110–11. According to Mr. Orabone, lot

1    number 128 would be consistent with a February 2009 manufacturing date. *Id.* ¶ 109.

2    These handwritten entries on the printed legend were present when Mr. Ramsay

3    received the Sample Box from the Armstrongs. *Id.* ¶ 112.

4    Based on Mr. Ramsay's years of experience selling Helix 5-25 product as a sales

5    agent for Helix Fiber Australasia, the Sample Box, the other Unopened Boxes, and the

6    Opened Box appeared to Mr. Ramsay to be genuine boxes of Helix 5-25 product as

7    sold by Helix Fiber Australasia in 2009 and after. *Id.* ¶ 113–15. Mr. Ramsay selected

8    the Sample Box to send to Hovey Williams LLP. *Id.* ¶ 117. Except as expressly

9    described below, he did not alter the Sample Box, the other Unopened Boxes, the

10   Opened Box, or their contents. *Id.* ¶ 118.

11   To document the state of the Sample Box, the other Unopened Boxes, and the

12   Opened Box, Mr. Ramsay videographed himself as he inspected them. *Id.* ¶ 119. To

13   preserve the Sample Box and transport it to the United States, Mr. Ramsay added

14   several strips of packing tape, labeling each strip of packing tape that he added with

15   either his name or his initials, "RR," to distinguish it from the tape that was originally

16   on the Sample Box when he received it from the Armstrongs. *Id.* ¶¶ 120–21. After

17   adding packing tape to the Sample Box, Mr. Ramsay sealed it in wrap and put it in a

18   large container, which he shipped to Hovey Williams *Id.* ¶ 122.

19   On April 18, 2022, Hovey Williams LLP received the Sample Box. *Id.* ¶ 123.

20   On April 19, 2022, Hovey Williams, LLP sent a sample of fibers from the Sample Box

21   to Cornerstone's expert, Fred Smith, who received the sample on April 20, 2022. *Id.*

22   ¶¶ 125–26.

23       **F.    The patents-in-suit and Helix's infringement allegations**

24   The '970 patent, entitled "Concrete Reinforcing Fibers," issued on April 23,

25   2019 from Application No. 14/390,270, which was filed on September 14, 2012 and

26   claims priority to Provisional Application No. 61/619,466, filed on April 3, 2012. *Id.*

27   ¶ 127. The '713 patent, the roughly triangular Helix 5-25 product, and the generally

28   rectangular Helix 5-25 product were not disclosed to the Patent Office during

1   prosecution and do not appear on the face of the '970 patent. *Id.* ¶¶ 128–33.

2       U.S. Patent No. 9,440,881 (the "'881 patent"), entitled "Micro-Rebar Concrete

3   Reinforcement System," issued on September 13, 2016 from Application No.

4   14/652,541, which was filed on December 18, 2013 and claims priority to Provisional

5   Application No. 61/738,483, filed on December 18, 2012. *Id.* ¶ 134. The '713 patent

6   was disclosed to the Patent Office during prosecution of the '881 patent and appears on

7   its face. *Id.* ¶ 135.

8       Plaintiff alleges that all past and present versions of Cornerstone's twisted steel

9   concrete-reinforcing fibers, which are marketed, offered for sale, and sold in the

10  United States and abroad under at least the names SteelX, SteelX 5:25 Gold, Badger

11  5:25, SteelX Rebar, Twisted Steel Rebar, and TSR (the "Accused Products"), as well

12  as the concrete composite structures in which the Accused Products are used, infringe

13  claims 1–22 of the '970 patent and claims 3–7 of the '881 patent (the "Asserted

14  Claims"). *Id.* ¶ 136.

15  **III.   Argument**

16      **A.   Legal standards for summary judgment of invalidity**

17      Summary judgment is proper when there is no genuine dispute as to any

18  material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

19  Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v.*

20  *Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (only disputes over facts that might

21  affect outcome of suit under governing substantive law will properly preclude entry of

22  summary judgment under Rule 56). "Summary judgment is as appropriate in a patent

23  case as in any other." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731

24  F.2d 831, 835 (Fed. Cir. 1984). Where no genuine dispute of material fact remains and

25  the movant is entitled to judgment as a matter of law, the court should apply Rule 56 to

26  "avoid unnecessary expense to the parties and wasteful utilization of the jury process

