1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
10
11   PENSMORE REINFORCEMENT          Case No. 5:21-cv-01556-JWH-SHK
        TECHNOLOGIES, LLC d/b/a/
12      HELIX STEEL,                  **CLAIM CONSTRUCTION ORDER**
13           Plaintiff,               **[ECF Nos. 69, 70, 76, & 77]**
14   v.
15   CORNERSTONE
        MANUFACTURING AND
16      DISTRIBUTION, INC.,
17           Defendant.
18   _____
     CORNERSTONE
19      MANUFACTURING AND
        DISTRIBUTION, INC.,
20           Counterclaimant,
21   v.
22   PENSMORE REINFORCEMENT
        TECHNOLOGIES, LLC d/b/a/
23      HELIX STEEL,
24           Counterdefendant.
25   _____
26
27
28

This matter is before the Court for claim construction.  The parties— Plaintiff and Counterdefendant Pensmore Reinforcement Technologies, LLC d/b/a Helix Steel ("<u>Helix</u>") and Defendant and Counterclaimant Cornerstone Manufacturing and Distribution, Inc. ("<u>Cornerstone</u>")—agree upon the construction of one limitation and present to the Court nine other limitations for decision.[1]  The Court conducted a claim construction hearing in August 2022.  After considering the opening and responsive claim construction briefs and the technology tutorial presentations that the parties provided, as well as the argument by counsel at the hearing, the Court construes the disputed terms as stated herein.  For the reasons explained below, the Court concludes that Claim 3 of U.S. Patent No. 9,440,881, in which all of the disputed limitations appear, is indefinite.

## I.  TECHNOLOGICAL BACKGROUND

In this action, Helix asserts claims for relief for direct and indirect infringement of two patents:  U.S. Patent No. 10,266,970 (the "<u>'970 Patent</u>"), entitled "Concrete Reinforcing Fibers"; and U.S. Patent No. 9,440,881 (the "<u>'881 Patent</u>"), entitled "Micro-Rebar Concrete Reinforcement System" (jointly, the "<u>Asserted Patents</u>").[2]

**A.    The '970 Patent**

The '970 Patent "relates to concrete reinforcing fibers."[3]  Because concrete has low tensile strength and low fracture toughness, it generally needs to be reinforced.  The '970 Patent sought to improve on the standard process of reinforcing concrete with rebar "by incorporating short, randomly distributed fibers in concrete such that the reinforcing fibers are distributed throughout the

---

[1]    Joint Claim Construction Statement (the "<u>Joint Statement</u>") [ECF No. 65].

[2]    *See generally* First Am. Compl. [ECF No. 29].

[3]    *See* '970 Patent [ECF No. 29-2] 1:14.

matrix and thus a new composite material . . . is obtained."[4]  This method is desirable because "[f]iber reinforced concrete has significantly improved energy-absorption capability (often called toughness), impact resistance, and fatigue endurance, with greater resistance to cracking."[5]

Figure 6 of the '970 Patent provides an exemplary method of manufacture for the fibers:[6]



FIG. 6

Although different types of fibers have been used to reinforce concrete, the claimed invention sought to improve upon such fibers by describing "an efficient and low cost method to manufacture the fibers used in these composites."[7]  Thus, the disclosed fibers satisfied the need for "improved geometries"—which "improve[d] the pull-out load of the fiber, the stress-strain

---

[4] *Id.* at 1:18-30.
[5] *Id.* at 1:30-34.
[6] *Id.* at 4:17-18.
[7] *Id.* at 1:35-48.

response," and the "energy absorbing capacity of the composite"—and they did so "at a significantly lower cost than [was] currently available."[8]

To that end, Claim 1 of the '970 Patent discloses:

1.  A reinforcing fiber comprising:

a body defining a longitudinal axis and having a cross section in the shape of a bilateral truncated circle, wherein the bilateral truncated circle has an aspect ratio between 1.53 and 1.93, wherein the aspect ratio is a ratio of width (w) to thickness (t) of the body, wherein the body is twisted along its longitudinal axis; wherein the body has a width (w) of between 0.01375 inches and 0.0159 inches.[9]

**B.    The '881 Patent**

Relatedly, the '881 Patent discloses a micro-rebar concrete reinforcement system, including "[a] method for designing and manufacturing micro reinforced concrete that produces a composite material that shares physical properties with both the reinforcing material and the concrete."[10]  The micro reinforced concrete comprises "a two-part system that [is] made of micro reinforcements, which are twisted steel fibers, and a concrete matrix."[11]

Figure 1 of the '881 Patent depicts "micro reinforcements exhibiting twists along the length of the fibers":[12]

---

[8]    *Id.* at 1:46-61.

[9]    *See id.* at Claim 1, 13:26-35.

[10]   *See* '881 Patent [ECF No. 29-3] Abstract.

[11]   *Id.*

[12]   *Id.* at 4:22-23.



Fig. 1

To overcome problems with prior fiber-reinforced concrete (*e.g.*, high cost and performance inefficiencies), which had prevented fiber-reinforced concrete from gaining ground vis-à-vis traditional rebar-reinforced concrete, the disclosed system offered "a way to characterize its tensile performance and develop designs that are reliable and more economical than typical steel fiber concrete."[13]  Claim 1 discloses a design method for micro fiber reinforced concrete structures,[14] and Claim 3, which is the primary asserted claim, discloses a micro reinforcement as follows:

> 3.  **A micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior** up to the point of **dominant crack** formation in a concrete matrix reinforced by the micro reinforcement, the twisted steel fiber further having stable tensile resistance after **dominant crack** formation up to a characteristic length determined by length, material used to manufacture and the number of twists provided in the twisted steel fiber, **wherein the twisted steel fiber meets the following criteria**:

---

[13]    *Id.* at 2:7-14.

[14]    *Id.* at Claim 1, 9:40-10:2.

a. **a strain capacity increase requirement** determined by tensile test results indicating a statically significant increase (minimum of 95% confidence, the maximum p-value in a two sample t-test, 0.05) in tensile **strain capacity** versus structural plain concrete, wherein a minimum of six control (plain concrete) specimens are considered in the analysis in addition to a minimum number of twisted steel fiber samples; and

b. a **post-crack tensile stability** requirement determined by tensile test results indicating that the median of **a load carried at Sa (design crack width) of the test specimen divided by a maximum load after 0.01 in displacement** is equal to or greater than 0.85, wherein the **twisted steel fiber crack width, Sa**, is the crack width resulting from tensile stresses typically measured for structural design applications and represents the average upper limit of displacement in a direct tension test where the stress remains stable, wherein Sa is set forth as:

$$Sa = \delta + X/3 \qquad \text{(Eq. 1)}$$

where:

$\delta =$ material elongation as stated on raw material certification test reports, inch (mm)

X= elongation from twist, representing the materials approximate ability to "stretch" and need not be exactly determined, inch (mm)

$$X = 1 - \cos\left(a\tan\left(\frac{n2\pi d}{l}\right)\right) \qquad \text{(Eq. 2)}$$

and where:

n=number of full twists in the twisted steel fiber

d=**equivalent diameter of the twisted steel fiber, inches (mm)**

L=length of the twisted steel fiber, inches (mm)

X=percentage reduction in length from twisting of the twisted steel fiber

and where:

the resulting values of Sa are used as a reference point for computing tensile resistance and compute maximum allowable crack width.[15]

## II.  LEGAL STANDARDS

The task of claim construction involves determining the meaning of a word or a group of words—which is known as a "limitation"—in a patent claim. Claim construction "'is simply a way of elaborating the normally terse claim language in order to understand and explain, but not to change, the scope of the claims.'"  *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001) (quoting *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000)). Construing the meaning of patent claims is an issue for the Court to decide as a matter of law.  *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 387-91 (1996). "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  The task of claim construction always begins with the claim language.  *See Innova*, 381 F.3d at 1116.  Indeed, "the proper construction of any

---

[15]     *Id.* at Claim 3 (emphasis added to show disputed claim limitations), 10:20-11:4.