27  and judicial resources." *Id.*

28      Although issued patent claims are presumed valid, *see* 35 U.S.C. § 282, that

1  presumption can be overcome by clear and convincing evidence. *Microsoft Corp. v. i4i*
2  *Ltd. P'ship*, 564 U.S. 91, 95 (2011). A motion for summary judgment on the
3  affirmative defenses of patent invalidity, including the on-sale bar and obviousness, is
4  proper when the factual inquiries present no genuine issue of material facts. *See, e.g.*,
5  *Junker v. Med. Components, Inc.*, 25 F.4th 1027, 1029, 1035 (Fed. Cir. 2022)
6  (reversing district court's denial of summary judgment of invalidity based on the on-
7  sale bar); *Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336,
8  1339, 1351 (Fed. Cir. 2017) (affirming district court's summary judgment of invalidity
9  for obviousness). Summary judgment should not be denied pending discovery where
10 the party opposing summary judgment cannot show that the evidence sought could
11 preclude the grant of summary judgment. *Hoffer v. Microsoft Corp.*, 405 F.3d 1326,
12 1331–32 (Fed. Cir. 2005). For example, in the face of a particularly strong *prima facie*
13 case of obviousness, even "substantial" evidence of secondary considerations of non-
14 obviousness cannot preclude  summary judgment of invalidity. *See Intercontinental*,
15 869 F.3d at 1341–42, 1348 (affirming summary judgment of obviousness).

16     **B.**    **The '970 Patent is invalid as obvious or anticipated in view of the**
17                   **generally rectangular Helix 5-25 fibers on sale before the critical date.**

18       An invention is not eligible for patent protection if it was "in public use or on
19 sale in this country, more than one year prior to the date of the application for patent in
20 the United States." 35 U.S.C. § 102(b) (pre-AIA).[1] The purpose of the on-sale bar is to
21 prevent an inventor from filing for a patent after his invention has been commercially
22 marketed, whether by the inventor or by a third party. *Meds. Co. v. Hospira, Inc.*, 827

23

24 _____

[1] The pre-AIA version of § 102(b) applies because the effective filing date of the '970
25 patent was before March 16, 2013. *E.g.*, *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d
26 1331, 1341 (Fed. Cir. 2016); *see also* 35 U.S.C. § 100(*i*)(1)(B) (defining "effective
   filing date" as "the filing date of the earliest application for which the patent or
27 application is entitled, as to such invention, to a right of priority … or to the benefit of
28 an earlier filing date …").

F.3d 1363, 1376–77 (Fed. Cir. 2016) (*en banc*). Whether the on-sale bar applies is a question of law based on underlying facts. *Dana Corp. v. Am. Axle & Mfg., Inc.*, 279 F.3d 1372, 1375 (Fed. Cir. 2002).

The on-sale bar "is triggered when a claimed invention is: (1) ready for patenting; and (2) the subject of a commercial offer for sale prior to the critical date." *Merck & Cie v. Watson Labs., Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016) (citing *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67–68 (1998)). "A single sale or offer to sell is enough to bar patentability." *Intel Corp. v. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed. Cir. 1991). And "ready for patenting" means that the invention was reduced to practice—*i.e.*, either a physical product was manufactured, or written descriptions and drawings sufficiently detailed the invention. *Hamilton Beach Brands, Inc. v. Sunbeam Prods.*, 726 F.3d 1370, 1375 (Fed. Cir. 2013). The on-sale bar invalidates a patent claim when the product sold or offered for sale "fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1352 (Fed. Cir. 2002) (citations, quotation marks omitted).

The application that ultimately issued as the '970 patent was filed on September 14, 2012 and claimed priority to a provisional application filed on April 3, 2012. SUF ¶ 127. Accordingly, the critical date of the '970 patent is April 3, 2011—*i.e.*, one year before the filing of the provisional application. *E.g.*, *Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 855 F.3d 1356, 1360 (Fed. Cir. 2017), *aff'd*, 139 S.Ct. 628 (2019). As shown below, the generally rectangular Helix 5-25 fibers, which were reduced to practice and on sale in the United States nearly three years before the critical date, render the '970 patent invalid as obvious or, in the alternative, anticipated.

### 1.   The claims of the '970 patent are obvious in view of the generally rectangular Helix 5-25 fibers on sale long before the critical date.