1   claim language must, among other things, 'stay[] true to the claim language.'"
2   *Straight Path IP Group v. Sipnet EU S.R.O.*, 806 F.3d 1356, 1361 (Fed. Cir. 2015)
3   (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250
4   (Fed. Cir. 1998)).  Claim terms "are generally given their ordinary and
5   customary meaning," *Phillips*, 415 F.3d at 1312 (quoting *Vitronics Corp. v.
6   Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning
7   that the term would have to a person of ordinary skill in the art," *id.* at 1313.
8   The terms must be read in the context of the entire patent, however.  *Id.* at 1314.
9   In interpreting a claim, the Court must focus primarily on the intrinsic evidence
10  of record, including (1) the claims themselves; (2) the specification; and (3) if in
11  evidence, the prosecution history.  *See id.* at 1312-20; *see also Medrad, Inc. v. MRI
12  Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

13          Among the intrinsic evidence, the "specification is always highly relevant
14  to the claim construction analysis.  Usually it is dispositive; it is the single best
15  guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.  "The
16  specification is, thus, the primary basis for construing the claims." *Standard Oil
17  Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).  It is "entirely
18  appropriate for a court, when conducting claim construction, to rely heavily on
19  the written description for guidance as to the meaning of the claims." *Phillips*,
20  415 F.3d at 1317.  The Federal Circuit has recognized that an inventor may
21  invoke a particular definition of a term in her specification or may otherwise use
22  a term in the specification in a manner that differs from the term's ordinary
23  usage.  *Id.* at 1316.  "In such cases, the inventor's lexicography governs." *Id.*

24          In addition to the specification, the Court should also consider the
25  prosecution history (if it is in evidence), consisting of "the complete record" of
26  the patent.  *Id.*  If, within the prosecution history, a patentee clearly and
27  unmistakably disavowed a claim construction, then the patentee disclaimed that
28  construction.  *See SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287

1  (Fed. Cir. 2005); *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324

2  (Fed. Cir. 2003).  Because the prosecution history often lacks the clarity of the

3  specification, however, it is less useful for claim interpretation purposes.  *See*

4  *Phillips*, 415 F.3d at 1317.

5        Although the Court may also consider extrinsic evidence—including

6  expert testimony, dictionaries, and learned treatises—such evidence is generally

7  viewed as less reliable than intrinsic evidence.  *See id.* at 1317-18.  Therefore, the

8  Court must use its discretion in admitting and weighing extrinsic evidence,

9  keeping in mind the inherent flaws in that type of evidence.  *See id.* at 1319.

## III.  AGREED UPON CLAIM CONSTRUCTION

11       The parties have agreed upon the following construction:[16]

| Limitation | Parties' Agreed Construction |
| --- | --- |
| "bilateral truncated circle" ('970 Patent, Claim 1) | "Shape somewhat like a rectangle only with two opposing flat sides and rounded sides, it may be thought of as a rectangle with two rounded opposite ends" |

18       The Court accepts the parties' agreed construction, and this construction

19  will bind them.  *See MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1377–78

20  (Fed. Cir. 2007) (rejecting appellate challenge to claim construction agreed to by

21  a party in district court).

---

16       *See* Joint Statement 2.

## IV.  ANALYSIS OF DISPUTED CLAIM LIMITATIONS

### C.    Meaning of "Dominant Crack"

| Limitation at Issue | |
| --- | --- |
| "dominant crack" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "The largest crack that becomes the failure plane" | "The single crack or two closely spaced cracks which extend through the entirety of the concrete matrix and across which the tensile load is exclusively carried by the fibers" |

The parties dispute whether the construction of this limitation should be defined with respect to its length and whether it may comprise multiple cracks. Helix argues that the plain and ordinary meaning of "dominant crack" is well known to a person of ordinary skill in the art (a "POSA") because, when testing the failure point of concrete structures, micro cracks form, and one of those micro cracks eventually becomes the largest crack; *i.e.*, the failure plane in the concrete structure.[17]  Helix contends that Claim 3 supports this understanding because it refers to a single "dominant crack" and to phases before and after that crack forms.[18]  Similarly, Helix relies on portions of the specification referring to the "dominant crack" in the same manner.[19]

Cornerstone asserts that a dominant crack emerges because, "[a]s additional tension is applied, more and more micro-cracks continue to form until those micro-cracks begin connecting to form larger continuous cracks, and one crack emerges as the dominant crack—*i.e.*, the crack [that] extends through the

---

[17]     Pl.'s Opening Claim Construction Br. ("Plaintiff's Opening Brief") [ECF No. 70] 8:10-17.

[18]     *Id.* at 8:18-26.

[19]     *Id.* at 9:4-24 (citing '881 Patent 4:60-67, 5:48-54, and Figs. 2 & 3); *see also id.* at 9:25-10:5 (citing '881 Patent 6:25-30).

1  entirety of the concrete matrix and across which the tensile load is exclusively

2  carried by the fibers."[20]  Cornerstone argues that the extrinsic evidence supports

3  the conclusion that, depending upon the amount of fibers used in the test

4  specimen, either a single dominant crack or multiple cracks may occur.[21]

5       In its responsive brief, Helix generally reiterates its opening arguments.[22]

6  Cornerstone does not address this limitation in its responsive brief.[23]

7       The Court agrees with Helix that this limitation should be understood by

8  its plain and ordinary meaning to a POSA.  Both the plain language of Claim 3

9  and the specification support the conclusion that Helix's proposed construction

10  reflects plain and ordinary meaning.  A POSA would understand the dominant

11  crack to be a single failure point that helps to define the maximum load.[24]

12  Because this plain and ordinary meaning is well understood from the intrinsic

13  evidence, the Court declines to reach Cornerstone's extrinsic evidence.

14  Cornerstone's suggestion—to narrow this term by proposed length and to

15  expand it to include multiple cracks—are not well supported by the claim

16  language or the specification.

17       Accordingly, the Court construes "dominant crack" to have its plain and

18  ordinary meaning of "the largest crack that becomes the failure plane."

19

20

21

22

23  _____

24  [20]    Def.'s Opening Claim Construction Br. ("Defendant's Opening Brief") [ECF No. 69] 17:9-13 (citing '881 Patent 6:6-12 & 6:25–31).

25  [21]    *Id.*

26  [22]    *See generally* Pl.'s Responsive Claim Construction Br. ("Plaintiff's Responsive Brief") [ECF No. 77].

27  [23]    *See generally* Def.'s Responsive Claim Construction Br. ("Defendant's Responsive Brief") [ECF No. 76].

28  [24]    *See, e.g.*, '881 Patent 6:4-34, 6:42-7:-21, & 7:32-52.

### D.    Meaning of "Elastic, Perfectly Plastic Behavior"

| Limitation at Issue | |
|---|---|
| "elastic, perfectly plastic behavior" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "The concrete matrix reinforced with twisted steel fibers exhibits elastic behavior and then perfectly plastic behavior. During the elastic portion, the concrete matrix can return to its original form if the tensile stress is removed. During the perfectly plastic portion, the tensile stress remains substantially constant while the tensile strain increases and the concrete matrix cannot return to its original form" | Indeterminate and Indefinite |

The parties tend to agree on the plain and ordinary meaning of elastic and plastic, but they disagree on whether those terms can be understood in the context of Claim 3.  They also disagree about whether "perfectly" in this context means "substantially."  Helix argues that a POSA would commonly use "elastic, perfectly plastic behavior" to describe the behavior of fiber-reinforced concrete before the dominant crack forms.[25]  In support, Helix relies on the preamble of Claim 3, which refers to the steel fiber as "having elastic, perfectly plastic behavior up to the point of dominant crack formation," as well as the specification, which says the same.[26]  Helix contends that its construction is further supported by Figure 3, which "clearly shows elastic and then perfectly plastic behavior for micro-reinforced concrete."[27]

---

[25]    Plaintiff's Opening Brief 11:2-7.

[26]    *Id.* at 11:4-16 (citing '881 Patent Claim 3, 4:60-67).

[27]    *Id.* at 13:5-6.