A patent claim is obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have

been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103 (pre-AIA). Because obviousness "is a question of law based on underlying questions of fact[,] . . . [s]ummary judgment of obviousness is appropriate if 'the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in dispute, and the obviousness of the claim is apparent in light of these factors.'" *Ill. Tool Works v. MOC Prods. Co.*, 856 F. Supp. 2d 1156, 1180 (S.D. Cal. 2012) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007)). Furthermore, "[i]t is well settled that a patent can be obvious in light of a single reference if it would have been obvious to modify that reference in a way that results in the patented invention." *Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp. 3d 656, 672 (E.D. Tex. 2015) (granting motion for summary judgment of invalidity for obviousness based on a single prior-art reference) (citing, *inter alia*, *Graham v. John Deere Co.*, 383 U.S. 1, 21–16 (1966) (finding patent invalid on two grounds, each based on single-reference obviousness); *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990–992 (Fed. Cir. 2009) (overturning jury verdict of non-obviousness based on single-reference obviousness)). In short, an obvious variation of a prior-art product cannot be the subject of a patent. *Lamb-Weston, Inc., v. McCain Foods, Ltd.*, 78 F.3d 540, 549 (Fed. Cir. 1996).

> When there is a … problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*KSR*, 550 U.S. at 421 (2007).

The generally rectangular Helix 5-25 product on sale beginning in 2008 (the "2008 Helix 5-25 Product") was a reinforcing fiber with a cross section in the shape of

a bilateral truncated circle, as recited in all claims[2] of the '970 patent. SUF ¶¶ 184–86; Doc. 29-2 at 20–21, claims 1–22. The body of the 2008 Helix 5-25 Product was twisted along its longitudinal axis, as recited in all claims of the '970 patent. SUF ¶ 191; Doc. 29-2 at 20–21, claims 1–22. The 2008 Helix 5-25 Product had between 3 and 4 twists of between 180 and 360 degrees along the longitudinal axis per every length of between 20 mm and 40 mm, as recited in claims 5–6, 11–12, and 20–21. SUF ¶ 192; Doc. 29-2 at 20–21, claims 5–6, 11–12, 20–21. The body of the 2008 Helix 5-25 Product was made of metal, as recited in claims 2 and 17. SUF ¶ 193; Doc. 29-2 at 20, claims 2, 17. And the 2008 Helix 5-25 Product was used to reinforce cement or other matrix materials, as recited in claims 16–22. SUF ¶ 194; Doc. 29-2 at 20–21, claims 16–22.

The 2008 Helix 5-25 Product was made by passing a round wire through rollers under sufficient force to produce fiber with a bilateral truncated circle cross-sectional shape, as recited in claim 7. SUF ¶ 195; Doc. 29-2 at 20, claim 7. The 2008 Helix 5-25 Product was made by continuously receiving a round wire, forming it into a fiber, and simultaneously pulling and twisting the fiber a threshold number of twists per inch while retaining the aspect ratio, as recited in claims 8 and 10. SUF ¶ 196; Doc. 29-2 at 20, claims 8, 10. The wire used to make the 2008 Helix 5-25 Product had a diameter of 0.50 mm ± 0.02 mm, a range that includes the 0.51 mm recited in claim 9. SUF ¶ 197; Doc. 29-2 at 20, claim 9. And the method of making the 2008 Helix 5-25 Product comprised the steps of cutting the twisted fiber to a threshold length of between 20 mm and 40 mm free of holding the twisted fiber while retaining the aspect ratio of the fiber,

---

[2] Claims 10–22 recite a "bitruncated circle"—a term that is not defined in the specification and does not even appear outside the claims. Doc. 29-2 at 20–21, claims 10–22; SUF ¶ 187. For purposes of this motion, the precise construction of "bitruncated circle" is immaterial, since the term is either used synonymously with "bilateral truncated circle" or is a broader term that would necessarily include any bilateral truncated circle. SUF ¶¶ 188–90.

as recited in claims 10–13. SUF ¶ 198; Doc. 29-2 at 20, claims 10–13.

Only two elements of the '970 patent's claims are not present in the target specifications of the 2008 Helix 5-25 Product: thickness and aspect ratio. Claims 1, 10, and 16 recite a "thickness (t) of between 0.01375 and 0.0159 inches." SUF ¶¶ 133–141. Helix's 2008 manufacturing specification for generally rectangular Helix 5-25 fibers required a cross-sectional thickness of 0.3013 mm (0.0123")—a slightly more flattened fiber than disclosed in the '970 patent. *Id.* ¶ 40. Similarly, claims 1, 3–4, 10, 16, and 18–19, recite aspect ratios ranging from 1.53:1 (thickest) to 1:93:1 (flattest). *Id.* ¶¶ 133–141; Doc. 29-2 at 20, claims 3–4, 18–19. Helix's 2008 manufacturing specifications disclose a 2:1 aspect ratio—*i.e.*, 0.0246" x 0.0123"—again, slightly more flattened than the fiber disclosed in the '970 patent. SUF ¶ 40.