Cornerstone responds that a POSA "would understand that elastic, perfectly plastic behavior describes the performance of material under load such as tension testing"; that is, the material "goes through only those two distinct phases"—in the elastic phase, the material stretches when tension is applied but can return to its original shape, whereas in the perfectly plastic phase, the material deforms continuously under the amount of pressure and does not return to its original shape when the load is removed.[28]  Although Cornerstone agrees with the basic precepts of "elastic" and "plastic," Cornerstone argues that the problem is that "the specification of the '881 patent does not describe elastic, perfectly plastic behavior before dominant crack formation as required by the claim."[29]  Cornerstone contends that, rather, Figures 2 and 3 "show stress-strain curves for concrete (plain or reinforced) rather than for the micro reinforcements themselves."[30]

Cornerstone rejects Helix's suggestion that, since this limitation is an academic term, the word "substantially" should be inferred to reflect real world conditions, because there is no support for construing "perfectly" as "substantially."[31]  Thus, Cornerstone asserts that "[Helix's] proposed construction would improperly read the term 'perfectly' out of the claim."[32] Cornerstone concludes that "[b]ecause the patent is inconsistent in its use of perfectly plastic, disclosing its ordinary meaning, but then claiming 'perfectly plastic behavior' for a performance region that does not exhibit perfectly plastic behavior, and because perfectly plastic has not been redefined by the inventors, a POS[]A would not be able to determine what is meant by elastic, perfectly

---

[28]   Defendant's Opening Brief 14:8-19.

[29]   *Id.* at 14:28-15:1.

[30]   *Id.* at 15:22-23.

[31]   *Id.* at 15:24-16:3.

[32]   *Id.* at 16:18-19.

1  plastic behavior to a reasonable degree of certainty . . . ."[33]  At the very least,

2  Cornerstone requests that "perfectly" be given its plain and ordinary meaning

3  rather than Helix's suggested meaning of "substantially."[34]

4          Helix replies that "'[e]lastic, perfectly plastic behavior' is a term of art

5  well known by a POSA in the reinforced concrete arts," as demonstrated by the

6  analysis of both parties' experts and by the consistency with which this term is

7  used in Claim 3 and depicted in Figure 3.[35]  Helix argues that the specification

8  provides support for this limitation by disclosing that, "[a]ccording to the

9  present invention, the preferred micro reinforcements (10) have elastic,

10  perfectly plastic behavior up to the point of dominant crack formation in the

11  micro reinforced concrete (14) and have stable tensile resistance after dominant

12  crack formation up to a characteristic length of the micro reinforcement (10), as

13  determined by its length, material used for manufacture and the number of

14  twists."[36]  Moreover, Helix asserts that Figure 3 "shows the plateau region

15  described in the '881 Patent as 'perfectly plastic behavior,'" providing further

16  support that the term is not indefinite.[37]  And relying on the "idealized stress

17  strain curve" in Figure 2 is a "non-starter[]" because Figure 2 does not show

18  "perfectly plastic behavior up to dominant crack formation."[38]

19          Helix further responds that it is not reading "perfectly" out of the claim

20  because "perfectly plastic behavior" is "a term well known to [a] POSA in the

21  reinforced concrete art to describe behavior where tensile stress remains

22  substantially constant while the tensile strain increases and the concrete matrix

23

24  _____

[33]     *Id.* at 16:21-26.

25  [34]     *Id.* at 16:27-28.

26  [35]     Plaintiff's Responsive Brief 2:12-18.

[36]     *Id.* at 2:24-3:5 (quoting '881 Patent 4:60-67).

27  [37]     *Id.* at 3:7-8.

28  [38]     *Id.* at 3:8-10.

cannot return to its original form."[39]  Helix explains that, in the art, "perfectly plastic behavior" is "well-known to include some variation, as shown in Fig. 3 of the '881 Patent."[40]

Cornerstone replies that every time the specification recites "elastic, perfectly plastic behavior," it clearly refers to the micro reinforcement (*i.e.*, the twisted steel fiber) as having this behavior, ***not*** the concrete matrix that is reinforced by the claimed micro reinforcement.[41]  Thus, Cornerstone argues that the claim is nonsensical because the "elastic, perfectly plastic" limitation "requires twisted-steel-fiber micro reinforcements to have a behavior that they are incapable of exhibiting."[42]  Cornerstone also rejects Helix's contention that a POSA would understand "perfectly" to mean "substantially" in the industry because Helix's expert cites nothing in support.[43]  Cornerstone concludes that "[b]ecause claim 3, read in light of the specification [Figs. 2 & 3], claims an idealized performance characteristic that [Helix's] expert admits micro reinforced concrete can never meet," the claim is indefinite.[44]

Cornerstone is correct that this limitation is indefinite because it describes an impossibility.  The limitation appears in the preamble to Claim 3:  "A micro reinforcement comprised of ***a twisted steel fiber having elastic, perfectly plastic behavior*** up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement."[45]  Thus, the claim language on its face states that the "micro reinforcement" (*i.e.*, the twisted steel fiber) has elastic, perfectly plastic behavior.  Helix and its expert acknowledge, however, that it is

---

[39]    *Id.* at 3:11-15.

[40]    *Id.* at 3:16-17.

[41]    Defendant's Responsive Brief 11:16-26.

[42]    *Id.* at 12:2-7.

[43]    *Id.* at 12:12-19.

[44]    *Id.* at 12:20-28.

[45]    '881 Patent Claim 3 (emphasis added).

the reinforced concrete matrix, not the component micro-fiber, that displays elastic and then plastic behavior under an increasing load.

For example, Helix's expert states, "the term 'elastic, perfectly plastic behavior' is commonly used to *describe the behavior of reinforced concrete* prior to formation of a dominant crack and/or prior to failure.  While plain concrete typically does not exhibit 'elastic, perfectly plastic behavior' prior to dominant crack formation because of its brittleness and lack of reinforcement, fiber reinforced concrete often experiences a period where the load or stress on the concrete remains substantially constant while the fiber reinforced concrete experiences increased strain or stretching.  This is due to the fiber reinforcements taking up the load and allowing micro cracks to form in the concrete, thus delaying the formation of a dominant crack and failure plane.  *The steel fiber reinforcement imparts elastic properties on the steel fiber reinforced concrete matrix*."[46]  Thus, Helix apparently agrees that the reinforced concrete matrix, not the steel fibers, is what displays elastic and plastic behavior.  However, as stated, that is not what is claimed.

Nothing in the specification supports the claim limitation that the steel fibers themselves have elastic, perfectly plastic behavior.[47]  Rather, the specification comports with Helix's expert's view:  it is *the concrete matrix* that displays such properties.[48]  Although Helix does not address the steel fibers vs.

---

[46]     Expert Decl. of Dr. Mary Vancura in Supp. of Pl.'s Claim Construction (the "Vancura Declaration") [ECF No. 70-4] 27:21-28:7 (emphasis added).

[47]     To the extent that it presents a physical impossibility, the claim language is indefinite for that additional reason.  *See, e.g.*, *Synchronoss Techs., Inc. v. Dropbox Inc.*, 389 F. Supp. 3d 703, 714 (N.D. Cal. 2019) (claim contained an "apparent impossibility" where the patentee acknowledged that "[a] digital media file cannot contain a directory of digital media files"; thus, the court rejected the argument "that a person of ordinary skill in the art would understand that [impossible claim language] means something other than what is written" because that cannot "render the claim language definite; it does the opposite"), *aff'd*, 987 F.3d 1358 (Fed. Cir. 2021).

[48]     *See* '881 Patent 2:15-35 (repeating Claim 1 language:  "one aspect the present invention provides a design method for micro fiber reinforced concrete

concrete matrix distinction in this context, Helix seems to suggest that the Court should read "elastic, perfectly plastic" as applying to the concrete matrix, not to the steel fibers.  But the Federal Circuit has cautioned that "[i]nventors are masters of their claims, and the words they use to describe and claim their invention are decisive and binding."  *Bio-Rad Lab'ys, Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1331 (Fed. Cir. 2021).