But the '713 patent—undisclosed to the Patent Office during prosecution of the '970 patent—expressly suggests modifying the dimensions of the fibers to arrive at all claimed ranges in the '970 patent. The '713 patent is titled "Optimized Geometries of Fiber Reinforcements of Cement, Ceramic and Polymeric Based Composites" and issued on November 23, 1999. *Id.* ¶ 154. The '713 patent discloses the use of twisted steel fibers as reinforcement for concrete to replace rebar. *Id.* ¶ 155. Thus, the '713 patent is in the exact same field of art and deals with the exact same problems as the '970 patent. *Id.* ¶ 156. The '713 patent teaches as follows:

> Based on the observation that the bond at the interface between a discontinuous fiber and a matrix is the weak link that governs the mechanical properties of the composite, it is essential that the pull-out load per fiber, due to bond, be maximized. One way to increase the pull-out load is by providing a more efficient fiber cross-section. However, it is important to keep the fibers compact in cross-section because fibers having compact cross-sections are ***stiffer than flat fibers*** and can be more easily mixed with the matrix.

*Id.* ¶ 157 (emphasis added).

1    The '713 patent further teaches as follows:

2        [I]t has been observed that a flat fiber does not mix with the

3        cement matrix as well as a round fiber. The compactness of the fiber

4        section and its stiffness in all directions, seems to influence the

5        rheology of the mix and the performance of the resulting composite.

6        This implies that for mixing purposes, a compact cross-section is

7        better than a flat one.

8    *Id.* ¶ 158.

9    The '713 patent identifies problems other than difficult mixing that can be

10   caused by fibers that are too flat: "Flat fibers, when twisted would form tunnel-like

11   segments that trap air. These tunnel-like segments may not be penetrated by the matrix

12   and may represent crack initiation points." *Id.* ¶ 159.

13   But the '713 patent also teaches against fibers that are too round, stating:

14       A very efficient method of improving the bond is by twisting the

15       fiber. However, twisting is not always effective, such as: 1) ***twisting is***

16       ***not effective with round fibers***, 2) twisting cannot be applied

17       uniformly to fibers of irregular cross section, and 3) ***twisting leads to***

18       ***undesirable tunneling in fibers of flat cross-section***; tunnel-like

19       portions are difficult to penetrate by the matrix, leading to increased

20       porosity, possible sites for stress concentration, and poorer interfacial

21       zone between the fiber and the matrix. These effects tend to adversely

22       affect the mechanical properties of the composite.

23   *Id.* ¶160 (emphases added).

24   Thus, the '713 patent teaches that the optimum geometry for concrete-

25   reinforcing fibers is a uniform cross-section that is neither round nor too flat—thereby

26   suggesting to one of skill to reduce the aspect ratio of a rectangular fiber to make it less

27   flat. *Id.* ¶¶ 161–62. Furthermore, in the '713 patent's nomenclature, a "flat fiber is

28   defined here as a fiber of rectangular cross-section with the larger side being at least

1    twice the smaller side." *Id.* ¶ 163. That is, a 2:1 aspect ratio, like the 2008 target ratio

2    for the generally rectangular Helix 5-25 product, is too flat, and the '713 patent

3    expressly teaches to make such fibers less flat. *Id.* ¶ 164. Thus, the '713 patent

4    expressly teaches to make the Helix 5-25 generally rectangular fiber thicker, with

5    smaller aspect ratios—*i.e.*, less than 2:1. *Id.* ¶ 165. The '713 patent's teaching is an

6    express suggestion to one of skill to vary the 2:1 ratio and increase the 0.0123"

7    thickness to arrive at a smaller ratio. *Id.* ¶ 166–67.