To adopt Helix's construction, this Court would have to add language to this claim limitation, such as:  "A micro reinforcement comprised of a twisted steel fiber [that when added to a concrete matrix gives the concrete matrix] elastic, perfectly plastic behavior up to the point of dominant crack formation in [the] concrete matrix reinforced by the micro reinforcement."[49]  But "[i]t is not [the Court's] function to rewrite claims to preserve their validity."  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002) (rejecting request to construe "perpendicular" as "parallel").  "Moreover, it is of no moment that the contradiction is obvious:  semantic indefiniteness of claims is not rendered unobjectionable merely because it could have been corrected."  *Id.* (quotation marks omitted).  This is especially true where the patentee knew how to claim the micro reinforced concrete when it wanted to—such as in Claims 1, 2, 7, and 8—but opted not to do so in Claim 3.

---

structures, the design method using an estimated number of twisted steel fibers in the micro reinforced concrete," wherein strain is monitored "to verify that ***the twisted steel fibers are behaving in the elastic and perfectly plastic region*** prior to crack formation" in the concrete structures) (emphasis added); *id.* at 2:62-66 (repeating Claim 3 language:  "[i]n a further aspect, the present invention provides ***a micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior*** up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement") (emphasis added); *id.* at 4:60-64 (same:  "[a]ccording to the present invention, ***the preferred micro reinforcements (10) have elastic, perfectly plastic behavior*** up to the point of dominant crack formation in the micro reinforced concrete (14)") (emphasis added).

[49]   *See* '881 Patent Claim 3.

Even when a patentee argues that a claim would be understood to mean something other than what it says, the Court agrees with Judge Plager that "it is not the province of the courts to salvage poorly—or incorrectly—drafted patent claims. Fair notice to the public, and to competitors, of what is claimed depends on [courts] holding patentees to what they claim, not to what they might have claimed." *Honeywell Intern., Inc. v. Universal Avionics Systems Corp.*, 493 F.3d 1358, 1368 (Fed. Cir. 2007) (Plager, J., dissenting).

"Claims mean precisely what they say." *Central Admixture Pharmacy Services, Inc. v. Advanced Cardiac Solutions, P.C.*, 482 F.3d 1347, 1355 (Fed. Cir.), *cert. denied*, 128 S. Ct. 648 (2007). Therefore, applying this rule to Claim 3, "elastic, perfectly plastic behavior" as a purported property of the claimed "micro reinforcement comprised of a twisted steel fiber" renders the claim indefinite.[50] Because the claim is indefinite, it is invalid. *See, e.g., Koki Holdings Co. v. Kyocera Senco Indus. Tools, Inc.*, 2021 WL 1092579, at *2 (D. Del. Mar. 22, 2021) (granting motion for summary judgment where claims "require[d] a physical impossibility," were "inherently unclear," and could not "provide reasonable certainty about the scope of the invention"; therefore, the claims "fail[ed] to satisfy the definiteness requirement of [35 U.S.C.] § 112 and [were] invalid").

## E.     Meaning of "Strain Capacity"

| Limitation at Issue | |
| --- | --- |
| "strain capacity" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "The ability to stretch or deform under tensile stress until dominant crack formation" | Indeterminate and Indefinite |

---

[50]     In light of this conclusion, the Court need not reach the parties' dispute concerning whether "perfectly" may mean "substantially."

The parties disagree whether "strain capacity" has a commonly accepted meaning in the context of the claimed invention.  Helix states that "strain" is commonly understood in the art; that is, "[w]hile stress is a load placed on concrete over a particular area, strain is the amount the concrete stretches or deforms."[51]  Helix argues that the specification supports that understanding because it explains that "'the described strains are based on deformation of the concrete, both before and after formation of a dominant crack.'"[52]  Based upon that understanding, Helix concludes that "strain capacity" means "the ability of fiber reinforced concrete to stretch or deform under tensile stress."[53]  Helix argues that Figure 3 and the plain language of Claim 3 support its contention that strain capacity is measured before the formation of the dominant crack.[54]

Cornerstone responds that this limitation is indefinite because it has multiple meanings in the relevant art and the specification does not define the term as used here.[55]  Cornerstone also argues that Claim 3 provides no support for Helix's contention that strain capacity is measured with respect to dominant crack formation.[56]

Helix replies that Cornerstone's various extrinsic evidence definitions "mean the same thing: 'strain capacity' in the context of reinforced concrete is 'the ability to stretch or deform under tensile stress until dominant crack formation.'  This has been the definition since the origins of the study of concrete, and remains the definition today."[57]  Further, Helix argues that a POSA would understand strain capacity in relation to dominant crack formation

---

[51]     Plaintiff's Opening Brief 13:16-20.

[52]     *Id.* at 13:23-28 (quoting '881 Patent 5:48-50).

[53]     *Id.* at 14:4-5.

[54]     *Id.* at 14:5-11.

[55]     Defendant's Opening Brief 17:26-18:1; *see id.* at 18:15-22.

[56]     *Id.* at 18:23-19:7.

[57]     Plaintiff's Responsive Brief 4:1-7.

1  because it measures "the capacity to withstand increasing stain up to a certain

2  point," with the relevant point being when it cracks under strain.[58]

3       Cornerstone responds to that argument by contending that experts in the

4  field disagree regarding how strain capacity is calculated, and, therefore, it is

5  indefinite here.[59]

6       The Court concludes that plain and ordinary meaning applies, which is

7  consistent with Helix's proposed construction.  A POSA would understand this

8  term in the context of the claimed invention.  First, Claim 3 discloses a twisted

9  steel fiber micro reinforcement with certain capabilities, including "a strain

10  capacity increase requirement determined by tensile test results."[60]  Second, the

11  specification supports this conclusion.  It teaches that, as stress increases on

12  reinforced concrete, the load is redistributed to the micro reinforcements, which

13  "results in a slight softening of the composite, which delays micro crack

14  localization, allowing the composite to resist well over 200 microstrain before

15  the formation of a dominant crack is observed.  Analysis of direct tension tests

16  has shown that this increase in strain capacity is statistically significant, with a

17  confidence level of over 99%."[61]  Thus, the specification demonstrates that

18  strain capacity refers to how much load the reinforced concrete can withstand

19  before a dominant crack emerges.  This term is not indefinite.

20       Accordingly, the Court construes "strain capacity" to have its plain and

21  ordinary meaning of "the ability to stretch or deform under tensile stress until

22  dominant crack formation."

23

24

25

---

26  [58]    *Id.* at 5:5-12.

27  [59]    Defendant's Responsive Brief 15:18-23.

    [60]    '881 Patent Claim 3.

28  [61]    *Id.* at 6:20-33.

## F.    Meaning of "Post-Crack Tensile Stability"

| Limitation at Issue | |
|---|---|
| "post-crack tensile stability" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "Tensile stability after formation of a dominant crack" | Indeterminate and Indefinite |

The parties disagree whether a POSA could understand this term in the context of the patent with reasonable certainty.  Helix argues that plain and ordinary meaning applies.[62]  Specifically, Helix contends that "post-crack" refers to the dominant crack, as that is the only crack mentioned earlier in Claim 3.[63]  Helix asserts that the specification also supports that understanding, because it teaches that the twisted steel fibers "in the micro reinforced concrete (14) [] have stable tensile resistance after dominant crack formation."[64]

Cornerstone responds that, because Claim 3 "does not set forth a comprehensible test by which this post-crack tensile stability, or 'Sa,' can be determined," a POSA would not understand the meaning of this term with certainty.[65]  Cornerstone also argues that because the design crack cannot be determined with reasonable certainty, "post-crack tensile stability" is indefinite.[66]

---

[62]    Plaintiff's Opening Brief 14:22-24.

[63]    *Id.* at 15:17-21.

[64]    *Id.* at 15:26-16:6 (quoting '881 Patent 4:60-67); *see also id.* (citing '881 Patent 7:53-64 ("the stable post-cracking behavior of micro-reinforced concrete (Phase III in FIG. 2) mimics the stable tensile response of traditional reinforcing bars in concrete"); *id.* at Fig. 2 (illustrating post-dominant crack tensile stability)).