8         In light of the '713 patent's teaching that the fiber should not be round, the '713

9    patent teaches that the aspect ratio should be anywhere between 2:1 (too flat) and 1:1

10   (round). When starting with the 0.50 mm wire used to manufacture the generally

11   rectangular Helix 5-25 product, *Id.* ¶¶ 6, 37, 40, 168, this range of aspect ratios teaches

12   a thickness between 0.0123 inches and 0.019685 inches. *Id.* ¶ 169. Thus, the '713

13   patent makes the entire range of aspect ratios between 2:1 and 1:1 and the entire range

14   of thicknesses between 0.0123 inches and 0.019685 inches obvious to try. *See KSR*,

15   550 U.S. at 421.

16        Based on the teaching of the '713 patent, one of ordinary skill in the art is

17   directed to modify the 2:1 aspect ratio of the generally rectangular Helix 5-25 product

18   into all of the '970 patent's claimed ranges. SUF ¶ 170. Such a modification would

19   also provide the claimed thickness ranges, because the Helix 5-25 is made from wire

20   with a diameter of 0.50 mm ± 0.02mm. *Id.* ¶¶ 41, 197. When claimed ranges overlap

21   with ranges disclosed in the prior art, a *prima facie* case of obviousness exists. *In re*

22   *Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003). Even a slight overlap of ranges is

23   enough to establish a *prima facie* case. *Id.* Thus, "when, as here, the claimed ranges are

24   completely encompassed by the prior art, the conclusion is even more compelling than

25   in cases of mere overlap." *Id.* at 1330.

26        "'[W]here the general conditions of a claim are disclosed in the prior art, it is not

27   inventive to discover the optimum or workable ranges by routine experimentation.'"

28   *E.I. DuPont de Nemours & Co. v. Synvina C.V.*, 904 F.3d 996, 1006 (Fed. Cir. 2018)

1  (quoting *In re Aller*, 220 F.2d 454, 456 (C.C.P.A. 1955)). This rule applies in cases "in

2  which the optimized variable is a 'result effective variable.'" *In re Applied Materials,*

3  *Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (quoting *In re Antonie*, 559 F.2d 618, 620

4  (C.C.P.A. 1977)). "A recognition in the prior art that a property is affected by the

5  variable is sufficient to find the variable result-effective." *Id.* at 1295. The '713 patent

6  establishes that thickness and aspect ratio are result-effective variables—*i.e.*, fibers

7  with more compact cross-sections are easier to mix, while fibers that are too flat form

8  air-trapping tunnels and cause cracking. SUF ¶¶ 157–60.

9  A segment of a range disclosed in the prior art *may* still be patentable in certain

10  narrow circumstances if the smaller range is "critical"—*i.e.*, that it produces "'a new

11  and unexpected result which is different in kind and not merely in degree from the

12  results of the prior art.'" *See DuPont*, 904 F.3d at 1006 (quoting *Aller*, 220 F.2d at

13  456). But nothing in the '970 patent and or its file history indicates that there is

14  anything "critical" about the performance of the fibers in their function as a concrete

15  reinforcement for any claimed range. SUF ¶¶ 147–48. Nothing suggests that the

16  claimed ranges perform any better in *degree*—much less in *kind*—than the 2:1 ratio

17  and 0.0123" thickness of the generally rectangular Helix 5-25 fibers that went on sale

18  in 2008. *Id.* ¶¶ 149–50. Because the fiber-thickness and aspect-ratio ranges recited in

19  the '970 patent are merely result-effective variables directed to known, predictable

20  results, Helix cannot rebut the *prima facie* case that the '970 patent's claims are

21  obvious.

22  Moreover, it would be readily apparent to one of skill in the art *how* to modify

23  the dimensions of the 2008 generally rectangular Helix 5-25 fibers to fall within the

24  ranges recited in the '970 patent. *Id.* ¶ 171. A single adjustment on the prior-art

25  machine being used to manufacture the fibers changes the position of the flat rollers

26  through which the raw wire is pulled. *Id.* ¶ 172. By increasing the distance between the

27  rollers—a simple mechanical change provided in the design of the machine—thickness

28  can be increased and aspect ratio reduced. *Id.* ¶¶ 173–74. This is because the wire is

1  not deformed as much when there is more space between the rollers. *Id.* ¶ 175.

2  According to Mr. Orabone, a screw setting on the machine allowed adjustments to

3  fiber thickness. *Id.* ¶¶ 52, 176. Thus, one of ordinary skill would have a reason to

4  modify the fibers and a reasonable expectation of success through the simple expedient

5  of changing the machine settings as designed. *Id.* ¶¶ 177–78.