[65]    Defendant's Opening Brief 23:1-5.

[66]    *Id.* at 23:5-8.

1    Helix replies that "Claim 3 plainly defines the 'post-crack tensile stability
2    requirement' as the entirety of part (b) of Claim 3."[67]
3    Cornerstone responds to Helix's argument by reiterating its position that
4    this limitation is indefinite "because the patent teaches that it is determined by
5    test results involving the indefinite variables . . . ."[68]
6    The Court agrees with Helix that plain and ordinary meaning applies; no
7    construction is necessary.  That conclusion is supported by the claim language,
8    which discloses "dominant crack formation" in the concrete matrix and requires
9    "a post-crack tensile stability" "determined by test results" examining the
10   median load carried.[69]  Likewise, the specification supports that understanding
11   by teaching that "stable tensile resistance" is measured "after dominant crack
12   formation."[70]  Whether a POSA can perform calculations to arrive at the
13   claimed test results is a separate question from whether a POSA would
14   understand this clear underlying term.
15   Accordingly, the Court concludes that plain and ordinary meaning applies
16   to "post-crack tensile stability" and that no construction is necessary.
17   **G.    Meaning of the "Load Carried/Maximum Load" Limitation**

| Limitation at Issue | |
|---|---|
| "a load carried at Sa (design crack width) of the test specimen divided by the maximum load after 0.01 in displacement" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "Tensile stress at the design crack width divided by tensile stress at a displacement or fixture movement of 0.01 inches" | Indeterminate and Indefinite |

---

[67]    Plaintiff's Responsive Brief 5:22-23.
[68]    Defendant's Responsive Brief 15:4-5.
[69]    '881 Patent Claim 3.
[70]    *See id.* at 2:62-3:4.

1    The parties again disagree whether a POSA could understand this term

2  with reasonable certainty in the context of the patent.  Helix argues that "[t]his

3  term can be given its plain and ordinary meaning, but construing this term is

4  likely helpful for a jury."[71]  Helix observes that design crack width is quantified

5  by Equation 1 in Claim 3 and is described qualitatively in the specification as

6  "the crack width resulting from tensile stresses typically measured for structural

7  design applications," where "Sa represents the average upper limit of

8  displacement in a direct tension test where the stress remains stable."[72]  In other

9  words, Helix contends that the design crack width is "the largest crack width

10  permissible in a particular design to ensure the concrete is safe for use."[73]

11    Further, Helix explains that the maximum load measurement refers to

12  measuring "tensile stress when the strain gauge in the direct tensile test fixture

13  measures 0.01 inches of displacement between the halos."[74]  Helix asserts that a

14  POSA would understand how to apply this equation because "Sa is always the

15  design crack width of the concrete matrix as set forth in Equation 1.  And the

16  units in Equation 1 amount to inches because both δ and X are in inches, and a

17  POSA would readily know to use the fiber length to compute δ and X."[75]

18    Cornerstone responds[76] that this limitation is indefinite because Claim 3

19  defines "Sa" three different times:

20  • "Sa (design crack width)";[77]

21  • "twisted steel fiber crack width, Sa";[78] and

22

23  [71]    Plaintiff's Opening Brief 16:15-16.

24  [72]    *Id.* at 16:21-28 (citing '881 Patent Claim 3 & 5:17-21).

    [73]    *Id.* at 17:1-2.

25  [74]    *Id.* at 17:17-21.

26  [75]    *Id.* at 18:9-12.

    [76]    *Id.* at 20:12-17.

27  [77]    '881 Patent 10:39.

28  [78]    *Id.* at 10:41–42.

- "Sa = $\delta$+X/3."[79]

Further, Cornerstone contends that "Sa" is "described using inconsistent units of measure," such as inches and as elongation (expressed as, *e.g.*, inches per inch, millimeters per millimeter, or a percentage).[80]  Cornerstone asserts that "Equation 2 is wrong for the additional reason that it contains an extra '2' in the numerator" and "the median of a load carried at Sa" lacks an antecedent basis.[81]  Cornerstone also avers there is a mathematical error in the equation because .01 strain converted to microstrain is 10,000 microstrain, not 1,000 microstrain as shown in the patent, resulting in the claimed test results never being depicted in the specification.[82]  Although Cornerstone acknowledges that "real-world tension testing may produce different results," Cornerstone argues that, in any event, "the disclosure of the '881 patent specification provides no guidance as to what those tests are to show, making it impossible for a POS[]A to determine whether this claim limitation is met."[83]

Helix replies that, although "Claim 3 uses Sa at least three separate times," the claim language makes clear that "Sa is the design crack width."[84] Further, Helix explains that "Sa is measured in units of length (inches or mm) because $\delta$ and X are measured in inches or mm."[85]  Helix also argues that a POSA would understand "that if raw material certifications report elongation in inches/inch (or mm/mm), $\delta$ is computed using the length of the fibers (about 1 inch for the '881 fibers)."[86]

---

[79]     *Id.* at 10:48.
[80]     Defendant's Opening Brief  20:18-27.
[81]     *Id.* at 20:28-21:4.
[82]     *Id.* at 21:9-22:12.
[83]     *Id.* at 22:19-23.
[84]     Plaintiff's Responsive Brief 6:12-13.
[85]     *Id.* at 6:18-20.
[86]     *Id.* at 6:22-24.

Further, Helix maintains that a POSA would understand "that X from Equation 2 is simply multiplied by the length of the fibers for insertion into Equation 1."[87]  Helix also rejects Cornerstone's antecedent basis argument because "Claim 3 requires the calculation of the median value of 'a load carried at Sa (design crack width) of the test specimen divided by a maximum load after 0.01 in displacement,'" which "specifies a median (a simple statistical calculation) because the direct tensile test is performed on multiple test specimens."[88]  Likewise, Helix rejects Cornerstone's 2-in-the-numerator argument because "[t]he inventors intentionally used the '2' in Equation 2's numerator to modify the equation derived by [Cornerstone's] expert (based upon a circular rod in tension) because of the preferred cross sectional shape of the '881 twisted steel fibers (closer to rectangular with a different aspect ratio)."[89]

Helix disagrees with Cornerstone's challenges to the Figures because Figure 2 is "idealized" and Figure 3 "does not show Phase III; and, a POSA knows that for twisted steel fiber reinforced concrete, the downward sloping curve in Fig. 3 does not approach 0, but rather levels off as the twisted steel fibers stabilize the concrete like shown in Fig. 2."[90]  Helix acknowledges that the patent contains a typographical error in Column 6, where "the last portion of the sentence should read 'engineering strain of 1% (10000 microstrain)', not 'engineering strain of 1% (1000 microstrain).'"[91]  Helix argues that that typographical error does not affect Claim 3, which neither recites microstrain

---

[87]   *Id.* at 7:1-3.

[88]   *Id.* at 7:4-10.

[89]   *Id.* at 7:11-16.

[90]   *Id.* at 7:26-8:5.

[91]   *Id.* at 8:5-7 (underlining added to show correction).

1  nor relies on this disclosure, for any of its computations; rather it "provides a
2  precise displacement value (0.01 inches) at which the load must be measured."[92]

3      In response, Cornerstone reiterates its argument that "[b]ecause 'Sa'
4  cannot be determined with reasonable certainty, it is impossible to calculate 'a
5  load carried at Sa (design crack width) of the test specimen divided by the
6  maximum load after 0.01 in displacement' with reasonable certainty," and,
7  therefore, it is indefinite.[93]  Further, Cornerstone maintains that "'Sa' is used in
8  claim 3 and the specification to identify two separate concepts, 'twisted steel
9  fiber crack width,' and 'design crack width.'"[94]

10     The Court agrees with Cornerstone that this limitation is indefinite
11 because Equation 2 results in a length/length calculation, which is dimensionally
12 unitless.