6          Separate and apart from the express modification suggestion in the '713 patent,

7  one of ordinary skill would also have known that by increasing the space between the

8  rollers, there would be less force created against the rollers by the passing of the wire,

9  and less wear on the rollers. *Id.* ¶¶ 179–80. Accordingly, there is also the known

10  advantage of extending machine life if the parts endure less force and consequently

11  less wear. *Id.* ¶ 181. This is an independent reason for one of skill to modify and

12  increase the thickness and decrease the aspect ratio of the Helix 5-25. *Id.* ¶ 182. Such

13  variations between the 2:1 aspect ratio and 0.0123" thickness to the full scope of the

14  claimed ranges would be a matter of routine optimization by one of ordinary skill. *See*

15  *Merck Sharp & Dohme Corp. v. Hospira, Inc.*, 874 F.3d 724, 730 (Fed. Cir. 2017)

16  (affirming judgment of obviousness); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1371

17  (Fed. Cir. 2007) (same).

18          In addition, one of skill would have known that, based on the target

19  specifications and the specifications for the raw wire used by Helix pre-critical date,

20  fibers within the claimed ranges would naturally be produced. SUF ¶ 183. Because the

21  Helix 5-25 target specifications and wire specifications would naturally produce wires

22  in the claimed ranges, those specifications independently disclose the "missing"

23  elements from claims 1, 10, and 16.

24          Finally, Helix will be unable to show that the fiber-thickness and aspect-ratio

25  ranges claimed in the '970 patent are non-obviousness due to any secondary

26  considerations, such as commercial success. Even if Helix comes forward with such

27  evidence and the Court gives it its "full and proper weight," the Court may still

28  properly conclude that the '970 patent's claims would have been obvious since

"merely ordinary experimentation" was required to arrive at the ranges recited in the '970 patent in light of the '713 patent's express teachings. *See Merck v. Hospira*, 874 F.3d at 731 (affirming judgment of obviousness because, "even giving the evidence of commercial success its full and proper weight, the court did not err in concluding that the claims would have been obvious at the time the invention was made in light of the merely ordinary experimentation required to arrive at the [patent-in-suit], starting from either [of two prior-art references]"). In any event, for evidence of commercial success or other secondary considerations to be relevant, Helix must show a nexus between such evidence and the merits of the claimed invention. "If commercial success is due to an element in the prior art, no nexus exists." *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1369 (Fed. Cir. 2011). Thus, any evidence of Helix's commercial success since April 3, 2012 is irrelevant unless Helix can show that it was the result of fiber thicknesses or aspect ratios disclosed in the '970 patent—*i.e.*, the only claim elements not already practiced by the prior-art Helix 5-25 fibers that Helix licensed under the prior-art '713 patent. See *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1313 (Fed. Cir. 2006) (rejecting secondary-consideration evidence because purported commercial success was attributable to "feature[s that were] not new").

### 2. The claims of the '970 patent are anticipated by generally rectangular Helix 5-25 fibers sold in 2009.

"It is well settled that a claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998) As shown above, the generally rectangular Helix 5-25 fibers that went on sale in 2008 were ***intended*** to practice all but two elements—thickness and aspect ratio—disclosed in the'970 patent's claims. According to the manufacturing specifications, the fibers were supposed to have a flatter generally rectangular cross-section than the '970 patent discloses. But in practice, actual Helix 5-25 fibers sold in 2009—still well before the critical date—had thicknesses and aspect ratios that brought them within the scope of

1  all claims of the '970 patent. Thus, in addition to being invalid as obvious, all claims of

2  the '970 patent are also invalid as anticipated.

3        The Helix 5-25 fibers in question were sold to an Australian end-user by Reuben

4  Ramsay of Helix Fiber Australasia in late September 2009. SUF ¶¶ 92–94. But

5  because Helix had no foreign sales force of its own, it first had to sell the fibers to

6  Helix Fiber Australasia before the fibers could be distributed in Australia. *Id.* ¶¶ 81–

7  83. As Mr. Orabone testified, all generally rectangular Helix 5-25 product was

8  manufactured in Grand Rapids, Michigan, and any Helix 5-25 product manufactured

9  by Helix in 2009 would have been the same product whether it was sold in the United

10  States or in Australia. *Id.* ¶¶ 80, 88.

11        Mr. Orabone received emailed orders from Helix Fiber Australasia and arranged

12  the logistics of shipping and delivery. *Id.* ¶¶ 84–85. When Helix 5-25 product was

13  shipped from Helix to Helix Fiber Australasia, Helix Fiber Australasia took title to the

14  product as soon as the order left Helix's plant in Grand Rapids, Michigan, and Helix

15  Fiber Australasia was thereafter responsible for loss or damage to the product. *Id.* ¶ 86.

16  Helix Fiber Australasia paid for the product by wiring money from Australia to a U.S.

17  account owned by Helix. *Id.* ¶ 87.