13     As an initial matter, the claim language and specification make clear that
14 "Sa" means "design crack width," and the specification uses "twisted steel
15 fiber crack width" as synonymous with "design crack width":

16     a post-crack tensile stability requirement determined by tensile test
17     results indicating that the median[95] of a load carried at ***Sa (design***
18     ***crack width)*** of the test specimen divided by a maximum load after
19     0.01 in displacement is equal to or greater than 0.85, ***wherein the***
20     ***twisted steel fiber crack width, Sa, is the crack width resulting from***
21     ***tensile stresses*** typically measured for structural design applications

---

92      *Id.* at 8:8-13.
93      Defendant's Responsive Brief 14:9-11.
94      *Id.* at 14:19-22 (quoting '881 Patent 3:17-18, 10:41–42, 2:49, 3:15–21, 5:16–21, 10:6, & 39) (internal citations omitted from quotation).
95      No antecedent basis is needed for "the median" because a POSA would understand what a median is.

and represents the average upper limit of displacement in a direct tension test where the stress remains stable . . . .[96]

Although using different terms usually implies that the terms have different meanings, "that implication is overcome where, as here, the evidence indicates that the patentee used the two terms interchangeably." *Baran v. Medical Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010).

But defining "Sa" as "design crack width" does not solve the invalidity problem. Helix argued that a POSA would understand that "X" in Equation 2 ***must be multiplied by the fiber length*** to calculate "X," as needed to solve Equation 1.[97]



Neither Equation 1 and 2, nor the specification, teaches that X must be multiplied by fiber length to arrive at Sa. To the contrary, Helix admits that the patent contains no such disclosure. Helix argues, without support, that a POSA

---

[96]     '881 Patent 3:13-21 (emphasis added).

[97]     *See* Pensmore/Helix Steel's Markman Presentation (the "Helix Slides") [ECF No. 83], Slide 34.

1  would know to complete that extra step.  But the Court will not add a new step

2  to calculate Equation 1 and 2.  To do so would be to rewrite the claim, which, as

3  stated previously, the Court will not do.

4        Separately, the Court is not persuaded by clear and convincing evidence

5  that the claim is invalid based upon the inventors' decision to use a "2" in the

6  numerator of the Sa equation.  Cornerstone does not rebut Helix's explanation

7  that a "2" in the numerator was necessary to account for the different cross-

8  sectional shape of the claimed steel fibers.  Cornerstone's argument does not

9  constitute clear and convincing evidence of indefiniteness.

10       Finally, although both parties acknowledge a typographical error in

11  "engineering strain of 1% (10000 microstrain)," Cornerstone has not shown how

12  that typographical error affects a POSA's ability to understand Claim 3's Load

13  Carried / Maximum Load formula, or why a POSA who is familiar with such

14  units of measurement in the relevant art could not reasonably understand that

15  that was a typographical error.  Even if a correction of the error were necessary

16  for a POSA to perform the calculation, the Court observes that "[d]istrict courts

17  are empowered to correct harmless typographical errors."  *Fiber Sys. Int'l, Inc.*

18  *v. Applied Optical Sys., Inc.*, 2009 WL 3571350, at *2 (E.D. Tex. Oct. 26, 2009)

19  (citing *Hoffer v. Microsoft Corp.*, 405 F.3d 1326, 1331 (Fed. Cir. 2005)).

20       Accordingly, the Court finds indefinite the claim limitation "a load

21  carried at Sa (design crack width) of the test specimen divided by the maximum

22  load after 0.01 in displacement" where the required calculations lead to a

23  dimensionless result.

24

25

26

27

28

## H.    Meaning of Claim 3's Preamble

| Limitation at Issue | |
|---|---|
| "A micro reinforcement comprised of a twisted steel fiber having . . .,wherein the twisted steel fiber meets the following criteria:" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| This term is the entire preamble, which contains many terms improper for construction as a whole.  The preamble generally describes pre- and post-dominant crack properties of a concrete matrix reinforced with twisted steel fibers, which properties of the twisted steel reinforced concrete matrix are further specified in parts (a) and (b) of the claim below when subjected to tensile testing. | The "micro reinforcement" of claim 3's preamble is a limitation of claim 3 and is a twisted steel fiber that must untwist as it pulls out from concrete. |

The parties dispute whether the preamble as a whole should be construed, and, at a minimum, whether it should be construed to refer to "a twisted steel fiber" as opposed to "a twisted steel fiber reinforced concrete matrix as a whole."  Helix argues that a POSA would understand that the "preamble's use of the phrase 'wherein the twisted steel fiber meets the following criteria' means twisted steel fiber in a concrete matrix," because "[a]ny interpretation that somehow reads the testing, measurements and criteria in parts (a) and (b) of Claim 3 to apply to the twisted steel fibers themselves—outside of a concrete matrix—completely ignores the understanding of a POSA in light of the '881 patent."[98]  Helix contends that, when read in light of the specification, a POSA "would understand that the test specimen for Claim 3 is a twisted steel fiber reinforced concrete matrix."[99]

---

[98]    Plaintiff's Opening Brief 19:19-20:3.

[99]    *Id.* at 20:17-18; *see also id.* at 20:19-22:3 (collecting citations).

Cornerstone responds that, based upon the preamble, "the Court should construe the claim to be limited to a micro reinforcement—*i.e.*, a twisted steel fiber *per se*—that must untwist as it pulls out from concrete," not the entire concrete matrix.[100]  This is because, Cornerstone contends, the '881 Patent "repeatedly defines a 'micro reinforcement' as a twisted steel fiber, distinct from the concrete it reinforces."[101]  In support, Cornerstone relies on the specification, which states that in "the present invention, micro reinforcements . . . are steel fibers produced with a twisted profile" and that the "micro reinforcement . . . must untwist as it pulls out of the concrete."[102]  Further, Cornerstone asserts that the preamble teaches a POSA that "a micro reinforcement" has a strain increase requirement and a post-crack tensile stability requirement because "the preamble's transition explains that 'the twisted steel fiber meets' those criteria."[103]  Thus, since the preamble cites limitations of the claim and provides antecedent basis for "twisted steel fiber," Cornerstone maintains that it should be construed.[104]

Cornerstone also contends that Claim 3's dependent claims support the conclusion that the preamble refers to the twisted steel fiber only, not to the entire concrete matrix, because, unlike Claim 3, the dependent claims recite the added limitation "wherein the micro reinforcement is combined in a concrete matrix forming a micro reinforced concrete."[105]  Cornerstone argues that "[e]ven if that reality leads Helix's expert to complain that the result is

---

[100]    Defendant's Opening Brief 7:13-15.

[101]    *Id.* at 7:16-17.

[102]    *Id.* at 7:24-27 (quoting '881 Patent 4:50-55).

[103]    *Id.* at 8:22-23 (citing '881 Patent 10:26-28).

[104]    *Id.* at 8:22-9:8.

[105]    *Id.* at 10:21-11:8 (citing '881 Patent Claims 4, 5, and 6).

1    nonsensical, the court must 'construe the claim as written, not as the patentees

2    wish they had written it.'"[106]

3    In reply, Helix generally reiterates its position.[107]  Helix also argues that

4    claim differentiation does not apply because "other key distinguishing

5    limitations [] define the scope of those claims," such as a certain tensile strain or

6    resistance, or the structure in which it is used.[108]

7    Cornerstone responds to Helix's argument by generally reiterating its

8    arguments.[109]  Further, Cornerstone asserts that instead of claiming a "micro

9    reinforcement" or a "twisted steel fiber," "[t]he inventors of the '881 patent

10   could have drafted claim 3's preamble (and the substantively identical text in the

11   specification) to recite:  A ***micro reinforced concrete*** comprised of a twisted steel

12   fiber *in a concrete matrix*, the ***micro reinforced concrete*** having elastic, perfectly

13   plastic behavior up to the point of dominant crack formation . . . , ***the micro***

14   ***reinforced concrete*** further having stable tensile resistance after dominant crack

15   formation . . . , wherein ***the micro reinforced concrete*** meets the following

16   criteria:  . . .," but the inventors did not.[110]  Cornerstone also argues that Helix

17   may not use an expert to support the contention that a POSA would

18   "understand the unambiguous language of the claims not to mean what it

19   sa[ys]."[111]

20   "[A]s a general rule[,] preamble language is not treated as limiting."