18        The Federal Circuit looks to the Uniform Commercial Code and other traditional

19  sources to define a "sale." *E.g.*, *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246,

20  1255 (Fed. Cir. 2000). For purposes of the on-sale bar, a sale is "a contract between

21  parties to give and pass rights of property for consideration which the buyer pays or

22  promises to pay the seller for the thing bought or sold." *Zacharin v. United States*, 213

23  F.3d 1366, 1370 (Fed. Cir. 2000). "Under the UCC, 'a "sale" consists in the passing of

24  title from the seller to the buyer for a price.'" *Classic Concepts, Inc. v. Linen Source,*

25  *Inc.*, Nos. CV 04-8088, CV 04-8457 GPS (MANx), 2006 WL 4756377, at *17 (C.D.

26  Cal. Apr. 27, 2006) (quoting UCC § 2-106). "[I]f the contract does not require delivery

27  at the buyer's destination, then 'title passes to the buyer at the time and place of

28  shipment.'" *Id.* (quoting UCC § 2-401(2)(a)).

Although the Helix 5-25 fibers in question were sold to an Australian company, the title to the Helix 5-25 fibers passed in Michigan, and payment was received in Michigan. SUF ¶¶ 86–87. Thus, the generally rectangular Helix 5-25 fibers sold to Helix Fiber Australasia were "on sale in this country" within the meaning of 35 U.S.C. § 102(b) (pre-AIA). *See Zacharin*, 213 F.3d at 1370; *see also Robbins Co. v. Lawrence Mfg. Co.*, 482 F.2d 426, 434 (9th Cir. 1973) (invention manufactured in United States and shipped to Australia was on sale in United States because sufficient prefatory activity to sale occurred in United States), *cited with approval in Caterpillar Inc. v. Int'l Trade Comm'n*, 837 F. App'x 775, 778 (Fed. Cir. 2020). Indeed, as Mr. Orabone testified, Helix sold thousands of dollars of Helix 5-25 product with a generally rectangular cross-sectional shape, and the product it sold in Australia was the same product it sold in the United States. SUF ¶¶ 79, 88.

Examination and testing of the Sample Box of Helix 5-25 fibers sold by Helix to Helix Fiber Australasia has shown that significant percentages of the generally rectangular fibers being manufactured by Helix in 2009 practiced ***all*** limitations of all claims of the '970 patent. *Id.* ¶¶ 199, 222. Of 101 fibers randomly selected from the Sample Box and viewed under an optical microscope equipped with a digital camera and measurement software, more than three fourths (75.2%) met all limitations of the broadest claims—*i.e.*, claims 1–2, 4–8, 10–17, and 19–22. *Id.* ¶¶ 200–218. Almost one fourth (24.8%) of the fibers met all limitations of claim 9, which recites a wire diameter of 0.51 mm. *Id.* ¶ 219; Doc. 29-2 at 20, claim 9. And 8.9% of the fibers met all limitations of the two narrowest claims—*i.e.*, claims 3 and 18, which limit the permissible aspect ratio of the bilateral truncated circle cross-sectional shape to 1.72:1 or 1.73:1. SUF ¶¶ 220–21; Doc. 29-2 at 20, claims 3, 18.

Thus, Helix was already making Helix 5-25 fibers that practiced all claims of the '970 patent in 2009—two years before the critical date—and selling those Helix 5-25 fibers to customers in both the United States and Australia. Because these devices "fully anticipated the claimed invention" by embodying all limitations of all claims,

1  the '970 patent is invalid as anticipated under the on-sale bar, in addition to being

2  invalid as obvious.

### C.    The generally rectangular Helix 5-25 fibers and the '713 patent were material to the patentability of the '970 patent.