21   *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002).  To

22   determine "whether a preamble limits a claim," the Court analyzes the

---

24   [106]    *Id.* at 12:2-5 (quoting *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004)).

25   [107]    *See generally* Plaintiff's Responsive Brief 8:17-11:12.

26   [108]    *Id.* at 11:16-12:7.

        [109]    *See generally* Defendant's Responsive Brief 1:20-4:14.

27   [110]    *Id.* at 4:15-5:3 (emphasis in original).

28   [111]    *Id.* at 7:10-12.

preamble to see "whether it states a necessary and defining aspect of the invention or is simply an introduction to the general field of the claim." *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006); *see also Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (whether a preamble is limiting requires "review of the entire [] patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim").

Here, Claim 3's preamble provides defining aspects of the invention because it describes necessary characteristics of the claimed micro reinforcement.[112]   Specifically, the preamble introduces "a micro reinforcement comprised of a twisted steel fiber" that (1) has "elastic, perfectly plastic behavior up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement"; (2) has stable tensile resistance after dominant crack formation up to a characteristic length . . ."; and (3) "meets the following criteria:"  including (a) "a strain capacity increase requirement" and (b) "a post-crack tensile stability requirement."[113]   Accordingly, because the preamble is limiting, the Court will consider whether it refers to "a twisted steel fiber" as opposed to "a twisted steel fiber-reinforced concrete matrix" as a whole.

The Court's analysis regarding the "elastic, perfectly plastic" limitation applies with equal force here.  As stated, "[c]laims mean precisely what they say." *Central Admixture Pharmacy*, 482 F.3d at 1355.  On its face, the preamble

---

[112]   *See* '881 Patent Claim 3.  The preamble in its entirety is as follows:  "A micro reinforcement comprised of a twisted steel fiber having elastic, perfectly plastic behavior up to the point of dominant crack formation in a concrete matrix reinforced by the micro reinforcement, the twisted steel fiber further having stable tensile resistance after dominant crack formation up to a characteristic length determined by length, material used to manufacture and the number of twists provided in the twisted steel fiber, wherein the twisted steel fiber meets the following criteria: . . . ." *Id.*

[113]   '881 Patent Claim 3.

to Claim 3 recites properties of the micro reinforcement twisted steel fiber, not properties of the concrete matrix as a whole.  Helix's expert opines that that reading "makes no sense."[114]  Nevertheless, to the extent that it describes a physical impossibility, the "micro reinforcement" (aka "twisted steel fiber") limitation is indefinite.  *See Synchronoss Techs.*, 389 F. Supp. 3d at 714.

The Court agrees with Cornerstone that Claim 3's dependent claims provide further support for that conclusion:  dependent Claims 4, 5, and 6 recite "The micro reinforcement of claim 3, ***wherein the micro reinforcement is combined in a concrete matrix*** forming a micro reinforced concrete."[115]  If the micro reinforcement of Claim 3 was claimed only as part of a combined concrete matrix, then there would be no reason for the dependent claims to specify that attribute.  *See, e.g.*, *Phillips*, 415 F.3d at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim").  That is true even when the dependent claims add other attributes; dependent claims are not limited to the addition of one attribute.

At the hearing, Helix argued that the Court should apply the rule that claims should be construed to preserve validity.[116]  But that rule presupposes that a claim is susceptible to "more than one ***reasonable interpretation***." *Phillips*, 415, F.3d at 1327 (emphasis added).  Because a physical impossibility does not present a reasonable interpretation, that canon of claim construction is inapplicable.

Further, adopting an interpretation not covered by the claim language would thwart the public notice function of patents.  "Patent claims function to delineate the precise scope of a claimed invention and to give notice to the

---

[114]    *See* Vancura Declaration 48:18-21.
[115]    *See* '881 Patent Claims 4, 5, and 6 (emphasis added).
[116]    *See* Helix Slides, Slide 46.

public, including potential competitors, of the patentee's right to exclude."

*Fifth Generation Computer Corp. v. Int'l Bus. Machines Corp.*, 416 F. App'x 74, 78

(Fed. Cir. 2011) (citing *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950

(Fed. Cir. 2006)).  The notice function would be undermined if the Court

construed the claims to mean something other than what they say.

Accordingly, the Court construes "micro reinforcement comprised of a

twisted steel fiber" to mean the micro reinforcement only, not the concrete

matrix in which it is placed.  Because that construction describes a physical

impossibility, the preamble to Claim 3 renders the claim indefinite.

## I.     Meaning of "Strain Capacity Increase Requirement"

| Limitation at Issue | |
|---|---|
| "wherein the twisted steel fiber meets the following criteria . . . a.  a strain capacity increase requirement . . . " ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "increase in the strain capacity of a concrete matrix with twisted steel fibers as compared to plain structural concrete in a tensile test according to the requirement in part (a) of Claim 3" | Indeterminate and Indefinite |

The parties dispute whether this term is indefinite.  Similar to its

argument regarding the preamble, Helix asserts that part (a) of Claim 3 defines

this requirement and that a POSA would understand that it refers to *a concrete*

*matrix*; a POSA "would not test or evaluate the strain capacity of plain concrete

versus a mere steel fiber."[117]  Further, Helix contends that Claim 3's references

to "control specimens" and "test specimens" show that the limitation "refer[s]

---

[117]     Plaintiff's Opening Brief 22:19-23:11.

1    to concrete matrix test specimens, including control specimens with no twisted

2    steel fibers."[118]

3         Cornerstone responds that this limitation is indefinite because "'strain

4    capacity' is a measurement of concrete's response to tensile strain.  Yet the

5    plain language of the claim requires the twisted steel fiber itself to have the strain

6    capacity described in clause (a)."[119]  Cornerstone asserts that the claim language

7    "wherein the twisted steel fiber meets the following criteria" must not be

8    rewritten as "wherein the twisted steel fiber *in a concrete matrix* meets the

9    following criteria."[120]

10        In their respective replies, Helix reiterates its arguments,[121] and

11   Cornerstone does not address this limitation.[122]

12        The Court incorporates by this reference its analyses regarding the

13   "elastic, perfectly plastic" limitation and the preamble.  Applying those analyses

14   here, the Court concludes that this term indefinite because it describes a

15   physical impossibility—the twisted steel fibers cannot have a strain capacity

16   increase requirement.

---

[118]    *Id.* at 23:11-13 (emphasis added).

[119]    Defendant's Opening Brief 19:16-18.

[120]    *Id.* at 19:20-26 (emphasis added).

[121]    *See generally* Plaintiff's Responsive Brief at 13:3-25.

[122]    *See generally* Defendant's Responsive Brief.

## J.     Meaning of "Twisted Steel Fiber Crack Width, Sa"

| Limitation at Issue | |
|---|---|
| "twisted steel fiber crack width, Sa" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| "design crack width Sa when using twisted steel fibers in the concrete matrix (where Sa is defined in Equation 1)" | Indeterminate and Indefinite |

The parties dispute whether this term is indefinite. Helix argues that the claim language "defines Sa as the design crack width."[123] Further, Helix contends that a POSA would "understand[] that the reference to 'twisted steel fiber crack width Sa' is a reference to the design crack width of the twisted steel fiber reinforced concrete matrix," not the twisted steel fiber standing alone, which is supported by the specification.[124]

Cornerstone responds that this limitation is indefinite.[125] Cornerstone rejects Helix's expert's proposal "to equate 'twisted steel fiber crack width, Sa' with the 'Sa (design crack width) of the test specimen' disclosed elsewhere in claim 3."[126] Cornerstone argues instead that different terms are presumed to have different meanings.[127]

The parties reiterate their respective arguments in their reply papers.[128]

As stated above with reference to the "Load Carried/Maximum Load" limitation, the specification uses "twisted steel fiber crack width" as

---

[123]     Plaintiff's Opening Brief 24:4.
[124]     *Id.* at 24:8-18.
[125]     Defendant's Opening Brief 23:10-11.
[126]     *Id.* at 23:14-16.
[127]     *Id.* at 23:16-19.
[128]     *See generally* Plaintiff's Responsive Brief 14:1-15; Defendant's Responsive Brief 14:17-27.