In addition to its counterclaim seeking a declaration that the '970 patent is invalid, Cornerstone also asserts a counterclaim seeking a declaration that the '970 patent is unenforceable due to inequitable conduct. Doc. 37 at 45:12–49:15. The inequitable-conduct counterclaim alleges that Mr. Pinkerton, as a named inventor of the '970 patent, intentionally failed to disclose and directed others not to disclose prior sales and public uses of the Helix 5-25 product, as well as the existence of the '713 patent. *See* Doc. 37 at 46:8–20, 47:9–18. The counterclaim further alleges that, but for Mr. Pinkerton's decision to withhold information about the Helix 5-25 product and the '713 patent from the Patent Office during prosecution, the '970 patent would not have issued. *See* Doc. 37 at 46:17–20, 47:19–22

While the inequitable-conduct counterclaim as a whole is beyond the scope of this motion, the Court may nonetheless find that the '713 patent and the generally rectangular Helix 5-25 product on sale before the critical date were material to the patentability of the '970 patent. The standard for the materiality required to establish inequitable conduct is known as "but-for materiality." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011). Prior art is but-for material if the Patent Office "would not have allowed a claim had it been aware of the undisclosed prior art." *Id.* "[I]f a claim is properly invalidated in district court based on the deliberately withheld reference, then that reference is necessarily material because a finding of invalidity in a district court requires clear and convincing evidence, a higher evidentiary burden than that used in prosecution at the [Patent Office]." *Id.* at 1292.

As shown above, all claims of the '970 patent are invalid as obvious under the on-sale bar based on Helix's sales of generally rectangular Helix 5-25 fibers before the

1  critical date, in light of the suggestions to modify found in the '713 patent.

2  Alternatively, all claims of the '970 patent are invalid as anticipated under the on-sale

3  bar based on Helix's sales of Helix 5-25 fibers in the United States and Australia that

4  practiced all limitations of all claims of the '970 patent. Moreover, Helix argued during

5  prosecution of the '970 patent that the bilateral truncated circle cross-section it had

6  been using in the Helix 5-25 fibers since 2008 distinguished over prior art. SUF ¶ 151.

7  The Examiner rejected several claims based in part on a prior-art reference that

8  disclosed "a fiber which contains a truncated circular portion." *Id.* ¶ 152. Helix

9  responded that the prior-art reference "does not teach nor make obvious the use of a

10  fiber that has the cross-sectional shape of a bilateral truncated circle." *Id.* ¶ 153.

11  Because the Patent Office would not have allowed any claims of the '970 patent

12  if it had known that Helix was already making fibers with bilateral truncated circle

13  cross-sections for three years before the critical date, the Court should find that the

14  generally rectangular Helix 5-25 fibers were "but-for" material to the patentability of

15  the '970 patent. Additionally, the Court should find that the '713 patent was "but-for"

16  material because it expressly suggests modifying the dimensions of the generally

17  rectangular Helix 5-25 fibers to arrive at the '970 patent's claimed dimensions and

18  ranges.

19  **IV.  Conclusion**

20  For the reasons set forth above, Cornerstone respectfully requests that the Court

21  (1) grant its motion for partial summary judgment; (2) enter judgment in favor of

22  Cornerstone that all claims of U.S. Patent No. 10,266,970 are invalid as obvious under

23  35 U.S.C. § 102(b) (pre-AIA) or, alternatively, as anticipated under 35 U.S.C. § 103

24  (pre-AIA) and, thus, not infringed; and (3) enter judgment in favor of Cornerstone that

25  the following prior art was material to the patentability of U.S. Patent No. 10,266,970:

26  (a) U.S. Patent No. 5,989,713 and (b) Helix 5-25 fibers manufactured and sold by

27  Pensmore before the critical date of U.S. Patent No. 10,266,970 having a cross-

28  sectional shape that was generally rectangular and/or a bilateral truncated circle.

1

2

HOVEY WILLIAMS LLP

3    October 13, 2022              By: /s/ **Scott R. Brown**
                                         Scott R. Brown
4

5                                 *Attorneys for Defendant/Counterclaimant*

6

7                          **Certificate of Service**

8          On October 13, 2022, the foregoing Notice of Hearing on Motion and

9    Memorandum in Support of Cornerstone Manufacturing and Distribution, Inc.'s

10   Motion for Partial Summary Judgment of Invalidity was electronically filed with the

11   Clerk of the Court via the CM/ECF System, which will deliver electronic notification

12   to all registered counsel of record.

13                                 /s/ **Scott R. Brown**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28