1 synonymous or interchangeable with "design crack width"; thus, the

2 presumption that different claim terms have different meanings is overcome

3 when "the evidence indicates that the patentee used the two terms

4 interchangeably." *Baran*, 616 F.3d at 1316.

5      Accordingly, setting aside the fact that Sa cannot be calculated for the

6 reasons explained above, the Court construes "twisted steel fiber crack width,

7 Sa" as having its plain and ordinary meaning.

8 **K.**      **Meaning of the "Equivalent Diameter" Limitation**

| Limitation at Issue | |
|---|---|
| "d=equivalent diameter of the twisted steel fiber, inches (mm)" ('881 Patent, Claim 3) | |
| **Helix's Proposed Construction** | **Cornerstone's Proposed Construction** |
| Plain and ordinary meaning (which is "the diameter of the twisted steel fibers") | Indeterminate and Indefinite |

16     The parties dispute whether this term is indefinite.  Helix argues that

17 plain and ordinary meaning applies and that a POSA would understand this term

18 from the plain language of the claim and the specification.[129]  Helix also asserts

19 that a POSA would understand that this claim term uses "equivalent" because

20 "the steel fibers are twisted, no longer round raw material wire."[130]  Thus, Helix

21 contends that "a POSA experienced in the design and characterization of

22 reinforced concrete understands that industry practice dictates that the

23 equivalent diameter of twisted steel fibers in Claim 3 is the diameter of the raw

24 material wire."[131]

---

[129]     Plaintiff's Opening Brief 25:1-5.

[130]     *Id.* at 25:6-7.

[131]     *Id.* at 25:9-12.

1    Cornerstone asserts that this term is indefinite because "[t]he antecedent
2    basis for 'the twisted steel fiber' in this limitation is unclear, as there are
3    multiple fibers referenced previously in the claim," including (1) "[a] micro
4    reinforcement comprised of a twisted steel fiber"; and (2) "a minimum number
5    of twisted steel fiber samples."[132]  Additionally, because equivalent diameter can
6    be defined "by both perimeter and by cross-sectional area," Cornerstone argues
7    that this term does not provide a reasonable degree of certainty because using
8    each of those definitions would result in two different numbers for "d."[133]
9    Cornerstone rejects Helix's proposal as improperly reading the word
10   "equivalent" out of this limitation and contrary to Helix's expert's proposal for
11   providing a third way of measuring diameter.[134]

12       Helix replies that "'equivalent diameter' is a term commonly used and
13   well known in the reinforced concrete arts."[135]  That is, applying the governing
14   industry standard, Helix contends that, "for drawn wire fibers (Type I) like the
15   twisted steel fibers in Claim 3," a POSA would understand that "equivalent
16   diameter is the actual diameter of the raw material wire."[136]

17       Cornerstone responds that Helix ignores the fact that the specification
18   "incorporates by reference two possible ways to calculate the 'equivalent
19   diameter' of the twisted-steel-fiber micro reinforcements," including "an
20   equivalent diameter that applies the wire's pre-flattening cross-sectional area or
21   [its] perimeter."[137]

22
23
───────────────
24   [132]   Defendant's Opening Brief 23:26-24:4 (citing '881 Patent 10:20, 10:35–
     36).
25   [133]   *Id.* at 23:5-12.
26   [134]   *Id.* at 25:3-18.
27   [135]   Plaintiff's Responsive Brief 14:20-21.
     [136]   *Id.* at 14:24-15:2.
28   [137]   Defendant's Responsive Brief 13:4-5 & 13:24-25.

In its Tentative Ruling, the Court asked Helix to address at the hearing the discrepancy between the two definitions seemingly incorporated by reference (*i.e.*, measuring equivalent diameter via pre-flattening cross-sectional area versus the perimeter of the wire).  At the hearing, Helix argued that the '881 Patent does not incorporate by reference the methods of calculating equivalent diameter from the Naaman Patents.[138]  That is because, Helix contends, the '881 Patent merely references the Naaman Patents; the '881 Patent does not incorporate their calculations by reference.

The Court agrees with Helix.  In the invention Summary, the '881 Patent explains that "[t]he present disclosure provides a micro reinforcement concrete system that uses twisted steel fibers (such as those disclosed in U.S. Pat. Nos. 6,060,163 and 5,989,713 and PCT Application No. PCT/US2012/055567 [*i.e.*, the Naaman Patents], each of which is herein incorporated by reference) along with a way to characterize its tensile performance and develop designs that are reliable and more economical than typical steel fiber concrete."[139]

Although that passage incorporates by reference twisted steel fibers such as those disclosed in the Naaman Patents, it does not incorporate and apply every aspect of those patents to the instant disclosure.  More specifically, the '881 Patent does not "identify with detailed particularity what specific material it incorporates [such as calculations for equivalent diameter] and clearly indicate where that material is found" in the Naaman Patents.  *Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1346 (Fed. Cir. 2009) (quotation marks omitted).

With that dispute resolved, the Court concludes that a POSA would understand this limitation by its plain and ordinary meaning.  At the hearing, Helix persuasively argued that the industry standard found in ASTM A820

---

[138]   Helix Slides, Slide 67.

[139]   '881 Patent 2:7-14.

provides that meaning.  That Standard Specification for Steel Fibers for Fiber-Reinforced Concrete explains that for "cold drawn wire"—such as that used to make the twisted steel fiber reinforcements—the "cross-sectional area used to compute $f_u$ [average tensile strength] shall be . . . the area calculated from the actual diameter of the parent source material or finished fiber."[140]

Accordingly, the Court construes "equivalent diameter" as having its plain and ordinary meaning.

## V.  CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** as follows:

1.      The Court construes the single undisputed limitation and the nine disputed limitations as follows:

| Limitation | Construction |
|---|---|
| "bilateral truncated circle" ('970 Patent, Claim 1) | "Shape somewhat like a rectangle only with two opposing flat sides and rounded sides, it may be thought of as a rectangle with two rounded opposite ends" |
| "dominant crack" ('881 Patent, Cl. 3) | "The largest crack that becomes the failure plane" |
| "elastic, perfectly plastic behavior" ('881 Patent, Cl. 3) | Indefinite |
| "strain capacity" ('881 Patent, Cl. 3) | "The ability to stretch or deform under tensile stress until dominant crack formation" |
| "post-crack tensile stability" ('881 Patent, Cl. 3) | Plain and ordinary meaning |
| "a load carried at Sa (design crack width) of the test specimen divided by the maximum load after 0.01 in displacement" ('881 Patent, Cl. 3) | Indefinite |

---

[140]     Helix Slides, Slide 65 (quoting ASTM A820).

| Limitation | Construction |
|---|---|
| "A micro reinforcement comprised of a twisted steel fiber having . . . , wherein the twisted steel fiber meets the following criteria:" ('881 Patent, Cl. 3 preamble) | "A micro reinforcement comprised of a twisted steel fiber" means just the micro reinforcement, not the concrete matrix in which it is placed. |
| "wherein the twisted steel fiber meets the following criteria:<br><br>    a. a strain capacity increase requirement . . . " ('881 Patent, Cl. 3) | Indefinite |
| "twisted steel fiber crack width, Sa" ('881 Patent, Cl. 3) | Plain and ordinary meaning |
| "d=equivalent diameter of the twisted steel fiber, inches (mm)" ('881 Patent, Cl. 3) | Plain and ordinary meaning |

2.      A Status Conference is **SET** for January 20, 2023, at 9:00 a.m. in Courtroom 9D of the Ronald Reagan Federal Building and U.S. Courthouse, 411 W. 4th Street, Santa Ana, California.

**IT IS SO ORDERED.**

Dated: ___January 3, 2023_____      _____
John W. Holcomb
UNITED STATES DISTRICT JUDGE

-41-